# JOHN DOE

PO Box #250050<br>
New York, NY 10025<br>
(917) 450-9050

**Direct Dial: (917) 450-9050**
**Direct Email: johndoe.casemail@gmail.com**

<u>VIA ECF</u>                                           April  28, 2026
The Honorable Robyn F. Tarnofsky
United States District Court
Southern District of New York
500 Pearl Street, Room 703
New York, NY 10007

**Re:**    ***Doe v. Columbia University*** **No. 1:25-cv-02132-DEH-RFT**

Dear Judge Tarnofsky:

 I write as Plaintiff in the above-referenced matter to respectfully respond in opposition to non-party Jane Roe's application at ECF 191 seeking a court order directing Plaintiff to reimburse Ms. Roe's purported e-discovery vendor costs of $$8,418.68[1] purportedly incurred pursuant to Ms. Roe's partial compliance with a subpoena that Plaintiff served on Jane Roe for the production of documents. For all of the reasons stated below, and because (a) discovery in this action is stayed (b) Ms. Roe has not fully complied with the subpoena and Ms. Roe's production is incomplete, (c) Ms. Roe is an interested non-party with a stake in the outcome of this litigation (d) Ms. Roe's own conduct contributed to the purported fees incurred (e) $8,418.68  in fees is unreasonable (f) there is no legal authority that supports Ms. Roe's application to shift $8,418.68  in fees to Plaintiff for a 76-page production of documents and (g) the equities in this case demand that Ms. Roe bear her own e-discovery costs and fees of compliance, Ms. Roe's application should be **denied.**

## I.    FACTUAL BACKGROUND

 On June 16, 2026 this Court issued an order permitting Plaintiff to serve a subpoena duces tecum on Jane Roe seeking production of communications documents between Ms. Roe and Mack Roe related to Plaintiff's GBM proceeding. ECF 71. On June 20, 2025, Attorney Molly K. Webster[2] of the law firm Krieger Kim & Lewin LLP ("KKL") informed Plaintiff via email that Ms. Webster  represented Jane Roe with respect to receiving service of, and responding to any subpoena served by Plaintiff on Jane Roe seeking the production of documents under subpoena.

---

[1] "Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.' " *see In re Aggrenox Antitrust Litig.,* No. 3:14-MD-02516 (SRU), 2017 WL 4679228, at *10 (D. Conn. Oct. 18, 2017) "In particular, non-parties should not be permitted to run up bills merely because they expect "someone else [to] pay[the] the tab." *Id.*

[2] Plaintiff  notes, that Ms. Webster, is a former colleague of Gabrielle E. Tenzer — counsel for Defendant Columbia University in this action — at the law firm formerly known as Kaplan Hecker & Fink LLP. While it is still unclear as to who retained Ms. Webster for Ms. Roe, or as to Ms. Webster's cost agreement with Ms. Roe, it is clear that Ms. Webster's and Ms. Roe's interests in this action closely align with those of Defendant Columbia University.

1

On September 22, 2025 Plaintiff served Jane Roe with a subpoena duces tecum issued by this Court, on counsel for Jane Roe, directed at Jane Roe for the production of documents. Specifically, Plaintiff sought Jane Roe's production of the following categories of documents under a subpoena issued by this Court:

(a) ***Category #1:*** All communications limited to text messages, WhatsApp messages, voice note messages, emails, and recorded phone calls with associated metadata including the date and time stamps of said communications between Jane Roe and Mack Roe between the dates of April 23, 2022 and June 5, 2024 that relate in any way to [Plaintiff] in the gender-based misconduct proceeding, [Jane Roe's] gender-based misconduct allegations generally against [Plaintiff], [Jane Roe's] allegations against [Plaintiff] generally, and [Jane Roe's] own respective involvement as a Complainant, Witness, or Respondent in the gender-based misconduct investigation and proceeding, and collectively, and [Jane Roe's] and [Mack Roe's] joint and collective involvement in Columbia University's gender-based misconduct investigation and proceeding involving [Plaintiff]

(b) ***Category #2:*** [Jane Roe's] telephone call log sufficient to identify, evidence, or memorialize any and all telephonic communications between [Jane Roe] and [Mack Roe] during the period of April 23, 2022 through June 5, 2024, including but not limited to call detail records, call logs, internal billing or routing records, metadata, or other records reflecting the date, time, duration, participants, and originating/receiving telephone numbers associated with each such communications.

On October 27, 2025, Plaintiff met and conferred with Ms. Webster related to the scope and potential cost of production. Ms. Webster informed Plaintiff that there were two (2) options for production. Option 1 involved the production of documents in PDF format without metadata, and Option 2 involved the production of documents in native format with metadata. Ms. Webster informed Plaintiff that production of documents in native file format would cost approximately $2,000.00 to $3,000.00 for *full production* of 25 months of communications documents in native format with metadata, and that production of documents in PDF format with no metadata would "cost somewhat less". Plaintiff informed Ms. Webster that Plaintiff considered $2,000.00 to $3,000.00 for native *production* of 25 months of communications documents with metadata "reasonable" and agreed to pay $2,000.00 to $3,000.00 insofar as Ms. Webster agreed to produce a privilege log along with the production sufficient to identify all communications withheld on the basis of "relevance" or "privilege" in the event that an *In Camera* review of the privilege log was warranted[3]. Ms. Webster agreed to produce the requested documents as well as a privilege log

---

[3] This Court should note, that in the underlying disciplinary proceeding giving rise to this action, Jane Roe refused to provide these very communications to Columbia upon request, on the grounds that they were not relevant, and "not necessary" to the GBM proceeding. Turns out, the communications were highly relevant and necessary to the GBM proceeding, and revealed the extent of Jane Roe's false statements to Columbia, impermissible coordination and collusion with Mack Roe, and multiple violations of Columbia's GBM Policy and Student Conduct Policy over a 2-year period in connection with Jane Roe's sexual misconduct allegations against Plaintiff, and Plaintiff's GBM proceeding at issue in this lawsuit. Plaintiff's position on the privilege log was — and still remains — that it should not be (a) up to Jane Roe, an adverse non-party who previously withheld these documents, and who has invested

2

sufficient to identify all communications withheld on the basis of "relevance" or "privilege, but that Jane Roe would not consent to an *in camera* review of any documents withheld due to "relevance" or privilege, and that Jane Roe would oppose any application by Plaintiff for an *in camera* review by the Court. and the parties agreed that Plaintiff would pay *reasonable* costs upon *full* compliance of Jane Roe's production of the documents requested by Plaintiff under subpoena. Ms. Webster agreed that Jane Roe would not seek from Plaintiff, (a) attorney's fees associated with the production or (b) fees associated with collection and review of documents subject to production. **The *only* costs that the parties agreed that Plaintiff would pay, are *reasonable* costs of Jane Roe's full production when the production was *fully* complete.**

Five (5) months later, on February 3, 2026, after an exhaustive amount of motion practice, including conferences and motions to compel related to Jane Roe's repeated refusals to comply with the subpoena, **Jane Roe produced 76 pages of documents to Plaintiff.** The document production was missing voluminous amounts of communications between Jane Roe and Mack Roe during the specified time period requested to the tune of 23 months missing out of 25 months, and did not include a privilege log sufficient to identify all communications withheld on the basis of relevance or privilege as the parties had agreed. For example the following gaps and 23 out of 25 months of communications withheld by Ms. Roe are highly evident in Jane Roe's production[4]:

April 28, 2022 —  June 12, 2022  **1.5 months of documents <u>WITHHELD</u>**
July 7, 2020 — September 12, 2022  **2.5 months of documents <u>WITHHELD</u>**
November 4, 2022 — August 7, 2023  **9 months of documents <u>WITHHELD</u>**
August 15, 2023 — January 8, 2024  **5 months of documents <u>WITHHELD</u>**
January 8, 2024 — April 2, 2024 **3 months of documents <u>WITHHELD</u>**
April 2, 2024 — June 5, 2024 **2 months of documents <u>WITHHELD</u>**
April 23, 2024 — June 5, 2025  **<u>24/25 Total Months of documents WITHHELD</u>**

Thereafter, Plaintiff sent an email to Ms. Webster requesting compliance with Category #2 of the Subpoena, which requested the production of Jane Roe's call-log sufficient to identify all telephonic communications between Jane Roe and Mack Roe between the relevant time period. Ms. Webster objected. In response, Plaintiff requested a meet and confer with Ms. Webster per protocol, prior to any motion practice over the dispute. On February 10, 2026 Plaintiff attempted to meet and confer with Ms. Webster, and the first words out of Ms. Webster's mouth was

---

interest in maintaining the status quo with respect to the findings against Plaintiff — the very findings that Plaintiff seeks to reverse through this lawsuit and/or (b) be up to Ms. Webster, counsel for Jane Roe, who continues to contend that none of the communications are "relevant" to this action and should never have been ordered by the Court to be produced in the first place to determine which communications are "relevant" and responsive to Plaintiff's subpoena ,and which communications are not. Accordingly, relevancy should be determined by Plaintiff and the Court.

[4] Given the pattern of Jane Roe's communications with Mack Roe already established in the communications that were produced by Jane Roe, it is highly unlikely that Jane Roe and Mack Roe did not exchange relevant and responsive communications for nearly 23 months — nearly the entire duration of Plaintiff's disciplinary proceeding. Given Jane Roe's posture in this litigation, and the aggressive manner in which counsel for Jane Roe has acted with respect to producing these communications Plaintiff respectfully submits that Ms. Webster, on behalf of Jane Roe, who seeks to "zealously advocate" for Jane Roe's interests in maintaining the status quo with respect to the findings against Plaintiff — the very findings that Plaintiff seeks to reverse in this lawsuit should not be trusted to put her zealous advocacy of Jane Roe's interests in this litigation aside and be impartial in determining which documents to produce.

3

something to the effect of "Mr. Doe, I am only doing this call because its required by the rules. I am not budging" and stated that Jane Roe would not produce a call log, or a privilege log. In response, Plaintiff noted that the production appeared insufficient and that nearly 23 out of 25 months of communications were missing from the production, and that the accompanying privilege log was previously agreed to by the parties. Ms. Webster then informed Plaintiff that the "gaps" in the communications accounted for communications documents that Ms. Roe deemed "not relevant" to the litigation, and was withholding[5] on that basis. Ms. Webster informed John Doe that no communications documents were withheld by Jane Roe on the basis of "privilege"— only "relevance", and that neither the privilege log o call log would be produced. In an effort to resolve the dispute without additional motion practice, Plaintiff again proposed an *in camera* review by the Court of the documents withheld on "relevance" grounds. Ms. Webster *strongly* objected, informing John Doe that Ms. Webster "was an experienced lawyer" and that John Doe "should just take her word for it", and that if John Doe wanted Jane Roe to produce a privilege log or call log, Plaintiff should "file a motion with the Court". The "meet and confer" ended shortly thereafter.

On February 18, 2026 Plaintiff filed a motion for a pre-motion conference related to Jane Roe's refusal to comply with the subpoena with respect to Jane Roe's production of a call log *see* ECF 163. Jane Roe opposed. On February 27, 2026 this Court held a conference to discuss Plaintiff's 163 motion. Thereafter, on February 27, 2026 this Court issued an Order directing "Counsel for Jane Roe shall produce a log of all calls between Jane Roe and Mack Roe on days on which either Jane Roe or Mack Roe was interviewed by Columbia" *see* ECF 170. Thereafter, between February 27, 2026 and March 18, 2026 Plaintiff sent multiple requests for a status update to Ms. Webster, in relation to when Jane Roe would make her production of the call log pursuant to the Court's 170 Order — to which Ms. Webster never responded.

On March 23, 2026 Judge Ho issued an Opinion and Order (ECF 188) dismissing the complaint without prejudice — granting Plaintiff leave to file a motion for leave to file an amended complaint identifying the issues identified by the Court in the Court's 188 Opinion and Order. This Court also adjourned all scheduled hearings *sin die* and stayed discovery pending Plaintiff's filing of a new operative complaint *see* ECF 189. Immediately thereafter, on March 24, 2026, Ms. Webster sent Plaintiff an email attached to several invoices from "epicglobal.com"('Epiq") a — according to their website, a "tenured" "worldwide" and "battle-tested" e-discovery advisory platform — totaling **$8,418.68**. Ms. Webster indicated, that, due to Judge Ho's dismissal of the Complaint,  Plaintiff owed **$8,418.68** to Ms. Webster's law firm KKL for costs reimbursement related to Jane Roe's partial compliance with the subpoena — **more than triple the $2,000.00 to $3,000.00 that Ms. Webster had quoted to Plaintiff** for Jane Roe's **full** production of native file documents with metadata. Despite Ms. Webster having actual knowledge that the purported e-discovery costs and fees were rapidly increasing far beyond what Ms. Webster had originally quoted to Plaintiff, Ms. Webster did not — at any time, provide any such notice of increasing costs to Plaintiff or give Plaintiff the opportunity to object to the costs.

---

[5] This Court should note, that in the underlying disciplinary proceeding giving rise to this action, when Jane Roe was represented by counsel *entirely* at Columbia's expense, Jane Roe withheld these very communications from both Plaintiff and Columbia upon request, on the grounds that they were not relevant, and "not necessary"  to the GBM proceeding. Turns out, the communications were highly relevant and necessary to the GBM proceeding, and revealed the extent of Jane Roe's false statements to Columbia, impermissible coordination and collusion with Mack Roe, and multiple violations of Columbia's GBM Policy and Student Conduct Policy over a 2-year period in connection with Jane Roe's sexual misconduct allegations against Plaintiff, and Plaintiff's GBM proceeding at issue in this lawsuit.

4

Upon Plaintiff's review of the Epiq invoices submitted as Exhibit 7 to ECF 191, Plaintiff observed the following: *First,* no fewer than 22 billing task descriptions across the three Epiq invoices that had been redacted by Ms. Webster on the grounds of "attorney work product" making it impossible for Plaintiff and this Court to verify the nature of the tasks,  and whether the tasks were necessary to comply with the subpoena. The redactions effectively conceal critical information relevant to evaluating compliance with the subpoena, and to the instant dispute related to the costs of compliance *see* Ex. 1 to ECF 191 (March 24, 2026 email from Ms. Webster stating that redacted portions "represent attorney work product"). Among those redactions were the following:

**Entry 1 — December 29, 2025** *"Coordination with sales and other required departments as per the requirement of Molly Webster* **[REDACTED]**\*\**; getting information on cost estimates* **[REDACTED]**\*\*" **Concealing: Actual cost estimates and pricing information obtained from Epiq at Ms. Webster's direction).**

**Entry 2 — December 29, 2025** *"Email communications with Molly Webster* **[REDACTED]**\*\*" **Concealing: Specific instructions from Ms. Webster to Epiq regarding scope and operational directives.**

**Entry 3 — December 29, 2025** *"Project Kick-off Meeting with Molly and Team; Correspondence with Internal team* **[REDACTED]**\*\*" **Concealing: Substance of the kick-off meeting and Ms. Webster's instructions to the Epiq team about scope, timeline, and processing preferences.**

**Entry 4 — December 31, 2025** *"Creation of Custodian reference file for staged data* **[REDACTED]**\*\*" **Concealing: The specific data categories, file types, and document volumes staged for processing.**

**Entry 5 — January 14, 2026** *"As per the request of Molly Webster performed native export* **[REDACTED]**\*\*" **Concealing: The identity of the specific documents natively exported at Ms. Webster's direction.**

**Entry 6 — January 14, 2026** *"As per the request of Molly Webster performed PDF export in searchable format in individual files for documents* **[REDACTED]**\*\*" **Concealing: The identity of the first of four separate PDF document sets exported on January 14 at Ms. Webster's direction.**

**Entry 7 — January 14, 2026** *"As per the request of Molly Webster performed PDF export in searchable format in individual files for documents* **[REDACTED]**\*\*" **Concealing: The identity of the second of four PDF document sets exported on January 14.**

**Entry 8 — January 14, 2026** *"As per the request of Molly Webster performed PDF export in searchable format in individual files for documents*

5

*[REDACTED]\*\*"* **Concealing: The identity of the third of four PDF document sets exported on January 14.**

**Entry 9 — January 14, 2026** *"As per the request of Molly Webster performed PDF export in searchable format in individual files for documents [REDACTED]\*\*"* **Concealing: The identity of the fourth of four PDF document sets exported on January 14.**

**Entry 10 — January 26, 2026** *"Identified the documents [REDACTED] and followed by creating the 2L review batchset as requested by the client"* **Concealing: The search criteria or document tags used to identify documents for second-level review.**

**Entry 11 — January 27, 2026** *"Email communication with Molly Webster to [REDACTED] and checked with the project management team for availability and later shared teams invite"* **Concealing: The purpose of the meeting being scheduled between Ms. Webster and the Epiq project management team.**

**Entry 12 — January 27, 2026** *"Identified the extended metadata coding layout fields and added the RSMF fields to it to [REDACTED] as per the request of Molly Webster"* **Concealing: The specific purpose for which RSMF metadata fields were being added to the review platform layout at Ms. Webster's direction.**

**Entry 13 — January 27, 2026** *"Email communication with Molly Webster regarding [REDACTED] production to be done by Friday"* **Concealing: The identity of the specific production set or document category that was due by Friday.**

**Entry 14 — January 28, 2026** *"Email communication with Julia B. Stahlman regarding the [REDACTED]\*\*"* **Concealing: What a second, previously undisclosed KKL attorney was working on in the Relativity platform at Plaintiff's expense.**

**Entry 15 — January 28, 2026** *"Team call with Molly Webster & Julia B. Stahlman to provide them Relativity training [REDACTED]\*\*"* **Concealing: The specific Relativity features and workflows Ms. Webster and Ms. Stahlman were trained on at Plaintiff's expense.**

**Entry 16 — January 29, 2026** *"Email communication with Molly Webster regarding [REDACTED] and updated the required permissions"* **Concealing: Which users or document sets had their platform permissions updated, and why.**

**Entry 17 — January 29, 2026** *"Performed imaging for the documents [REDACTED] to be later exported in PDFs"* **Concealing: The identity of the documents being imaged for yet another round of PDF exports on January 29.**

6

**Entry 18 — January 29, 2026** *"Created a search for documents [REDACTED] and shared with Molly Webster"* **Concealing: The actual search query used to identify documents, revealing the criteria Ms. Webster used to determine which documents to produce and which to withhold from Plaintiff.**

**Entry 19 — January 29, 2026** *"Email communication with Molly Webster [REDACTED] and perform PDF export"* **Concealing: Ms. Webster's specific instructions for what documents to export and in what format.**

**Entry 20 — January 29, 2026** *"Performed PDF export of documents [REDACTED] along with once native export as per the request of Molly Webster"* **Concealing: The identity of the documents exported in both PDF and native format at Ms. Webster's direction.**

**Entry 21 — January 29, 2026** *"Performed QC on the PDF export of documents [REDACTED] and delivered to Molly Webster via a secure link"* **Concealing: The identity of the specific documents delivered to Ms. Webster by Epiq via secure link that have not been produced to Plaintiff.**

**Entry 22 — February 3, 2026** *"Prepared the custom sort order [REDACTED] for production volume PROD001"* **Concealing: The custom sort criteria applied to the document production that was delivered to Plaintiff.**

***Second,*** the Epiq invoices reflect *extensive* billing by an astounding fourteen (14) individual Epiq personnel and paralegals at exorbitant rates — rates that far exceed the "reasonableness" much less "typical" standard for administrative fees approved by Courts in this district *see 28th Highline Assocs., LLC v. Roache*, No. 18-CV-1468, 2019 WL 10632851, at *6 (S.D.N.Y. July 29, 2019) (holding that "[a] paralegal rate of $195 per hour is high compared to rates approved in the [Southern]District [of New York]" and that "a rate of $100.00 per hour per paralegal is appropriate." and capping costs at a rate of $100 per hour per paralegal.

***Third,*** the time detail reflects that Epiq's mobile device collection was rescheduled on at least three separate occasions — December 16, 17, 18, and 22, 2025 — with Epiq personnel billing hourly on each occasion for "setup for MDEC collection that was rescheduled." ***Fourth*** the invoices reflect that Epiq's "Project Kick-off Meeting" to discuss project requirements and specifications did not occur until December 29, 2025 — thirteen days *after* collection had already begun on December 16, 2025. Multiple Epiq personnel billed for that meeting and the surrounding correspondence. ***Fifth,*** the invoices reflect the following billing rates charged by Epiq: ESI Collection at **$275.00 per hour**; Forensic Project Manager at **$195.00 per hour**; Client Services Project Manager I at **$195.00 per hour**; Client Services Project Manager II at **$195.00 per hour**; and Technical Analyst/Litigation Support at **$175.00 per hour**. Mobile Device Extraction Collection (MDEC) at a flat fee of **$1,325.00**. The three Epiq invoices include multiple project managers billing concurrently on the same dates for what appear to be overlapping tasks.

7

***Sixth***, and notably, the unredacted billing entries in the time detail reveal a striking and consistent pattern: virtually every task performed by Epiq personnel was performed expressly *"as per the request of Molly Webster," "as per the requirement of Molly Webster,"* or *"per the instructions of Molly Webster."* This repeated attribution confirms that the scope, direction, and relentless accumulation of these costs was driven entirely by Ms. Webster's preferences and directives, not by any legitimate requirement of the subpoena itself. Plaintiff did not retain Epiq. Plaintiff did not instruct Epiq. Plaintiff had no role or say whatsoever in shaping the work Epiq performed. Yet Plaintiff is now being asked to bear the full financial consequences of choices executed exclusively at Ms. Webster's direction. That result is neither equitable nor supported by law. **Seventh**, the time detail reflects that on **December 29, 2025**, Epiq billed Ms. Webster for "getting information on cost estimates: when Ms. Webster had already quoted Plaintiff a production cost of **$2,000.00-$3,000.00** nearly two months earlier on November 7, 2025. This redundancy suggests that either either (a) the earlier estimate provided to Plaintiff was not the product of any meaningful analysis, or (b) that Epiq was performing duplicative work — neither of which provides a basis for shifting those costs to Plaintiff.

## II.    LEGAL STANDARD

The law is clear. "Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *In re Aggrenox Antitrust Litig.,* No. 3:14-MD-02516 (SRU), 2017 WL 4679228. *See also United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014) "Rule 45 only protects non-parties from "*significant* expense resulting from compliance," *In re Aggrenox Antitrust Litig.,* No. 3:14-MD-02516 (SRU), 2017 WL 4679228. "In particular, non-parties should not be permitted to run up bills merely because they expect "someone else [to] pay[the] the tab." *Id. see also  Cf. Gumbhir v. Curators of Univ. of Mo.*, 157 F.3d 1141, 1146 (8th Cir. 1998); *Medcom Holding Co. v. Baxter Travenol Labs.*, 200 F.3d 518, 521 (7th Cir. 1999) "[a] non-party may be required to absorb a non-significant portion of its expenses, particularly "where the equities of the particular case demand it." *In re Aggrenox Antitrust Litig.,* No. 3:14-MD-02516 (SRU), 2017 WL 4679228. "Fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *Id see also N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1139 (2d Cir. 1983).

## III.    DISCUSSION

### A.  Jane Roe's Application is premature, as Discovery is Stayed Pending a Ruling From The Court, and Ms. Roe Has not Fully Complied With the Subpoena.

As a preliminary matter, the parties' agreement is unambiguous: payment of costs is due "90 days after ***full compliance*** with the subpoena" or within 90 days of any resolution of disputes related to the costs *See* Ex. 6 to ECF 191. *Here,* full compliance has not occurred. Jane Roe has not produced the agreed-upon privilege log of the voluminous documents that Jane Roe has withheld on "relevance" grounds,  nor has Ms. Roe produced a call log in compliance with the Court's Order on February 27, 2026 (ECF 170). This alone should end the inquiry. Until Ms. Roe achieves full compliance with the subpoena—including producing a privilege log sufficient to identify the voluminous documents withheld by Ms. Roe on the basis of "privilege", and the Court-

ordered call log production—the 90-day payment clock has not started, and Plaintiff is under no obligation to pay anything. Ms. Webster's own November 7, 2025 correspondence acknowledges that the $2,000 production estimate did not include the cost of the call log collection and production, confirming that costs associated with the subpoena are not final. *See* Ex. 5 to ECF 191.

Moreover, on March 23, 2026, this Court stayed all discovery unless and until a new operative complaint is filed. ECF No. 189. It would be inconsistent with the spirit and purpose of the Court's discovery stay to require Plaintiff to litigate and pay costs related to a discovery dispute arising out of a now-stayed proceeding. Plaintiff respectfully submits that, consistent with the terms of the parties' agreement, any cost disputes related to the subpoena should be addressed after the Court's decision on Plaintiff's discovery resumes and after Ms. Roe achieves full compliance with the subpoena, including the production of the Court-ordered call log.

### B. The Purported Epiq Costs are Unnecessary and Unduly Expensive Services That did not Result From Compliance With the Subpoena and are therefore not Recoverable under Federal Rule of Civil Procedure 45(d)(2)(B)(ii))

Federal Rule of Civil Procedure 45(d)(2)(B)(ii) provides that, on timely motion, a court must protect a person subject to a subpoena from "significant expense resulting from compliance." The operative phrase is critical: *resulting from compliance.* As courts in this district and others have made pellucidly clear, Rule 45 "does not cut a blank check to non-parties — unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-02516 (SRU), 2017 WL 4679228. Non-parties "should not be permitted to run up bills merely because they expect 'someone else [to] pay the tab.'" *Id.* The $8,418.68 that Ms. Roe now seeks to shift to Plaintiff is precisely the kind of unnecessary, unduly expensive, and self-directed spending that Rule 45 does not protect — and that this Court should decline to award.

### 1. Ms. Webster Drove the Scope and Cost of Epiq's Work Exclusively Through Her Own Directives, Not Through the Requirements of the Subpoena.

The most striking feature of the Epiq billing records is also the most damning: virtually every task performed by Epiq personnel was performed expressly *"as per the request of Molly Webster," "as per the requirement of Molly Webster,"* or *"per the instructions of Molly Webster."* This is not a minor or incidental observation — it goes to the heart of whether these costs "resulted from compliance" with the subpoena, as Rule 45 requires. They did not. They resulted from compliance with Ms. Webster's own preferences, directives, and operational choices.

Plaintiff did not retain Epiq. Plaintiff did not instruct Epiq. Plaintiff had no role whatsoever in shaping the scope, methodology, or volume of the work that Epiq performed. The subpoena itself — targeted, specific, and limited in scope — called for the production of communications between Jane Roe and Mack Roe during a defined 25-month window, and Jane Roe's telephone call logs for the same period. Nothing in the subpoena required Ms. Webster to retain a worldwide e-discovery platform, stage documents in a Relativity review environment, conduct multiple rounds of PDF and native exports, train two separate KKL attorneys on the Relativity platform at Plaintiff's expense, or generate second-level review batchsets — all of which appear in the Epiq

invoices. These were choices — Ms. Webster's choices — and the financial consequences of those choices cannot now be offloaded onto Plaintiff simply because the case has been stayed.

Indeed, the billing records reveal that the accumulation of costs was not only driven by Ms. Webster's directives, but driven *without any notice to Plaintiff whatsoever.* Despite having actual knowledge that the purported e-discovery costs were rapidly ballooning far beyond the $2,000.00–$3,000.00 that Ms. Webster herself had quoted to Plaintiff for full native production with metadata, Ms. Webster did not — at any point — alert Plaintiff to the escalating costs, provide Plaintiff with interim invoices, or give Plaintiff any opportunity to object. A non-party who silently runs up costs it expects a subpoenaing party to absorb — without notice, without consent, and without any nexus to the actual requirements of the subpoena — is not entitled to recover those costs under Rule 45. *In re Aggrenox Antitrust Litig.*, 2017 WL 4679228; *see also United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014).

### 2.  The Billing Records Reflect Pervasive Redundancy, Inefficiency, and Work That Bears No Rational Relationship to the Scope of the Subpoena.

The specific line items in the Epiq invoices independently confirm that these costs are not the product of reasonable and necessary compliance efforts. First, Epiq's mobile device collection was rescheduled on at least four separate occasions — December 16, 17, 18, and 22, 2025 — with Epiq personnel billing at hourly rates on each occasion for "setup for MDEC collection that was rescheduled." The cost of that organizational dysfunction — whatever its cause — cannot be passed to Plaintiff. Second, Epiq's own "Project Kick-off Meeting," during which project requirements and specifications were discussed, did not occur until December 29, 2025 — a full thirteen days *after* collection had already begun on December 16, 2025. The fundamental inversion of that sequence — collecting before scope was even defined — reflects a process designed around Ms. Webster's convenience, not around the efficient and economical satisfaction of Plaintiff's subpoena. Third, and perhaps most illustrative of the broader problem, on December 29, 2025, Epiq billed Ms. Webster for time spent *"getting information on cost estimates"* — the precise exercise that Ms. Webster had already completed, and communicated to Plaintiff, nearly two months earlier on October 27, 2025, when Ms. Webster quoted a production cost of $2,000.00–$3,000.00 for native production with metadata.

Fourth, the invoices reflect billing by an astounding fourteen (14) individual Epiq personnel — including multiple project managers billing concurrently on the same dates for what appear to be overlapping tasks — at rates that far exceed those approved as reasonable in this district. *See 28th Highline Assocs., LLC v. Roache*, No. 18-CV-1468, 2019 WL 10632851, at *6 (S.D.N.Y. July 29, 2019) (holding that a paralegal rate of $195 per hour "is high compared to rates approved in the [Southern] District [of New York]" and that "a rate of $100.00 per hour per paralegal is appropriate"). The volume of personnel deployed, and the rates at which they were billed, bear no relationship to the modest and targeted scope of Plaintiff's subpoena.

Taken together, these are not isolated billing anomalies. They describe a pattern — and that pattern has a name. It is *exactly* what the court in *In re Aggrenox* warned against when it held that non-parties "should not be permitted to run up bills merely because they expect someone else to pay the tab." 2017 WL 4679228, at *10. Ms. Roe should not be rewarded for doing so here.

10

### 3. The Pervasive Redactions Preclude Any Meaningful Assessment of Reasonableness and Cannot Support an Award of Costs

A party seeking cost-shifting under Rule 45 bears the burden of demonstrating that the costs sought are reasonable and that they resulted from compliance with the subpoena. *See In re Aggrenox Antitrust Litig.*, 2017 WL 4679228. Ms. Roe cannot meet that burden here, because Ms. Webster has redacted no fewer than 22 billing task descriptions across the three Epiq invoices — purportedly on "attorney work product" grounds — rendering it impossible for Plaintiff or this Court to evaluate what those tasks were, why they were performed, or whether they were in any way necessitated by the subpoena *see Match Grp.,LLC v. Beazley Underwriting Ltd.*, No. 22-CV-4629, 2023 WL 9603886(recommending that e-discovery vendor costs **not** be shifted to the requesting party, holding that "Although block billing [of vendor costs and fees] is "not prohibited in this Circuit," the timekeepers' use of block billing ha[d] significantly "hindered th[e] Court's ability to understand how much time was devoted to particular tasks, so as to determine whether that time was reasonably spent.") Among the entries concealed by the redactions here, are, critically: the actual cost estimates obtained from Epiq at Ms. Webster's direction; the substance of Ms. Webster's instructions to Epiq regarding scope and operational directives; the identity of specific documents exported, imaged, and delivered via secure link that were never produced to Plaintiff; the criteria used to identify documents for second-level review; and the purpose and content of Relativity platform training provided at Plaintiff's expense to not one but two KKL legal personnel — including a second KKL employee, Julia B. Stahlman, whose involvement in this matter had never previously been disclosed to Plaintiff.

### 4. Jane Roe's History of Withholding These Communications Counsels Against Any Award of E-Discovery Costs

This Court should not evaluate Ms. Roe's cost application in a vacuum. Context matters — and the context here is deeply troubling. In the underlying gender-based misconduct ("GBM") proceeding at Columbia that gave rise to this action, Jane Roe was represented by very competent counsel retained and paid for entirely at Columbia's expense. During that proceeding, when Plaintiff and Columbia each requested the very same communications that are the subject of Plaintiff's subpoena in this action, Ms. Roe withheld them — making the representation that they were "not relevant" and "not necessary" to the GBM proceeding. That representation, it turns out, was false. As such, even assuming that a portion of the Epiq fees are "reasonable," those costs should not be shifted to Plaintiff and should be borne by Jane Roe herself because the Epiq fees resulted from Jane Roe's own conduct in the underlying proceedings giving rise to this action.

### C. The Equities of This Case Independently Counsel Against Any Award of Costs.

Even assuming, *arguendo*, that some portion of the Epiq costs bore a legitimate nexus to subpoena compliance — which Plaintiff does not concede — courts retain the discretion to deny cost-shifting where the equities of the case counsel against it. *In re Aggrenox Antitrust Litig.*, 2017 WL 4679228; *see also Fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees. N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1139 (2d Cir. 1983). The equities here plainly favor Plaintiff. Ms. Roe produced only 76 pages of documents — representing a mere 2 out of 25 months of the requested

communications — without the agreed-upon privilege log, and without the Court-ordered call log. Ms. Webster ran up costs in excess of three times the amount she had quoted to Plaintiff, without notice and without consent. And Ms. Roe now seeks to recover those costs in full, despite having only partially complied with the subpoena and despite having done so in a manner that required extensive, burdensome, and costly motion practice to compel even that partial compliance. Awarding the full measure of costs claimed under these circumstances would not merely be inequitable — it would reward exactly the kind of obstruction and expense-running that Rule 45 was designed to prevent.

### D. The Cases Jane Roe Cites Requires Shifting _Reasonable_ Costs of _Actual_ Compliance, and Counsel's _Against_ Shifting $8,418.68 in E-Discovery Fees

Finally, in support of her Application, Jane Roe cites caselaw that counsels against Ms. Roe's application and requires shifting **_reasonable_ costs** of **_actual_ compliance** and requires that the non-party have no stake in the litigation from which the costs derived.

**_Sonoma_**: Starting with _Sonoma Cnty. Ass'n v. Retired Emps. v. Sonoma County_, 2015 WL 10767718, at *1 (S.D.N.Y. Oct. 6, 2015), Ms. Roe cites _Sonoma_ for the proposition that the purported **$8,418.68** in Epiq costs costs should be shifted to Plaintiff. But **_Sonoma_ counsels against shifting $8,418.68** in fees . _First,_ What _Sonoma actually_ held was that "payment by a party issuing a subpoena of the _reasonable_ production costs incurred by a non-party is warranted where the non-party has no stake in the litigation." _Second,_ the non-party in _Sonoma_ had fully complied with the subpoena. _Third,_ as described in detail above, the purported fees _here,_ totaling a whopping $8,418.68, for a 76-page document production are unnecessary, unduly expensive, and far from "reasonable" in any respect. _Fourth,_ the non-party in _Sonoma,_ "had no 'stake' in the litigation" _Here,_ Jane Roe — to whom Plaintiff's subpoena was directed has a "stake" in this litigation in that Ms. Roe has interest in maintaining the status quo with respect to the disciplinary findings and conclusions reached by Defendant Columbia University in the underlying GBM proceedings that gave rise to this lawsuit — the very findings and conclusions Plaintiff seeks to reverse through this action. Accordingly, _Sonoma_ counsels against Ms. Roe's application to shift $8,418.68 in fees to Plaintiff because _Sonoma_ requires that Jane Roe not have litigation stake.

**_Prescient_**: _Next,_ Ms. Roe cites _Prescient Acquisition Grp., Inc. v. MJ Publ'g Tr._, No. 05-CV-6298,2006 WL 2996645, at *3 (S.D.N.Y. Oct. 13, 2006) for the proposition that Plaintiff is required to " reimburse 100% of actual expenses" incurred in responding to the subpoena. But, _Prescient_ counsels against Ms. Roe's application for several reasons. _First,_ in _Prescient,_ the non-party to whom the subpoena was directed, fully complied with the subpoena. _Second_, the _Prescient_ production yielded 2,100 pages. The _Prescient_ Court then shifted $7,147.64 in expenses to the issuing party of the subpoena for the 2,100-page production, which equates to roughly $3.40 per page produced. **Accordingly, under _Prescient,_ Plaintiff would owe approximately $258.00 in reimbursement costs to Ms. Roe, rather than the approximately $116.00 per page that Ms. Roe is requesting to shift to Plaintiff** as Ms. Roe produced a total of 76 pages of documents to Plaintiff pursuant to Plaintiff's subpoena directed at Ms. Roe. The _Prescient_ Court went on to say that "a non-party can be required to bear some or all expenses where the equities of a particular case demand it." Accordingly, _Prescient_ counsels against Ms. Roe's application.

12

***Match:*** *Next,* Ms. Roe also cites *Match Grp.,LLC v. Beazley Underwriting Ltd.*, No. 22-CV-4629, 2023 WL 9603886 for the proposition that "$8,418.68 represents typical—if not lower than average—costs for an e-discovery vendor costs" Not so. *Match* involved a post-summary judgment cost-shifting framework to the losing *Defendant* — not a non-party — after the winning Plaintiff had secured a $3,628,670.64 judgment against the Defendant. Moreover, *Match* did not involve cost reimbursements pursuant to a subpoena. The Magistrate Judge in *Match* went on to recommend that e-discovery vendor costs **not** be shifted to the losing Defendant, holding that "Although block billing [of vendor costs and fees] is "not prohibited in this Circuit," the timekeepers' use of block billing ha[d] significantly "hindered th[e] Court's ability to understand how much time was devoted to particular tasks, so as to determine whether that time was reasonably spent." but went on to opine that if the trial judge ultimately determined that cost shifting was appropriate notwithstanding the Magistrate Judge's recommendation — that $22,653.13 in fees for an18,320-page production of documents was appropriate which equates to approximately $1.25 per page produced. **Accordingly, under *Match*, Plaintiff would owe approximately $95.00 total in reimbursement costs to Ms. Roe, rather than the approximately $116.00 per page that Ms. Roe is requesting to shift to Plaintiff** as Ms. Roe produced a total of 76 pages of documents to Plaintiff pursuant to Plaintiff's subpoena directed at Ms. Roe. Accordingly, *Match* counsels against Ms. Roe's application.

***Highline****: Finally,* Ms. Roe cites *28th Highline Assocs., LLC v. Roache*, No. 18-CV-1468, 2019 WL 10632851, at *6 (S.D.N.Y. July 29, 2019) that awarded $40,000 in costs post-judgment to a prevailing party for the proposition that the Epiq invoices totaling $8,418.68 are "reasonable" and should be court-ordered to be paid by Plaintiff. But *Highline* involved a post-summary judgment cost-shifting framework to the losing *Defendant* — not a non-party — after the winning Plaintiff had secured a $3,628,670.64 judgment against the losing Defendant. But be that as it may, *Highline* can still inform the Court, how this district has ruled in other e-discovery cost shifting matters. The e-discovery vendor costs shifted by the *Highline* Court concerned e-discovery vendor costs of "collecting, processing, and production of 18,000 pages of documents from 7 custodians. The *Highline* Court ultimately shifted $53,625.46 in e-discovery costs to the winning Plaintiff post-judgement. Doing the math, the cost per document shifted in *Highline* was roughly $3.00 per document page produced. **Accordingly, under *Highline's* cost-shifting framework of e-discovery costs Plaintiff would owe approximately $230.00 total in reimbursement costs to Ms. Roe, rather than the approximately $116.00 per document that Ms. Roe is requesting from Plaintiff** as Ms. Roe ultimately produced a total of 76 pages of documents to Plaintiff pursuant to Plaintiff's subpoena directed at Ms. Roe. Accordingly, *Highline Match* counsels against Ms. Roe's application.

As reflected above, Jane Roe is unable to cite a single case that counsels in favor of Ms. Roe's application to shift $8,418.68 in e-discovery fees to Plaintiff for Jane Roe's production of 76 pages of documents to Plaintiff under subpoena — because no such case exists. The large majority of the purported Epiq costs and fees are "unnecessary and unduly expensive services that did not 'result from compliance' and, therefore, do not count as [reasonable] 'expenses.' permitted to be shifted under Rule 45 " *In re Aggrenox Antitrust Litig.,* No. 3:14-MD-02516 (SRU), 2017 WL 4679228, at *10 (D. Conn. Oct. 18, 2017) "In particular, [Attorney Molly Webster on behalf of Jane Roe] should not be [rewarded for] running up the bills merely because she expected [Plaintiff] [to] pay[the] the tab." *See Id.*

13

### E.  CONCLUSION

For all of the foregoing reasons, and because (a) discovery in this action is stayed (b) Ms. Roe has not fully complied with the subpoena and Ms. Roe's production is incomplete, (c) Ms. Roe is an interested non-party with a stake in the outcome of this litigation (d) Ms. Roe's own conduct contributed to the purported fees incurred (e) $8,418.68  in fees is unreasonable (f) there is no legal authority that supports Ms. Roe's application to shift $8,418.68  in fees to Plaintiff for a 76 page production of documents and (g) the equities in this case demand that Ms. Roe bear her own e-discovery costs and fees of compliance, Plaintiff respectfully requests that this Honorable Court **deny** Ms. Roe's application to shift $8,418.68 in e-discovery fees to Plaintiff.

There is a conference scheduled in this matter for May 6, 2026, at 11:00 AM (ECF 198)

Your Honor's attention to this matter is greatly appreciated.

Respectfully Submitted,

John Doe,
Plaintiff, Pro Se

cc: Molly K. Webster **(VIA ECF)**
    All Counsel of Record **(VIA ECF)**

14