UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

| | |
|---|---|
| JOHN DOE, | Case No. 1:25-cv-02132-DEH-RFT |
| Plaintiff, | |
| v. | |
| COLUMBIA UNIVERSITY, | |
| Defendant. | JURY TRIAL DEMANDED |

-----------------------------------------------------x

### AMENDED COMPLAINT

**PLAINTIFF JOHN DOE,**[1] a pseudonym, proceeding *pro se,* and for his Amended Complaint against Defendant Columbia University in the City of New York, ("Columbia"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.    This Title IX/disability/race discrimination and related state lawsuit is brought on behalf of Plaintiff John Doe ("John Doe"), who was an African-American male student, with Attention Deficit Hyperactivity Disorder ("ADHD') at Columbia University's School of General Studies ("Columbia") in his senior year and merely a handful of classes shy of graduation, when he was suspended for a period of three semesters, terminated from University employment, dismissed from

---

[1] On March 31, 2025 Magistrate Judge Henry J Ricardo **granted** John Doe's Application to permit Plaintiff John Doe, non-party student complainant Jane Roe and non-party student witness Mack Roe to proceed in this action under pseudonyms *See* Sealing Order ECF 19 at *1

1

his scholarship program, and banned from campus, for alleged sexual misconduct that he did not commit, despite Columbia's own concessions that there was insufficient evidence to prove the necessary elements required by Columbia's Gender-Based Misconduct Policy to substantiate the charge against John Doe, and after Columbia told John Doe that John Doe "had no rights under Title IX".

2.     John Doe's hope and lifelong dream had been to attend law school after graduation, and become an attorney working in the federal government on foster care policy and public interest law, in the realm of child and youth advocacy.  But those hopes and dreams were shattered when, after a process that was sex-biased, and due process deficient, John Doe was found responsible by Columbia for sexual misconduct that he did not commit due in significant part to anti-male discriminatory bias that informs and permeates Columbia and that, among other things, led Columbia to give short shrift to John Doe's counter-complaint of coercion, extortion, retaliation, and sexual harassment by the female student complainant.

**PARTIES AND RELEVANT PERSONS**

3.     Plaintiff John Doe is a disabled African American natural-born person, a first-generation college student, and a decorated academic who has earned twelve prestigious academic honors, awards, and appointments during his academic tenure and a prestigious full tuition scholarship to Columbia University's School of General Studies and resides in New York, New York.

2

**Deleted:** investigator's

**Deleted:** .

**Deleted:**

**Deleted:** misconduct

4.     John Doe, before entering Columbia, earned an associate's degree with high honors. He also earned the Phi Theta Kappa ΦΘΚ Honors Society Award, the Sigma Alpha Pi ΣΑπ Honors Society Award, the Hecht Family Charitable Foundation Scholarship Award, the Recognition of Service Learning in Education Award, the Emerging Student Leaders Award, the Service Award, the Advocate Award, Champion Award, Academic Scholarship Award, and Scholars Grant Award. John Doe received several letters of commendation from the Pennsylvania State House of Representatives, received a two-term appointment as a Senior Student Senator, and was nominated and accepted into the National Honor Society of Leadership and Success (NSLS)

5.     John Doe, when at Columbia, received the Academic Leadership and Service Scholarship Award ("PALS"), was appointed Junior Marshall, and Orientation Leader, and contributed over 100 hours in volunteer academic leadership and service hours to Columbia, by which he earned the "Service Award" for his dedication to leadership and service to Columbia.

6.     Defendant Columbia is an elite private Ivy League University located in New York City (Manhattan), New York, operating under a 1787 charter that places the institution under the Trustees of Columbia University and received approximately $800,000,000 in federal funding annually in 2022, 2023, and 2024. Upon information and belief, Columbia continues to receive direct federal

government grants and monies to the present day in amounts that were equal to or greater than what was received in prior years.

7. Jane Roe ("Jane Roe") is a non-party to this action. She is John Doe's accuser and the complainant in the underlying disciplinary proceedings brought by Columbia.

8. Mack Roe ("Mack Roe") is a non-party to this action. He is a student at Columbia and classmate of John Doe's and was an eyewitness in the underlying disciplinary proceedings.

**Formatted:** Font: 12 pt

9. Pursuant to a issued in this action, John Doe obtained text message communications between Jane Roe and Mack Roe spanning from April 24, 2022 through April 11, 2024. These communications are referenced throughout the factual allegations at the specific points in the chronological narrative where they are most relevant. They establish that Jane Roe and Mack Roe operated as a coordinated unit throughout every critical phase of Columbia's GBM proceeding against John Doe.

**Formatted:** Font: 12 pt

10. Colleen Walsh ("Director Walsh) is a non-party to this action. She is the Deputy Title IX Coordinator and Senior Director of Title IX investigations at Columbia and was at all relevant times, the Deputy Title IX Coordinator and Senior Director of Title IX investigations at Columbia in the underlying disciplinary proceedings giving rise to this action.

4

11. Jamie Kleidman ("Investigator Kleidman") is a non-party to this action. She is the Associate Director of OIE Investigations at Columbia was the lead investigator for Columbia in the underlying disciplinary proceedings.

12. Michelle Ashcroft ("Investigator Ashcroft") is a non-party to this action. She is an Associate Director of OIE investigations at Columbia and was the assistant investigator for Columbia in the underlying disciplinary proceedings.

13. Stephanie King ("Dean King") is a non-party to this action. She is the Associate Dean for  Student and Family Support at Columbia and was a hearing panelist in the underlying disciplinary proceedings.

14. Herbert Hugh ("Dean Hugh") is a non-party to this action. He is the Assistant Dean of Student Support at Columbia and was a hearing panelist in the underlying disciplinary proceedings.

15. Meaghan Borys ("Borys") is a non-party to this action. She is a Higher Education Attorney who Columbia retained to act as the hearing chairperson in the underlying disciplinary proceedings.

16. James Colgrove ("Dean Colgrove") is a non-party to this action. He is the Dean of the Postbaccalaureate Premedical Program at Columbia and was the Sanctioning Officer in the underlying disciplinary proceedings.

17. Carlos Alonso (" Dean Alonso") is a non-party to this action. He is the Dean of the Graduate School of Arts and Sciences at Columbia and was an Appellate Officer in the underlying disciplinary proceedings.

18. Shih-Fu Chang ("Dean Chang") is a non-party to this action. He is the Dean of the School of Engineering at Columbia and was an Appellate Officer in the underlying disciplinary proceedings.

19. Troy Eggers ("Dean Eggers"') is a non-party to this action. He is the Dean of the School of Professional Studies at Columbia and was an Appellate Officer in the underlying disciplinary proceedings.

## JURISDICTION AND VENUE

20. This Court has federal question and federal civil rights jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under federal law and under 28 U.S.C. § 1343 and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

21. This Court has personal jurisdiction over Columbia on the grounds that Columbia is conducting business within the State of New York, is a resident of the State of New York and whose actions that are the subject of this action took place in the Southern District of New York.

22.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A.    Federal Statutes and Regulations Forbid Sex Discrimination and Retaliation and Require Prompt and Equitable Disciplinary Proceedings.**

23.    Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

24.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. Columbia is a recipient of federal funds and is therefore bound by Title IX and its regulations.

25.    As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from discrimination based on sex. A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

26.    Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational institutions to maintain and disclose campus crime

statistics and security information. 20 U.S.C. § 1092(f). Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(i)(aa).

27.    The U.S. Department of Education's regulations implementing Title IX require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student...complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

28.    Regulations implementing the Clery Act require that campus sexual misconduct proceedings:

- "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result"

- be conducted by trained officials

- "be completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay"

- be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused"

- include "timely notice of meetings at which the accuser or accused, or both, may be present"

- give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings"

8

**Deleted:** Title IX

- be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"

- include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions." 34 C.F.R. § 668.46(k).

**B.    OCR's 2001 Guidance Affirmed the Requirement that Disciplinary Proceedings Be Prompt and Impartial.**

29.    Department of Education's Office for Civil Rights ("OCR") is the federal agency in charge of enforcing Title IX compliance.

30.    In 2001, after a public notice-and-comment period, OCR issued a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

31.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."

32.    The 2001 Guidance further stated that "[a]ccording due process to both parties involved, will lead to sound and supportable decisions" and that the "due process" requirement applies to both public and private colleges and universities.

**C.     Starting in 2011, the Federal Government Pressured Educational Institutions to Provide More Protection to Students Alleging Sexual Assault on The Basis of Protecting Women.**

33.    Starting in 2011, the federal government, including OCR, began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on college campuses.

34.    On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter").

35.    The April 2011 Dear Colleague Letter while now revoked, was in effect when Columbia's disciplinary procedures were put in place.  Before the April 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter. The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action:

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

36.    22. Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See 5 U.S.C. § 553.

37. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

38. 23. The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus."

39. The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited that, if had it been true, would represent triple the rate of rape for the same demographic in war-torn Somalia)2; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

40.   24. The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment.

41.   For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions to "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned educational institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15)

42.   25. The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample. Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," Washington Examiner, August 13, 2014,

http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

43.    26. Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014, found that college-age female students on campus were less likely to be victims of sexual assault than non-students, and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against women. Rape and Sexual Assault Victimization among College Age Females, 1995-2013 (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

44.    The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates that inherently made it more difficult for males accused of sexual misconduct to defend themselves. The April 2011 Dear Colleague Letter (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

45.    The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The April 2011 Dear Colleague Letter stated (p.

13

12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures. Additionally, the April 2011 Dear Colleague Letter stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

46.    On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers on Title IX and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf. The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.

47.    For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

14

48.    Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rule-making, yet both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

49.    In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "improperly used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, in violation of Title IX." (Emphasis in original.) The OCR letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.

50.    Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

15

51.     Prior to 2011 Dear Colleague Letter, schools were not required to adjudicate sexual harassment claims, which Dept. of Education had identified as "the exclusive province of the police and...the [local] district attorney." the OCR invited --indeed demanded -- that schools take on this authority and use it in accordance with their official but non-statutory) guidance, under pain of Federal investigation that would incur reputational harm, legal fees, not to mention possible loss of Federal grants. Thus, this guidance effectively mandated schools public and private to exercise this function.

52.     The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants. Almost all complainants are females and almost all respondents are males. A study by United Educators showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims,"

https://web.archive.org/web/201701225139/https://www.ue.org.UploadedFiles/Confronting%20Campus%20Sexual%20Assault.pdf.

53.     While the April 2011 Dear Colleague Letter gave lip service to both accusers and accused having the right to have a prompt and equitable resolution,

16

including the right to an adequate, reliable, and impartial investigation, similar and timely access to any information that will be used at the hearing and adequately trained fact-finders and decision makers, the April 2011 Dear Colleague Letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent and due process.

54.    Among other things, the April 2011 Dear Colleague Letter defined sexual harassment broadly as "unwelcome conduct of a sexual nature," conflating cases based on conduct with cases based on speech; stated that "mediation is not appropriate even on a voluntary basis" in cases involving alleged sexual assault; directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant"; directed schools to take interim steps to protect complainants and "minimize the burden on the complainant"; "strongly discourage[d]" schools from allowing cross-examination of parties; and urged schools to focus on victim advocacy.

55.    Even though the April 2011 Dear Colleague Letter purported to be a "guidance" document and did not go through rule-making procedures, OCR framed

17

many of its directives as mandatory. Moreover, the letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."

56.    The overriding purpose of the April 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the Brandeis court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished."

57.    The April 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted.

58.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual assaults, to adopt procedures that do not safeguard the rights of the accused, and to start with the presumption that a complainant is telling the truth.

59.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the April 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." In addition, OCR advised schools to give employees and students "trauma-informed" training and said, "hearings should be conducted in a manner that does not inflict additional trauma on the complainant."

60.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence."

61.    The Task Force's first report opened with the false claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts and stressed again that schools found in violation of Title IX risked losing federal funding.

62.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

63.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs.

64.    Ultimately, the Justice Department funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." End Violence Against Women International, Effective Report Writing: Using the Language of Non-consensual Sex at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; see also Campus Action Kit, Start by Believing, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

65.    Among other things, "Start by Believing" training direct investigators to "recreate the entire reality of the sexual assault from the perspective of the victim." "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case, and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'"

20

66.    The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

67.    In February 2014, then Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington."

68.    Assistant Secretary Lhamon told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them;" that school officials and she as "chief enforcer" needed to "radically change that message;" and that "if you don't want to do it together, I will do it to you." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

69.    In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding

21

inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the April 2011 Dear Colleague Letter.

70.    Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Assistant Secretary Lhamon additionally stood behind the April 2011 Dear Colleague Letter.

71.    In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the

last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014, available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832.

72.    Then Assistant Secretary Lhamon was quoted in the Los Angeles Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," Los Angeles Times, August 17, 2015.

73.    To support effectively making the April 2011 Dear Colleague Letter binding, the OCR hired hundreds of additional investigators for Title IX enforcement. The sharp increase in the number of investigations was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

74.    The Federal Government investigated over 250 schools for possible Title IX violations, including notable schools. According to the Chronicle of Higher Education, that number eventually grew to over 500. The overwhelming majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students. Indeed, in 2016, OCR for the first time found Title IX violations in response to a complaint by a disciplined student.

23

75.    The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then-Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge of its Office for Civil Rights ("OCR"), delivered what was treated and understood as marching orders by colleges and universities.

76.    In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

77.    In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.

78.    Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school." Assistant Secretary Lhamon additionally stood behind the April 2011 Dear Colleague Letter.

79.    Colleges and universities, including Columbia, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

80.    In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

81.    revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic. . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

82.    DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

83.    Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

84.    In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as Columbia, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

85.    Columbia was also under campus pressures to vigorously prosecute males accused of sexual assault. The publicized case of Emma Sulkowicz, who carried around campus her mattress on which she claimed she had been raped by a male Columbia student, brought pressure on Columbia's administration to pursue vigorously sexual misconduct cases against male students, even though the male student was found not responsible with respect to Emma Sulkowicz's university complaint and the criminal law authorities refused to prosecute.

86.    Under the guise of "performance art," a Columbia professor and Emma Sulkowicz jointly designed Emma Sulkowicz's senior thesis project (the "Mattress Project"). The Mattress Project, named "Carry That Weight," involved Emma carrying a mattress around campus at all times during her senior year.

27

87.    In her words, "I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me." She also publicly called the male student a "serial rapist" and vowed to carry the mattress to hers and the male student's graduation if the male student was in attendance.

88.    A "Carry That Weight National Day of Action" campus rally took place on October 29, 2014, organized by Emma Sulkowicz and her supporters from the "No Red Tape" and the "Carry That Weight" organizations. The rally centered on a list of ten demands that were read to the public and were published in writing on one of the mattresses which was signed by the activists, including Emma Sulkowicz. Also, on October 29, 2014, Columbia President Lee C. Bollinger co-authored an article in The New Republic that opened with a large picture of a smiling Emma carrying her mattress. In December 2014, Columbia student activists from "No Red Tape" and "Carry That Weight" organizations read a letter at Columbia President Lee C. Bollinger's office containing the following passage:

> Since then, Emma Sulkowicz's senior thesis Mattress Project: Carry That Weight has called national attention to the injustices survivors have been forced to carry alone for too long. You have not responded once to this piece, and her serial rapist remains on campus today.

89.    From May 11, 2015, to May 15, 2015, Columbia had on display, at the Columbia University Visual Arts Program in the Leroy Neiman Gallery in the Dodge Building on Columbia's campus, Emma Sulkowicz's pornographic prints depicting

28

the male student (whose name was shown) raping Emma Sulkowicz. Also, Emma Sulkowicz was permitted by Columbia to carry the mattress to her and the male student's graduation.

90.    In the keynote address at the Columbia graduation ceremony, Los Angeles Mayor Eric Garcetti, CC '92, SIPA '93, stated "You've held contrary opinions, held die-ins and sit-ins, carried mattresses". He also said in his speech. "It is the responsibility of an active citizen to engage with one another... Never stop being academics, and never stop being activists." Columbia bestowed Magna Cum Laude honors on Emma Sulkowicz not for her G.P.A. but for her "academic achievement" in her performance art -- the Mattress Project.

91.    The campus pressures at Columbia to rule for women in sexual misconduct cases were noted by the U.S. Court of Appeals for the Second Circuit in *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (Leval, J.).

92.    Columbia thereafter continued to be under student pressure to rule for women in sexual misconduct cases. In March 2017, a Reuters report stated: "A student at Columbia University sued the school on Tuesday, claiming officials showed indifference and apathy after she reported two separate incidents of sexual assault on the school's New York City campus in 2015." In October 2017, Reason reported that activist students at Columbia University barged into a Sexuality and

29

Gender Law class to protest the professor, a vice president and Title IX administrator who is insufficiently committed to the cause, according to the protesters.

93.    In December 2017, the New York Times reported that a renowned Greco-Roman historian and longtime professor at Columbia retired that month as part of the settlement of a sexual harassment lawsuit; the retirement, which Columbia announced in an e-mail to students and faculty members on Monday afternoon, came nearly three months after an anonymous graduate student filed a lawsuit against Dr. Harris alleging that he had kissed and groped her repeatedly while he was her academic mentor, and then disparaged her to colleagues when she rebuffed his advances; the student, identified only as Jane Doe, also sued the university for what she called its "deliberate indifference" to her complaints about him.

94.    In August 2017, Columbia issued revised Gender-Based Misconduct Policies which were supposedly in effect in John Doe's case. Those revised Gender-Based Misconduct Policies included, among others: (i) the requirement that investigators be impartial and unbiased; (ii) investigators interviewing all witnesses with relevant information; (iii) during the investigation, complainants and respondents may ask questions of each other through the investigators; (iv).

95.     Credibility is to be determined by the consistency of accounts over time, demeanor, corroborating evidence, motive to lie and reasonableness of detail;

30

(v) the burden of proof is the preponderance of the evidence, which means that it is more likely than not the respondent engaged in the conduct for which the respondent was charged as Gender-Based Misconduct under Columbia's Gender-Based Misconduct Policies; (vi) a pre-determination conference as to which it was the last opportunity for the parties to offer evidence and ask questions of each other through the investigators; (vii) a hearing panel that is tasked to evaluate and analyze the relevant information; and (viii) at the hearing, no cross-examination questions asked by the parties of each other.

**D.     The Department of Education Modifies Its Approach to Title IX Enforcement, Focusing on Fairness to All Parties.**

96.     In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX and Gender-based Misconduct proceedings.

97.     Recognizing the harmful results of the April 2011 Dear Colleague Letter, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American:

31

www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforce-ment.

Included in Secretary DeVos's speech was the following:

Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.

….

Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.

….

Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

98.    Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

99.    On September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents

32

for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

100.   This withdrawal effected a reversion to 2001 Department of Education guidance, which reads in relevant part: "The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding."

101.   A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred...;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility

33

of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

102.    Despite a different direction announced by the current White House Administration, colleges and universities have mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter resulting in gender biased enforcement of Title IX. Columbia is one such university. When new regulations were proposed, then Columbia VP Suzanne Goldberg stated that Columbia would "stick by its current standards"6 and remain "vigilant" despite the 2017 revocation of "Dear Colleague" guidance.7

103.    On May 6, 2020, U.S. Secretary of Education Betsy DeVos announced new Title IX regulations. The U.S. Department of Education written announcement stated:

> The Final Rule requires schools to investigate and adjudicate formal complaints of sexual harassment using a grievance process that incorporates due process principles, treats all parties fairly, and reaches reliable responsibility determinations. A school's grievance process must:

- Give both parties written notice of the allegations, an equal opportunity to select an advisor of the party's choice (who may be, but does not need to be, an attorney), and an equal opportunity to submit and review evidence throughout the investigation;

- Use trained Title IX personnel to objectively evaluate all relevant evidence without prejudgment of the facts at issue and free from conflicts of interest or bias for or against either party;

34

- Protect parties' privacy by requiring a party's written consent before using the party's medical, psychological, or similar treatment records during a grievance process;

  - Obtain the parties' voluntary, written consent before using any kind of "informal resolution" process, such as mediation or restorative justice, and not use an informal process where an employee allegedly sexually harassed a student;

  - Apply a presumption that the respondent is not responsible during the grievance process (often called a "presumption of innocence"), so that the school bears the burden of proof and the standard of evidence is applied correctly;

  - Use either the preponderance of the evidence standard or the clear and convincing evidence standard (and use the same standard for formal complaints against students as for formal complaints against employees);

  - Ensure the decision-maker is not the same person as the investigator or the Title IX Coordinator (i.e., no "single investigator models");

  - For postsecondary institutions, hold a live hearing and allow cross-examination by party advisors (never by the parties personally); K-12 schools do not need to hold a hearing, but parties may submit written questions for the other parties and witnesses to answer;

  - Protect all complainants from inappropriately being asked about prior sexual history ("rape shield" protections);

  - Send both parties a written determination regarding responsibility explaining how and why the decision-maker reached conclusions;

  - Effectively implement remedies for a complainant if a respondent is found responsible for sexual harassment;

  - Offer both parties an equal opportunity to appeal;

  - Protect any individual, including complainants, respondents, and witnesses, from retaliation for reporting sexual harassment or participating (or refusing to participate) in any Title IX grievance process;

35

- Make all materials used to train Title IX personnel publicly available on the school's website or, if the school does not maintain a website, make these materials available upon request for inspection by members of the public; and

- Document and keep records of all sexual harassment reports and investigations.

104.    The new Title IX regulations require, among other things, equal access to evidence; a grievance procedure that includes a live hearing at which the decision-maker must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those questions challenging credibility.

105.    Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally. Before a complainant, respondent, or witness answers a cross-examination or other question, the decision-maker must first determine whether the question is relevant and explain any decision to exclude a question that is ruled not relevant.

**E.    Columbia's Title IX Program and Anti-Male Gender Bias. Victim Centered, Trauma Informed Approach**

106.    Columbia has adopted policies and procedures that favor students who file complaints of sexual misconduct and deny fundamental protections to accused students and trains its officials to assume complaints of sexual misconduct are valid.

36

107. Columbia is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males.

108. Based on the information and statements available on Columbia's website, statements by university officials, the pressure from the federal government to adopt "victim"-centered, trauma-informed approaches, and the conduct and statements of Columbia's decision makers in John Doe's disciplinary proceeding, Columbia trains its Title IX personnel in accordance with the federally-funded "Start by Believing" model.

109. Columbia has touted that it provides "trauma-informed" training to its investigators and adjudicators.

110. The "trauma-informed" approach presumes that allegations made by a complainant occurred, focuses on a complainant's thoughts and feelings in determining whether alleged conduct was sexual harassment or assault, make credibility determinations based on presumptions about complainants and respondents generally and not on the evidence in a specific case, and disregards fair process protections for the accused.

111. "Trauma-informed" techniques are based on pseudoscience, allow authority figures to encourage alleged victims to create exaggerated or false memories, and unjustly undermine the accused's ability to defend against allegations.

112. Investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation but should instead be viewed as evidence that an assault occurred.

113. Columbia has been and is still in disagreement with the U.S. Department of Education's 2017 interim guidance and the 2020 issued Title IX regulations.

114. Columbia has questioned the value of procedural rights for the accused: "How often are we manipulated into prioritizing the abuser over the abused? How often are we...suckered into a side of a debate that we shouldn't even be having?"

115. Columbia's leadership expressed similar reservations regarding procedural rights, especially when it concerns cross-examination of parties and their evidence.

116. Columbia's leadership expressed dissatisfaction and distain for the Department of Education's federal rules that offer more rights to students accused of sexual misconduct on campus.

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Deleted: ¶



*(IMAGE #1) Photo of a slide from Columbia's Title IX Staff Training Materials* <span style="color:red">Deleted: ¶</span>

**F.   Columbia's Political Climate Prior to, and During John Doe's Enrollment and sexual misconduct proceedings**   <span style="color:red">Deleted: to</span>

117. Prior to the events in question, and during the Investigation, sanctioning, and John Doe's appeal stages of Columbia's , sexual misconduct disciplinary proceedings against John Doe, Columbia was highly sensitive to accusations that they did not take seriously, the complaints of sexual misconduct brought by of female Columbia student victims of sexual misconduct against Columbia male students.   <span style="color:red">Deleted: seriously.</span>

**G.   Columbia Faces Scrutiny, Pressure, and Multiple Investigations by the Department of United States Department of Education's Office for Civil**   <span style="color:red">Formatted: Heading 2</span>

**Rights (OCR) due to its handling of sexual misconduct complaints brought by Columbia females students against Columbia males students.**

118. In the time directly preceding John Doe's  sexual misconduct investigation and proceedings  Columbia University  was facing serious federal civil rights  litigation  federal  investigations  ,  and  national  media  scrutiny  due  to  its handling of sexual misconduct complaints brought by female Columbia University students against male Columbia students.

119. During the pendency of  Plaintiff's sexual misconduct investigation and proceedings  Columbia University  was facing serious federal civil rights litigation, federal  investigations , and  national  media  scrutiny  due  to  its  handling  of  sexual misconduct complaints brought by female Columbia University students against male Columbia students.

120. Columbia University had been under intense national media and federal scrutiny due to its previous handling of sexual misconduct cases which continued through the duration of John Doe's sexual misconduct disciplinary proceeding.

121. Columbia was under scrutiny by the United States Department of Education's  Office  for  Civil  Rights  ("OCR")  due  to  its  handling  of  sexual misconduct complaints brought by female Columbia University students against male Columbia students.

122. During the pendency of Plaintiff's sexual misconduct investigation and proceedings, and at the time of Columbia's decision to erroneously find John Doe

**Deleted:** .

40

"responsible" for sexual misconduct against of Jane Roe and reject John Doe's appeal of Columbia's findings, Columbia was under investigation by The United States Department of Education's Office for Civil Right (OCR) in at least 5 separate Title IX investigations concerning Columbia's handling of sexual misconduct complaints brought by female Columbia University students against male Columbia students.

123.    At least 3 of the OCR Title IX investigations had been pending against Columbia since 2015.

124.    The national criticism and prolonged federal scrutiny of Columbia University related to Columbia's handling of sexual misconduct complaints affected Columbia's global reputation and relationships with Columbia alumni donors.

125.    . The national criticism put significant pressure on Columbia University to find male students of Columbia "responsible" for complaints of sexual misconduct brought against them by female students in an effort to demonstrate to the Columbia Community that Columbia was taking complaints of sexual misconduct by male Columbia students seriously.

126.    The intense federal scrutiny put significant pressure on Columbia University to find Columbia male students "responsible" for alleged sexual misconduct brought by Columbia students in an effort to demonstrate to the United

41

States Office for Civil Rights ("OCR") that they were taking Columbia female students' complaints of sexual misconduct by male Columbia students seriously.

127.    Columbia was cognizant that if they failed to to demonstrate to the United States Office for Civil Rights ("OCR") that they were taking Columbia female students' complaints of sexual misconduct by male Columbia students seriously, OCR could withhold their federal funding.

**H.    Columbia Faces Legal Pressure, Sued in Federal Court and Reported to the United States Office for Civil Rights (OCR) by a Female Student due to Columbia's Handling of her Sexual Misconduct Complaint Brought Against a Male Columbia Student**

128.    On July 7, 2021 a Columbia female studentJane Doe[2] filed for an emergency injunction in the District Court for the Southern District of New York (S.D.N.Y) to seeking to enjoin Columbia University from concluding her Title IX sexual misconduct case that she brought against a Columbia male student calling Columbia's investigation and proceeding "unlawful" for not taking her complaint against the male student seriously. *See* Case No. 1:21-cv-05839-ER (S.D.N.Y)

129.    Shortly thereafter on July 20, 2021 Mary Mo filed a federal Title IX lawsuit in the District Court for the Southern District of New York against Columbia due to its handing of her sexual misconduct complaint brought against a Columbia male student. *See* Case No. 1:21-cv-05839-ER (S.D.N.Y)

---

[2] "Jane Doe" is a fictitious name. It does not identify any actual person, living or deceased, and any resemblance to real individuals is purely coincidental and not intended.

130.   Jane Doe also filed a complaint against Columbia with the United States Department of Education's Office for Civil Rights (OCR).

131.   Jane Doe then notified Columbia of Jane Doe's OCR complaint.

132.   The target of Jane Doe's lawsuit and concurrent OCR complaint, was Columbia's Title IX/Gender-based misconduct office, and managing administrators, the same office and administrators  that would later handle Jane Roe's sexual misconduct complaint against John Doe.

133.   Jane Doe's goal in filing her Title IX lawsuit and concurrent OCR complaint was to pressure Columbia University to convict the accused student of sexual misconduct.

134.   Jane Doe's lawsuit and concurrent OCR complaint accused Columbia of  violating Title IX under a deliberate indifference theory of liability.

135.   Jane Doe accused Columbia of  "protecting a two-time campus sex offender"

136.   Jane Doe's lawsuit and OCR complaint demanded extraordinary relief, including demanding that the District Court strip  Columbia University of its Federal Funding due to its handling of her sexual misconduct complaint against a male Columbia student

137.   Jane Doe was relentless in her lawsuit filing a flury of dispositive motions for judgement in her favor on her pleadings.

43

138.   Columbia aggressively defended the lawsuit.

139.   Jane Doe would go on to file multiple amended complaints, and dispositive motions for judgment in her favor on her pleadings

140.   Jane Doe's Title IX lawsuit remained pending against Columbia for the full duration of John Doe's disciplinary proceeding at Columbia.

141.   Jane Doe's lawsuit accused Columbia University of not taking her sexual misconduct complaint seriously because the perpetrator was a male and Jane Doe was a female.

142.   Columbia made multiple attempts to reach a settlement agreement with Jane Roe but to no avail.

143.   Jane Doe's lawsuit targeted Columbia's Gender-based misconduct office.

144.   Jane Doe's lawsuit caused Columbia to spend a immense amount of time and recourses defending the lawsuit and trying to reach a settlement with Jane Doe

145.   Columbia feared that if they acquitted a male student for sexual misconduct against a female student they could face additional federal lawsuits from Columbia female students due to its handling of sexual misconduct complaints brought against male students.

**I.    Columbia Was The Target of an Online Pressure Campaign by a Columbia Student Group of Columbia female student survivors**

**Accusing Columbia of Turning a Blind Eye to Sexual Misconduct Complaints Brought by Columbia Female Students Against Columbia Male Students**

146. In the time directly preceding John Doe's sexual misconduct disciplinary proceeding, Columbia's Title IX Office and Gender-based Misconduct Office was the target of an online pressure campaign by a Columbia Student group of female survivors and political activists.

147. The female political action student group operated on Instagram under the name "Columbia University Survivors" and under the handle "@cusurvivors"

148. The Instagram account amassed a total of 1,620 followers.

149. The female political action student group's purpose statements read as follows:

"The primary purpose of this platform is to support survivors of sexual and intimate violence at Columbia University by making their stories heard"

"We demand that Columbia University face accountability for its many practices of violence, including protecting abusers, and perpetrating environments hostile to survivors"

"Columbia's problems are not merely administrative, but structural and social" "We will be advocating for specific changes needed at Columbia and within its communities to keep each other safe"

45

"As the project increases we will be draft specific demands for the institution, organizations, and our communities"

"In an exceptionally isolating time, we hope that this virtual community can grow into a network of survivor support and political action.

150.   The female student political action student group facilitated its pressure campaign by directly "tagging" various administrative offices at Columbia University.

151.   The female student political action group created a google form where Columbia female students could submit "demand recommendations " for demands to be directed at Columbia and contained a space for Columbia female students to name a Columbia organization, institution or person in power at Columbia to whom the f  emale student wished to direct the demand.

152.   The female student political action group drafted, and served Columbia University administrative Offices with demands.

153.   Upon information and belief Columbia eventually caved to the pressure from the female student political action group and  reached a settlement agreement agree to various demands the group had made in exchange for the group ceasing its political action endevours directed at Columbia related to Columbia's handing of sexual misconduct complaints brought by Columbia female students against Columbia male students.

**Formatted:** List Number Simple

**J.    Columbia's Title/IX Gender-based Misconduct Office   Faced National Media Scrutiny due to its Handling of Sexual Misconduct Complaints Brought by Columbia Female Students and Affiliantes Against Columbia Male Students and Employees**

154.   On September 11, 2020, less than two years before Jane Roe filed her false and fictitious complaint of sexual misconduct against John Doe through Columbia's Gender-based Misconduct Office, ("GBMO'), CBS News released an article criticizing Columbia for its handing of sexual misconduct complaints brought against a male Columbia employee and medical doctor, Dr. Robert Hadden. The article was titled "Columbia University under criminal investigation for its handling of sex assault allegations against doctor".

https://www.cbsnews.com/news/columbia-university-investigation-robert-hadden-sexual-assault-allegations/ and circulated throughout the Columbia community.

155.   In December of 2021, four months before Jane Roe filed her false and fictitious complaint against  John Doe, Columbia agreed to a $71.5 million settlement with 79  survivors of sexual abuse by a former Columbia university University employee and Columbia medical doctor, Dr. Robert Hadden.

156.   Columbia's Title IX and Gender-based misconduct office was directly involved in advising on the  $71.5 million settlement agreement with the survivors.

47

157.   Columbia's Title IX Coordinator played a direct role in advising on the $71.5 millioon settlement agreement with the survivors.

158.   Columbia's Title IX Coordinator sat on the committee that advised Columbia on the $71.5 million agreement with the survivors.

159.   On April 1, of 2022, just 25 days before Jane Roe filed her false and fictitious complaint against John Doe, Columbia began aggressively promoting its month-long annual "Sexual Assault Awareness Month on campus https://socialwork.columbia.edu/news/commemorating-sexual-assault-awareness-month-2022

160.   The goal of Columbia's sexual assault awareness month programming was to demonstrate that Columbia to female sexual misconduct com

161.   On April 27, 2022, one day after Jane Roe filed her false and fictitious complaint against John Doe, Columbia, hosted its sexual misconduct awareness "Denim Day" https://universitylife.columbia.edu/events/denim-day

162.   In October of 2022, six months after Jane Roe had filed her false and fictitious complaint against John Doe, Columbia agreed to pay $165 million to 147 additional survivors of sexual misconduct by Dr. Robert Haddon. https://www.nytimes.com/2022/10/07/nyregion/columbia-university-robert-hadden-settlement.html

48

https://www.columbiaspectator.com/news/2022/10/07/columbia-newyork-presbyterian-hospital-to-pay-165-million-to-former-hadden-patients/
https://www.cnn.com/2022/10/07/us/columbia-university-sexual-abuse-gynecologist-settlement/index.html

163. These settlements, totaling over $236 million, highlight the Columbia's significant public and legal pressures, which influenced its administrative actions and decisions in John Doe's case.

164. On October 24, 2023, abc7 news released an article titled "Survivors of former OBGYN demand internal investigation and accountability for sex abuse cover-up"https://abc7ny.com/robert-hadden-case-obgyn-sex-abuse-survivors/13964450/

165. On September 11, 2023, Apple Podcast "Wondery" posted a "True Crime" episode titled "Exposed: Cover-Up at Columbia University,"  alleging that Columbia was involved in a cover-up of female students' allegations and complaints of sexual misconduct.

https://www.propublica.org/article/columbia-obgyn-sexually-assaulted-patients-for-20-years

166. On September 20, 2023, Medical Marketing and Media posted an investigative article titled "5 documents that helped us understand how Columbia

protected a predator," stating that the article entailed "evidence ProPublica reporter Bianca Fortis used to investigate how the university allowed it to happen." https://www.propublica.org/article/five-documents-helped-us-understand-how-columbia-protected-a-predator

167. October 4, 2023, a large mass of Columbia student "survivors" and their allies, disrupted and protested the inauguration of then President Minouche Shafik and demanded greater accountability from the university when dealing with student allegations of sexual misconduct and assault by male perpetrators.

168. The student protestors accused Columbia's Title IX and Gender-Based Misconduct Office of not taking female complaints of sexual misconduct seriously.

169. Investigator Kleidman was a target of the protest.

170. The protest put immense public and institutional pressure on Columbia on Columbia administrators involved in John Doe's GBM proceeding to find John Doe responsible for sexual misconduct against Jane Roe.

Deleted: .





*(IMAGES #2-3)Photos of Columbia University Students protesting the inauguration of President Minouche Shafik on October 4, 2023.*

51

171. On November 13, 2023, Columbia University President Minouche Shafik and Columbia University Irving Medical Center (CUIMC) CEO Dr. Katrina Armstrong released a statement announcing their joint "Multi-Pronged Plan To Address Past Abuses of Robert Hadden and Support Survivors" of sexual misconduct. Stating in part:

> "We owe it to the courageous survivors and the entire Columbia community to fully reckon with Hadden's abuses," said Minouche Shafik, President of Columbia University and Dr. Katrina Armstrong, Chief Executive Officer of the CUIMC. "Columbia failed these survivors, and for that we are deeply sorry. This announcement aims to ensure we are on a path that repairs harm and prevents further trauma – moving us forward and rebuilding the trust of our entire community."

https://www.cuimc.columbia.edu/rebuilding-trust/news-updates/columbia-university-and-cuimc-announce-multi-pronged-plan-address-past-abuses-robert-hadden-and-support-survivors

172. On November 13, 2023, Columbia also announced its creation of a 100 Million Dollar Survivor Settlement fund.

173. On November 13, 2023, Columbia also announced that it was, "Committed to an external investigation to thoroughly examine the circumstances and failures that allowed Hadden's abuse to continue."

174.   On November 22, 2023, Columbia University's Student Newspaper (Columbia Spectator) posted an article titled "Former Columbia, NFL football player Marcellus Wiley, CC '97, accused of sexual assault in lawsuit"

https://www.columbiaspectator.com/sports/2023/11/22/former-columbia-nfl-football-player-marcellus-wiley-cc-97-accused-of-sexual-assault-in-lawsuit/

175.   That same day, on November 22, 2023 the New York Post posted an article titled "Former NFL star, ex-ESPN analyst Marcellus Wiley accused of raping fellow Columbia student in 1994"

https://nypost.com/2023/11/22/sports/marcellus-wiley-accused-of-raping-fellow-columbia-student-in-1994/

176.   Also on November 22, 2023   PBS News released an article titled "Columbia Univ. faces scrutiny for ignoring complaints about OB-GYN who abused patients"    https://www.pbs.org/newshour/show/columbia-univ-faces-scrutiny-for-ignoring-complaints-about-ob-gyn-who-abused-patients

177.   On February 4, 2024 the New York Post, posted an article titled " Columbia University hit with restraining order over 'catch and kill' scheme on doctor's abuse victims: lawyer"

https://nypost.com/2024/02/04/metro/columbia-university-slapped-with-restraining-over-catch-and-kill-scheme-on-doctors-abuse-victims-lawyer/

178. On February 17, 2024, thirty-three days before John Doe's GBM Hearing, NBC News posted an article titled "Who's going to believe me?': Survivors of sexual assault by a New York gynecologist talk about the long road to justice" https://www.nbcnews.com/news/us-news/survivors-sexual-assault-robert-hadden-interview-rcna138556

179. On March 13, 2024, WBUR ran an article titled " 'Exposed' podcast about Columbia gynecologist's abuse nominated for Ambies awards" https://www.wbur.org/hereandnow/2024/03/13/exposed-podcast-columbia

180. On May 14, 2024, while John Doe's appeal was pending, Fast Company ran an article titled "This shocking investigation exposed a sexual predator at Columbia—and the school's efforts to cover it up" 'Exposed: Cover-Up at Columbia University" https://www.fastcompany.com/91073331/wondery-laura-beil-world-changing-ideas-2024

**K.    Columbia Faced Political Pressure by Jane Roe to Pursue Serious Gender-based Misconduct Charges against John Doe**

181. The public pressure on Columbia was further exacerbated by the pressure from Jane Roe and campus anti-male activism during the time of her complaint.

182. During the time of her complaint Filing, Jane Roe was an employee at Columbia University Medical Center, where Dr. Haddon was previously employed.

183.   Jane Roe subsequently received a full tuition scholarship award through Columbia University Medical Center.

184.   April is recognized as Sexual Assault Awareness Month at Columbia University (and other universities).

185.   During April 2022, 2023, and 2024, campus-wide activities were held focused on purporting to raise awareness of and preventing sexual assault.

186.   This timing of these activities is significant, as Jane Roe, who is an active sexual assault awareness advocate on campus, filed her university complaint against John Doe  on April 26, 2022.

187.   Jane Roe's timing in filing her false and fictitious complaint against John Doe aligned with Columbia's Sexual Assault Awareness Month and was just before "Denim Day," an event held on April 27, 2022, aimed at raising awareness about sexual misconduct on campus.

188.   In fact, Jane Roe cited "Denim Day" and "Sexual Assault Awareness Month" in her complaint against John Doe.  The awareness events played a role in Jane Roe's decision to file her false and fictitious complaint at that time.

189.   On April 27, 2022, Jane Roe texted her cousin who was also a Columbia student,  (Individual 5) informing her that she had filed a Title IX complaint against John Doe.

55

190.   In that same exchange, Jane Roe told informed her cousin (Individual 5) that Carlos Alonso, Columbia University's Vice President for Graduate Education, Dean of Columbia University's Graduate School of Arts and Sciences (GSAS), and Dean of Jane Roe's School was requesting to speak with Jane Roe about her allegations of sexual misconduct against John Doe.

191.   Shortly thereafter, Jane Roe informed her cousin that she was speaking with Dean Carlos Alonso.

192.   Dean Alonso discussed the events in question related to John Doe's alleged misconduct against Jane Roe.

193.   Dean Alonso offered to support Jane Roe in relation to Jane Roe's sexual misconduct allegations against John Doe.

194.   Dean Alonso advised Jane Roe on how to proceed with her sexual misconduct allegations against John Doe.

195.   Dean Alonso developed a personal relationship with Jane Roe and maintained the personal relationship with Jane Roe for the duration of Columbia's GBM proceeding invlolving John Doe.

196.   Dean Alonso remained an advisor to Jane Roe throughout Columbia's investigation and proceedings involving John Doe in relation to Jane Roe's pursuit of Jane Roe's sexual misconduct allegations against John Doe.

**Deleted:** the Dean of her School Dean

**Deleted:** James Colgrove

**Deleted:** her

**Deleted:** complaint and

**Deleted:**

**Deleted:** Colgrove

197.   Jane Roe also told her cousin (Individual 5) stating that she had "written enough to give speeches." regarding her complaint against John Doe.

198.   Jane Roe further told her cousin (Individual 5) that she felt that her sexual misconduct allegations and complaint against John Doe would "lowkey start a movement" at Columbia.

199.   Jane Roe was interested in leveraging the campus climate around sexual misconduct to pressure Columbia to aggressively investigate Jane Roe's sexual misconduct allegations against John Doe and find John Doe guilty.

200.   Subsequently, when Jane Roe filed her sexual misconduct complaint against John Doe, Jane Roe told Columbia that John Doe was a "High Profile Representative" of the University and that she (Jane Roe "needed action to be taken" against John Doe by Columbia.

201.   Jane Roe informed Columbia that Jane Roe was actively involved in sexual misconduct awareness programing at Columbia and that Jane Roe would be using Jane Roe's story to advocate for change.

202.   This backdrop of activism, from Jane Roe, and from the greater Columbia community combined with Columbia university's recent settlement history related to its handling of sexual misconduct complaints contributed to an environment wherein university administrators felt compelled to address aggressively any allegations of sexual misconduct.

Deleted: the

Deleted: ,

203. This contemporaneous campus activism affected the fairness and neutrality of the investigative and disciplinary processes of John Doe's case by creating a pressure to find male respondents guilty to appease the campus activism, and to avoid potential lawsuits from female complainants.

204. The contemporaneous campus activism resulted in bias and a predisposition towards ruling against male respondents specifically, against John Doe as Columbia feared a potential lawsuit from Jane Roe if they did not find John Doe responsible.

L.    **The Evening of April 23, 2022, and Early Morning Hours of April 24, 2022 (the "Incident")**

205. The series of events giving rise to this matter occurred on the evening of April 23, 2022, and the early morning hours of April 24, 2022.

206. In the late evening and early morning hours of April 23-24, 2022, John Doe attended a party at Jane Roe's apartment after receiving three separate invitations from Jane Roe.

207. Soon after John Doe arrived at Jane Roe's party, Jane Roe began to smoke marijuana. Jane Roe offered John Doe marijuana twice, which he declined.

208. Throughout the night, Jane Roe continued to consume alcohol and smoke marijuana.

209. Mack Roe arrived at Jane Roe's Party at approximately 10:30 PM.

210. Mack Roe and Jane Roe were exploring romantic interest around this time, and according to Jane Roe, had a "mutual intention to date".

211. Mack Roe was in the same PALS scholarship program as John Doe and the two considered each other close friends.

**M.    Mack Roe's Disclosure of Sexual Misconduct to John Doe and Subsequent Death Threats towards John Doe**

212. Upon Mack Roe's arrival, Mack Roe requested John Doe's assistance assembling a bookshelf for Jane Roe.

213. While John Doe and Mack Roe were assembling the bookshelf in Jane Roe's bedroom, Mack Roe told John Doe that while he was with Individual 6 in an Uber in route to a recently held "School of General Studies Gala," Individual 6's breasts came out of her dress and that he had recorded her exposed breasts without her knowledge.

214. Mack Roe told John Doe, "If you tell anyone about this, I will fucking kill you." John Doe promised Mack Roe that he would not tell anyone.

215. Individual 6 was a fellow PALS Scholar to John Doe and Mack Roe, and both Mack Roe and John Doe considered Individual 6 a friend.

216. At approximately 11:00 PM, John Doe and Mack Roe finished assembling the bookshelf for Jane Roe. By this time, multiple guests including Mack Roe and Jane Roe assembled in the living room, At 11:11 PM, John Doe took a photo of the guests and at 11:16 PM texted  the photo  to Jane Roe.

59



*(IMAGE #4) 11:11 PM Photo of party guests taken by John Doe.*

**N.     Jane Roe's Phone Charging Issue**

217.   At approximately 11:30 PM, Jane Roe approached John Doe, requesting his help with troubleshooting a charging issue with her cell phone, and asked if she could borrow his portable charger.

218.   For about 30 seconds, John Doe troubleshooted Jane Roe's charging issue with her phone by cleaning out the charging port on her phone using a bobby pin attached to his key ring that he used periodically to lance his facial acne.

219.   John Doe remained in Jane Roe's presence, and Jane Roe's phone was turned off as the battery was dead.

220.   There was no way for John Doe to access the contents of Jane Roe's phone.

221.   At no time did Jane Roe unlock her phone for John Doe.

60

222.   Jane Roe thanked John Doe and asked him if she could borrow his portable charger.

223.   John Doe lent his portable charger to Jane Roe, which she possessed for approximately 30 minutes.

224.   At 11:47 PM Jane Roe took a photo of the cheesecake that one of the guests had brought to the party as a snack for the guests.

225.   Jane Roe was in full and constant possession and control of her phone throughout the night.



(IMAGE #5) *11:47 PM photo of cheesecake taken by Jane Roe*

226.   Despite Jane Roe taking this photo, at 11:47 PM she told the investigators that she was not in possession of her phone throughout the night, and that John Doe was in possession of her phone during this time.

227.   A short time later, John Doe clogged Jane Roe's toilet.

61

228.   John Doe advised Jane Roe that he had clogged the toilet and was feeling embarrassed.

229.   Jane Roe giggled and told John Doe "not to worry" because there was a "plumbing issue" with her toilet and "it had happened to her too."

230.   John Doe told Jane Roe that he was embarrassed and thinking about leaving the party.

231.   Jane Roe told John Doe not to worry about the toilet issue and begged him to stay.

232.   Jane Roe told John Doe that he was "overthinking it" and offered him marijuana and alcohol to help him relax. John Doe declined.

**O.   Jane Roe's Sexual Harassment of John Doe and Requests for a "Sexy" Photoshoot**

233.   As the party continued, Jane Roe began to  harass John Doe .

234.    Jane Roe told John Doe that she wanted him  to take  " sexy photos" of her using his professional camera and "amazing photography skills."

235.   John Doe did not want to take sexy photos of Jane Roe.

236.   John Doe told Jane Roe that he was uncomfortable taking sexy photos of Jane Roe.

237.    John Doe told Jane Roe that he was not interested in taking sexy photos of her due to her relationship with Mack Roe .

238.   Jane Roe and Mack Roe were exploring mutual romantic interests at this time and Jane Roe and Mack Roe  were visibly inseparable.

Deleted: .¶



*(IMAGE #6) Photo of Jane Roe (Left) seated with Mack Roe (Right)  provided by Jane Roe*

239.   Jane Roe then showed John Doe boudoir style, semi-nude, and implied nude photographs of herself posted on her Instagram that she had taken with other photographers.

240. John Doe told Jane Roe that he was still uncomfortable with her proposition, given his status as a professional photographer on campus and her relationship with Mack Roe Mack Roe

241. Jane Roe began to harass John Doe with sexual innuendos and continued to ask him to do a "sexy photoshoot of her."

242. John Doe reiterated to Jane Roe that he was uninterested in taking sexy photos of her, given her relationship with Mack Roe.

243. Eventually, John Doe told Jane Roe that he would do a photoshoot with her under three conditions.

244. The conditions were that Jane Roe would have to pay for the photoshoot just like everyone else, have a supportive friend of her choice present at the photoshoot, and that the shoot would be professional, not "sexy" or nude.

245. Jane Roe became agitated, and told John Doe that "she could change his mind"

246. John Doe then began to price match Uber and Lyft to find his way home from the party.

247. John Doe found that due to "increased demand," the ride-sharing service was extremely expensive, and unaffordable to him.

248. John Doe decided to wait until the increased demand and high prices subsided.

64

**P.     The "Debate"**

249.   At approximately 12:30 AM spirited debate ensued between John Doe and Witness one over "political correctness," "PC" culture, and school-related politics.

250.   Eyewitness 1 verbally attacked John Doe.

251.   During the debate, Mack Roe told John Doe, "These women are crazy"

252.   Eventually John Doe withdrew from the debate.

253.   The debate ended at approximately 12:45 AM. John Doe continued price-matching Uber and Lyft to source his way home.

254.   John Doe told Jane Roe that he wanted to leave the party, but the Uber and Lyft prices were too high, so he asked if she could help him find the safest public transportation route.

255.   Jane Roe told John Doe he could stay the night at her apartment. John Doe explained to Jane Roe that he was not comfortable staying the night.

256.   Jane Roe told John Doe she would get him an Uber from her account and asked for his address. John Doe accepted Jane Roe's her offer. John Doe thanked Jane Roe and gave him his address as Jane Roe requested.

**Q.     Jane Roe takes a photo of John Doe Engaged with his Phone**

257.   At 12:50 AM, Jane Roe took a photo of John Doe  sitting down looking at his phone. eyewitness 1 and eyewitness 3 are visible in the background.



*(IMAGE #7) 12:50 AM Photo taken by Jane Roe of John Doe engaged with his phone*

258.    Despite Jane Roe taking this photo, she  told Investigator Kleidman that that John Doe was in possession of her phone during the time that this photo was taken, and that she was not in possession of her phone at all throughout the night.

259.    A few seconds later Jane Roe took a series of photos (Exhibit 57A, Exhibit 57B, Exhibit 57C, and Exhibit 57 E) of Witness 1 and Witness 3 chatting at the computer.

66



*(IMAGES #8-11) 12:50 AM Photos taken by Jane Roe of eyewitness 1 and 3 chatting.*

260.   Despite Jane Roe also taking this series of photos, she told Investigator Kleidman that John Doe was in possession of her phone during the time that this

67

photo was taken, and that she was not in possession of her phone at all throughout the night.

261. Jane Roe then left the living room with her phone and joined Eyewitness 1, Eyewitness 2, and Mack Roe in the bedroom.

262. John Doe continued to sit on his phone and play 8-ball pool  while he waited for the Uber that Jane Roe had said that she ordered to arrive.

263. At 12:59 AM, John Doe received a video from Jane Roe which depicted a clogged toilet with feces swirling in the bowl. John Doe was confused by the video.

264. At approximately 1:00 AM Jane Roe emerged from her bedroom, and said goodbye to eyewitness 1, eyewitness 2, and Mack Roe as they left her apartment.

265. As soon as eyewitness 1, eyewitness 2, and Mack Roe left Jane Roe apartment John Doe asked Jane Roe why she sent him the video, of the clogged toilet. Jane Roe giggled and told John Doe "see I told you it's happened to me too" "don't overthink it, it's fine" "I know you're overthinking it" .

266. Jane Roe continued to laugh at John Doe's reaction and confusion. John Doe told Jane Roe that he wasn't even thinking about the toilet issue anymore and that he was tired and wanted to go home.

267.    Subsequently, John Doe then asked Jane Roe about the status of Uber. Jane Roe told John Doe that the Uber was "on the way". Jane Roe told John Doe to "be patient" and "cheer up" .

**R.    Jane Roe Sends John Doe Explicit Photos and Videos Without John Doe's Consent**

268.    A short time later, without any warning or affirmative consent from John Doe, Jane Roe texted him a photo of her genitals, her buttocks, and a video of her dancing naked in her bathroom.

269.    Giggling, Jane Roe asked John Doe if "he had changed his mind",  to which John Doe responded that he had not.

270.    Jane Roe asked John Doe why he was so serious, and again told John Doe to "Cheer up"

271.    Jane Roe then asked John Doe if he "had ever been with a Puerto Rican girl". John Doe told Jane Roe that he had not but was not interested in getting with her sexually given her relationship with Mack Roe.

272.     Jane Roe told John Doe that "now he had his chance". John Doe did not want to have sex with Jane Roe. John Doe told Jane Roe that he was not interested.

273.    Jane Roe told John Doe that the pictures and videos that she sent to John Doe were "private" and that John Doe must promise that he would not tell

Mack Roe about her sending them, or about him staying the night, or doing a photoshoot of her. Jane Roe told John Doe "You must keep it a secret between us"

274.    John Doe promised Jane Roe that he would keep it a "secret".

275.    Jane Roe then told John Doe that if Mack Roe ever asks about the interactions he should "just make something up".

276.    Jane Roe told John Doe that she was trusting him to not tell Mack Roe and told him that telling Mack Roe would be breaking the trust and that if the trust was broken, there would be "immense consequences".

277.    Jane Roe told John Doe that Mack Row was jealous and possessive  and that she was scared of what Mack Roe would do if he found out that she sent John Doe the photos and videos.

278.     John Doe promised that he would keep their conversation and photos and videos a secret.

279.     Jane Roe then went into her bedroom and closed the door while John Doe sat on the couch watching YouTube videos on his phone.

280.    At approximately 1:30 AM Jane Roe came out of her bedroom and said that she wanted to "talk" to John Doe. Jane Roe told John Doe that she was sorry that her guests were so rude to John Doe, and said "That's just the way that eyewitness 1 can be" "Do not take it to heart"

281.    Jane Roe told John Doe that she agreed with his opinions and tried her best to defend him during the debate.

282.    Jane Roe told John Doe that he was "overthinking" her relationship with Mack Roe. John Doe again asked Jane Roe about the status of the Uber. Jane Roe told John Doe that the "Uber thingy" "wasn't working" and to just be patient.

283.    Jane Roe told John Doe that "she did not believe that he would keep things a secret" from Mack Roe.

284.    Jane Roe told John Doe that Mack Roe was "controlling and abusive" and that she was afraid of what Mack Roe would do if Mack Roe found out that Jane Roe had sent naked pictures of herself to John Doe.

285.    John Doe then screen-recorded the conversation between him and Jane Roe to memorialize the conversation between John Doe and Jane Roe.

Deleted: .

286.    John Doe wanted to document the proof of Jane Roe's harassment.

287.    Jane Roe became irate and lunged for John Doe's phone, and demanded that John Doe turn over his phone.

288.    Jane Roe then blocked John Doe from leaving her apartment.

289.    John Doe then handed Jane Roe his phone.

**S.    Jane Roe Involves Mack Roe and Starts False Narrative**

290.   At 2:10 AM Jane Roe called Mack Roe and falsely alleged that John Doe had accessed her cellphone and had sent explicit pictures and videos from her cell phone to his without her knowledge or consent.

291.   Mack Roe secretly recorded the conversation on his IPAD.

292.   A few moments later, Mack Roe called John Doe and the conversation continued. Jane Roe then deleted the screen recording that John Doe had made, and then created a screen recording of her own, which she then texted to herself.

293.   Jane Roe told John Doe that he had sent explicit photos and videos to himself from her phone without her consent.

294.   Jane Roe wanted Mack Roe to hear her false narrative and accusations against John Doe.

295.   John Doe explicitly denied Jane Roe's false allegations saying "No I didn't" to Jane Roe and attempted to interrupt her lies and to set the record straight with Mack Roe.

296.   Jane Roe refused to let John Doe speak with Mack Roe and instructed John Doe to leave her apartment.

**T.    Jane Roe Threatens John Doe With Title IX Complaint and Coerces John Doe to Make a False Disclosure to Mack Roe Under Threat**

297.   As John Doe was leaving the apartment, Jane Roe told John Doe that if John Doe breaks her trust, " there would be immense consequences" for John Doe.

298.   Jane Roe clarified during her interview that "immense consequences" referred to her filing a Gender-Based Misconduct complaint against John Doe. John Doe promised Jane Roe that "no trust would be broken"

299.   Fearing retribution from Jane Roe, John Doe falsely disclosed to Mack Roe that he had sent himself pictures from Jane Roe's phone.

300.   Given Jane Roe's previous threats and coercive demands toward John Doe, John Doe felt he had no choice but to give a false narrative to Mack Roe that aligned with Jane Roe's.

301.   John Doe was fully aware of the  severe and adverse actions he could face at the hands of Jane Roe if he disclosed to Mack Roe the truth of what actually occurred.

302.   At 2:54 AM Mack Roe called John Doe and told John Doe to tell him "the truth of what happened at Jane Roe's apartment. John Doe explained to Mack Roe that Jane Roe had sent him explicit pictures and videos of herself attempting to seduce him for a "sexy photoshoot", and that Jane Roe had been harassing him throughout the night.

303.   John Doe affirmed to Mack Roe that he did not send himself pictures from Jane Roe's phone and that he only said that he did because Jane Roe had coerced him to say so.

304.   John Doe told Mack Roe that Jane Roe had threatened him that if he told Mack Roe that she had sent him explicit pictures and videos (the truth), there would be immense consequences.

305.   John Doe also explained to Mack Roe that he had made a screen recording of the pictures and videos she had sent him and that it upset her.

306.   John Doe informed Mack Roe that he wanted to file sexual harassment allegations against Jane Roe.

307.   Mack Roe informed John Doe that he must wait until Mack Roe had the chance to speak with Jane Roe regarding the incident before he John Doe took any action against Jane Roe by filing a complaint.

308.   Mack Roe Mack Roe told John Doe he would serve as a "confidential advisor" to him and demanded that John Doe "not take any action" against Jane Roe before first speaking to him.

309.   John Doe agreed not to take any action against Jane Roe, including filing a sexual harassment complaint against Jane Roe before speaking with Mack Roe.

**U.    Jane Roe and Mack Roe Coerce an Apology Text From John Doe for Columbia  to Use as Evidence of Guilt Against John Doe**

310.   Shortly thereafter, Mack Roe confronted Jane Roe about Jane Doe's alleged sexually harassment of John Doe at Jane Roe's apartment, and Jane Roe's sending of her sending nude and sexually explicit photos of herself to John Doe.

311.  Mack Roe told Jane Roe that John Doe was considering filing a sexual harassment complaint against Jane Roe with Columbia University.

312.  Mack Roe told Jane Roe to take legal action against John Doe and file a sexual misconduct against John Doe before John Doe could file one against her, in order to protect herself from John Doe.

313.  Jane Roe told Mack Roe that she "had no evidence against John Doe to support a sexual misconduct complaint against John Doe.

314.  Mack Roe told Jane Roe that Mack Roe would help her get evidence to support a sexual misconduct complaint against John Doe.

315.  Thereafter, Mack Roe told John Doe that he had spoken to Jane Roe and that Jane Roe disputed John Doe's account of what occurred at Jane Roe's apartment and demanding that John Doe send her an apology by text message for "breaking her trust" during the party at Jane Roe's apartment.

316.  John Doe explained to Mack Roe that John Doe had broken Jane Roe's trust by disclosing to Mack Roe that Jane Roe had sent John Doe nude pictures of herself, propositioned John Doe for sex and a risqué boudoir photoshoot.

317.  John Doe explained to Mack Roe, that at no time, did John Doe transfer nude photos of Jane Roe from Jane Roe's phone to John Doe's phone

75

318.   John Doe told Mack Roe that given how "close" Mack Roe was to Jane Roe, that Mack Roe had the right to know what actually occurred between Jane Roe and John Doe at Jane Roe's apartment.

319.   John Doe told Mack Roe that John Doe should not have to apologize to Jane Roe for telling Mack Roe the truth.

320.   John Doe did not want to text Jane Roe an apology, and told Mack Roe that "he did not want to".

321.   John Doe was concerned that an apology text to Jane Roe could be used against John

322.   John Doe explained to Mack Roe that John Doe felt that he was being "setup" by Jane Roe.

323.   . Mack Roe demanded that John Doe text Jane Roe an apology for breaking her trust.

324.   John Doe did not want to text Jane Roe an apology, and told Mack Roe that "he did not want to".

325.   John Doe told Mack Roe that Mack Roe had the right to know what actually occurred.

326.   Mack Roe told John Doe that "he had no choice" but to text an apology to Jane Roe for breaking Jane Roe's trust.

**Deleted:** .

76

327.   John Doe then texted Jane Roe an apology text for "breaking Jane Roe's trust" as demanded by Jane Roe and Mack Roe..

> **Deleted:** <#>¶

328.   In the text message, John Doe apologized to Jane do for "breaking her trust" by disclosing to Mack Roe that Jane Roe had sent John Doe sexually explicit photos and videos of herself, had requested sex from John Doe, and had begged John Doe to stay the night at her apartment.

> **Deleted:** <#>¶

329.   Thereafter, Jane Roe researched John Doe and discovered that John Doe had received a scholarship to Columbia, and that he was recognized for his humanitarian work in Honduras.

330.   John Doe's public recognitions and full-tuition scholarship made Jane Roe upset.

**V.    Jane Roe Spreads False Narrative to  Eyewitnesses in an Effort to Curate Testimony Unfavorable to John Doe and Favorable to Jane Roe**

331.   Later that day, Jane Roe falsely told Eyewitness 1 that during the party, when she and Eyewitness 3 (both party attendees)  were talking  at the John Doe was in possession of her phone and was sending himself nude pictures of her. Jane Roe then asked Eyewitness 1 if she would be a Witness against John Doe and eyewitness 1 agreed to be a witness against John Doe on behalf of Jane Roe.

332.   Jane Roe falsely told eyewitness 2, that during the party,  John Doe was using her phone to order an Uber and that he sent himself her "nudes" . Jane Roe

then asked eyewitness 2 if he would be a Witness against John Doe and eyewitness 2 agreed to be a witness against John Doe on behalf of Jane Roe.

333.    Jane Roe then falsely told eyewitness 4, that during the party, John Doe had requested to use her phone to order an Uber, because his Uber was not working, and subsequently sent himself nude photos and videos of her. Jane Roe asked eyewitness 4 if she would be a Witness against John Doe and eyewitness 1 agreed to be a witness against John Doe on behalf of Jane Roe.

334.    Jane Roe then falsely told her cousin (Individual 5) who did not attend the party,  that during the party, John Doe was in possession of her phone to order an Uber and had sent himself nude photos of her. Jane Roe asked her cousin (Individual 5) if she would be a Witness against John Doe. Individual 5 agreed to be a witness against John Doe on behalf of Jane Roe.

**W.    April 25, 2022: Mack Roe Meets Privately with Jane Roe to Discuss Mack Roe's Secret Recordings With John Doe**

335.    The following day on April 25, 2022, at 4:05 PM Mack Roe texted John Doe informing him that Mack Roe had a "conversation" with Jane Roe that Morning, and that it appeared that the situation was "getting out of his hands".

336.    Mack Roe further informed John Doe that he was to "stay calm and not freak out" and that he was "planning on having a second conversation" with Jane Roe"

**X.    Mack Roe Hands Over Secret Recording to Jane Roe**

337.   1 hour later, at approximately 6:00 PM Mack Roe met with Jane Roe and played the recording he had made of the phone call Jane Roe had placed to his phone on the night of the alleged incident while John Doe was still at Jane Roe's apartment.

338.   Shortly thereafter, Mack Roe provided Jane Roe a copy of the recording of the secretly recorded call.

**Y.    Jane Roe Fears Sexual Harassment Complaint From John Doe and Makes Coercive and Retaliatory Demands of John Doe**

339.   Approximately two hours later, at 7:17 PM, Mack Roe called John Doe on his cell phone. The call lasted 73 minutes. During the call, Mack Roe informed John Doe that he had spoken to Jane Roe and that she was "paranoid" that John Doe would file sexual harassment allegations against her, putting her employment at Columbia University Medical Center in jeopardy.

**Z.    Jane Roe Makes Retaliatory, Coercive and Extraordinary Demands of John Doe**

340.   Mack Roe informed John Doe that Jane Roe had researched him online and had found his photo and featured story plastered on Columbia's website and Instagram accounts. Jane Roe told Mack Roe that John Doe "was undeserving" of his scholarship.

341. Mack Roe informed John Doe that Jane Roe had compiled a list of demands that John Doe must meet to resolve, and "reconcile the case within certain justice boundaries."

342. Mack Roe informed John Doe that if he met Jane Roe's Demands, the case would be resolved, and that Jane Roe would not file a claim against John Doe, accusing him of "serious criminal and immoral actions."

343. Jane Roe demanded that John Doe forfeit his PALS Scholarship Award to Columbia.

344. Jane Roe demanded that John Doe suspend his on-campus photography business, employment, and related endeavors on campus.

345. Jane Roe demanded that John Doe resign as a student representative.

346. Jane Roe demanded that John Doe request that his public feature on Columbia's website regarding his past humanitarian work be removed from the School website and Instagram.

347. Jane Roe demanded that John Doe resign as a student representative.

348. Jane Roe demanded that John Doe return his Leadership Award, which he was awarded by the Dean for his student leadership and service, to Columbia.

349. Jane Roe Demanded that John Doe handwrite her a letter of apology admitting to "breaking her trust" and deliver it to Mack Roe for approval.

350.  Mack Roe informed John Doe that if he did not meet the Jane Roe's demands, she would file a claim against him with Columbia University, accusing him of "serious criminal and immoral actions".

351.  John Doe informed Mack Roe that he "did nothing wrong" and felt uncomfortable admitting something he did not do.

352.  John Doe informed Mack Roe that his Scholarship, awards, and his photography business were "all that he had". John Doe told Mack Roe that he did not want to write Jane Roe a letter as was being demanded.

## AA.  Jane Roe and Mack Roe Coerce "Apology Letter" From John Doe for Columbia to Use as Evidence of Guilt Against John Doe.

353.  Mack Roe informed John Doe that Jane Roe was demanding that John Doe write Jane Roe a handwritten letter of apology "for breaking Jane Roe's trust"

354.  Mack Roe informed John Doe that the apology letter was a prerequisite to Jane Roe not proceeding with the sexual misconduct allegations against John Doe

355.  Mack Roe, on behalf of Jane Roe demanded that John Doe draft the apology letter as requested by Jane Roe and send it to Mack Roe for approval.

356.  Mack Roe informed John Doe that John Doe "had no choice" and "did not understand how serious this was."

357.  Mack Roe told John Doe that he (John Doe) was being uncooperative.

358.  Mack Roe told John Doe that Columbia would do John Doe a "serious injustice" if Jane Roe filed a claim against John Doe.

Deleted:

**Formatted:** List Number Simple

359.   Fearing the prospect of a false complaint of a sexual misconduct complaint being filed against John Doe to Columbia, John  drafted a letter addressed to Jane Roe apologizing for breaking Jane Roe's trust.

360.   John Doe did not send the letter to Jane Roe

361.   John Doe sent the letter addressed to Jane Roe to Mack Roe for Mack Roe's review, and told Mack Roe not to share the letter with Jane Roe.

362.   Mack Roe told Jane Roe that Mack Roe would not share the letter with Jane Roe.

363.   Without John Doe's consent or approval Mack Roe submitted the letter to Columbia to be used as "evidence of guilt" against John Doe.

364.   Jane Roe testified during the investigation that Jane Roe did not see the letter until Columbia presented the letter as "evidence of guilt" against John Doe.

365.   Mack Roe informed Columbia that it was Jane Roe's and Mack Roe's idea that John Roe write the letter and an "option" that Mack Roe gave to John Doe.

366.   John Doe was coerced and threatened by Mack Roe into writing the letter addressed to Jane Ro and into sending the letter to Mack Roe against John Doe's will.

**BB.   Columbia Ignores, and Refuses to Respond to or Investigate John Doe's Reports, Complaint of continued Racial Coercion and Harassment by Mack Roe.**

367. Mack Roe repeatedly told John Doe that John Doe would face "excessive punishment" by Columbia if Jane Roe filed a claim against him "because John Doe was black".

368. Mack Roe repeatedly told John Doe that John Doe was a "black man" and "did not stand a chance"

369. Mack Roe told John Doe that because John Doe was Black, his best choice was to admit that he had stolen nude photographs of Jane Roe from Jane Roe's phone.

370. John Doe repeatedly told Mack Roe that John Doe would prove his innocent of Jane Roe's allegations to Columbia, and in response, Mack Roe repeatedly told John Doe that John Doe's decision was "stupid" because John Doe was "black"

371. Mack Roe's racial harassment of John Doe affected John Doe's ability to concentrate on John Doe's studies.

372. Subsequently, on January 10, 2023 at 4:00 PM John Doe met with Columbia University's Deputy Title IX Coordinator and Senior Director of Title IX investigations Colleen Walsh, and reported to Director Walsh reported to Columbia that he was being retaliated against and racially coerced and harassed by Mack Roe and that Mack Roe's racial harassment of John Doe had been happening for over 8 months. .

83

373.   Mack Roe informed Director Walsh that Mack Roe's racial harassment of John Doe was negatively effecting John Doe's ability to participate in the investigation, succeed in his classes, and meaningfully participate in the Scholarship program that both John Doe and Mack Roe were jointly apart of.

374.   Director Walsh informed John Doe that "she took his report of racial coercion and harassment from Mack Roe seriously" and thanked him for reporting the harassment to Director Walsh.

375.   Director Walsh never followed up with John Doe concerning his reports to Director Walsh about the racial harassment that John Doe had faced from Mack Roe over an extended period of time.

376.   Director Walsh was a designated mandatory report at Columbia and was required to report John Doe's reports of racial harassment from Mack Roe to the appropriate offices at Columbia.

377.   Director Walsh and Columbia ignored John Doe's complaint of racial coercion and harassment and did not initiate any investigation or followup with John Doe in response to John Doe's reported claims of racial harassment by Mack Roe.

378.   Thereafter, on April 7, 2024, John Doe John Doe reported the racial harassment from Mack Roe to James Colegrove, a senior administrative Dean at Columbia University, in a written statement signed by John Doe.

84

379.   Dean James Colegrove never followed up with John Doe in response to John Doe's report of racial harassment from Mack Roe.

380.   On January 28th, 2024 at 10:30 AM, John Doe met with Columbia University's then Senior Vice President of Student Affairs and reported that John Doe had experienced severe racial harassment from Mack Roe.

381.   Columbia had actual knowledge of John Doe's reports of racial harassment from Mack Roe

382.   Not once, did Columbia ask or even attempt to ask Mack Roe about John Doe's allegations of racial coercion and harassment. Columbia was repeatedly, willfully indifferent to John Doe's John Doe's claims of racial harassment and Coercion by Mack Roe.

383.   Columbia took no action to address the racial harassment that John Doe faced at the hands of Mack Roe, and that John Doe reported to Columbia

384.   Columbia's response to John Doe's reports of racial harassment by Mack Roe where unreasonable in light of what John Doe reported to Columbia.

**CC.  Mack Roe Continues his Coercion and Attempts to Blackmail John Doe**

385.   Mack Roe informed John Doe that Mack Roe had incriminating and damaging evidence against John Doe that Mack Roe would disclose the evidence to Columbia if John Doe did not comply with Jane Roe's demands.

> **Formatted:** Superscript

386.    When John Doe asked Mack Roe what he was talking about, Mack Roe refused to tell him. John Doe told Mack Roe that Mack Roe was blackmailing him on Jane Roe's behalf. Mack Roe told John Doe that Mack Roe "was doing the right thing for justice."

387.    Shortly thereafter, John Doe informed Mack Roe that he would be suspending his photography business and forfeiting the photoshoot opportunities that he had been given on campus.

388.    Later that night at 9:49, John Doe sent Mack Roe a handwritten letter for Jane Roe as demanded by Mack Roe and Jane Roe.

389.    In the letter, John Doe apologized to Jane do for "breaking her trust" by disclosing to Mack Roe that Jane Roe had sent John Doe sexually explicit photos and videos of herself, had requested sex from John Doe, and had begged John Doe to stay the night at her apartment.

390.    John Doe instructed Mack Roe  not to share the letter with Jane Roe.

391.    John Doe then informed Mack Roe that he would not be meeting the rest of Jane Roe's demands. Mack Roe told John Doe that John Doe was "making a very bad decision." By not complying with Jane Roe's demands.

392.    Mack Roe informed John Doe that he would inform Jane Roe that John Doe was refusing to meet her demands and that Jane Roe would proceed in filing a claim against John Doe accusing John Doe of "serious criminal and immoral action."

86

393. Shortly thereafter, Mack Roe informed Jane Roe that John Doe was refusing to meet her demands.

394. Mack Roe instructed Jane Roe to take legal action against John Doe and file a complaint against John Doe with Columbia.

**DD. Jane Roe Falsely Accuses John Doe of Sexual Exploitation and Stalking**

395. The following day, On April 26, 2022, Jane Roe sent an email to her program Director Lili Yamaska (a mandatory Columbia reporter), alleging that John Doe had gained unauthorized access to her phone and had sent himself explicit photos and videos from her phone without her knowledge and consent.

396. Jane Roe then filed a complaint with Columbia University's Gender-Based Misconduct Office, Columbia University's Title IX Office, and Columbia University's Student Conduct Office, alleging that John Doe had sexually exploited her by gaining unauthorized access to Jane Roe's cell phone and sent himself sexually explicit images from Jane Roe's phone to John Doe's without her knowledge and affirmative consent.

397. Jane Roe then submitted a report to Niko Crawford (a mandatory Columbia Reporter ) alleging that John Doe had gained unauthorized access to her phone and had sent himself explicit photos and videos from her phone without her knowledge and consent.

398.  Yamaska then called the Gender-Based Misconduct Hotline to report the allegations against John Doe on behalf of Jane Roe to the Gender-Based Misconduct Office (GBMO) At 1:15 PM, a report was submitted to Columbia's GBMO detailing the allegations.  The following morning, on April 27, at 10:21 AM, Jane Roe submitted a written complaint to Columbia's GBMO detailing the allegations.

399.  In Jane Roe's report, Jane Roe stated that the nature of her complaint entailed "Student misconduct, violation of privacy, sexual harassment, intent of defamation, appropriation of personal data including videos and images of explicit and/or sexual content, suspicion of stalking, lack of accountability, multiple transgressive acts in wide severity spectrum, non-accordance with public statements made in representation of the awards, program, school, and university of affiliation as presented in official Columbia University social media and other electronic platforms including official Columbia University website(s)."

400.  Jane Roe stated that John Doe was a "Columbia Constituent and a high-profile representative."

401.  Jane Roe noted that it was "important to know that John Doe was a high-profile student at the School of General Studies and was featured on several official online platforms."

402.   Jane Roe stated, "John Doe is a recipient of the PALS scholarship at Columbia GS, which was awarded for his community work in Honduras related to female hygiene education programs."

403.    Jane Roe Cited "Denim Day" and "Sexual Assault Awareness Month" Jane Roe demanded that Columbia take "subsequent and appropriate action" against John Doe.

**EE.   Jane Roe's Texts to Jane Roe's Cousin (Individual 5,) With False Narrative**

404.   After reporting John Doe to Columbia's GBMO, Jane Roe texted her cousin, (Individual 5)  and Columbia University student, who was not at the party, about the incident and her subsequent reports.

405.   Jane Roe gave her cousin (Individual 5) a false narrative.

406.   Jane Roe wanted to garner support for her false and fictitious sexual misconduct complaint against John Doe

407.    Jane Roe told her cousin (Individual 5)  that she "lowkey feels like this will start a movement". Jane Roe told her cousin that "she had written enough to give speeches".



*(IMAGE #12) Text message exchange between Jane Roe (blue) and Individual 5 (gray)*

408. Jane Roe told her cousin (Individual 5) that, that morning, she discovered that "The guy [John Doe] is the face of the program" and that "He's [John Doe] plastered on all official programs like front page news."

90

409. Jane Roe then linked to the articles on Columbia's website and Instagram, where John Doe was featured for his humanitarian work in Central America, Honduras.

410. Subsequently, Jane Roe told her cousin (Individual 5) that she had filed the Yumaska report against John Doe because she needed "extensions" on her work.

411. Jane Roe then sent her cousin (Individual 5) screenshots of the Yumaska Report that she had filed via email, citing "Denim Day" and "Sexual Assault Awareness Month" at Columbia.

412. Columbia redacted nearly all of Jane Roe's email to Yumaska and refused to provide it to John Doe, despite John Doe's repeated requests.

413. Columbia told doe that the associated email of the Yumaska report that was submitted as evidence against John Doe was "irrelevant"

414. Jane Roe then informed her cousin (Individual 5) that she had filed a report with Title IX.

415. Jane Roe informed her cousin (Individual 5) that Dean Colgrove was requesting to speak with her regarding her allegations and complaint against John Doe.



(IMAGE #13) *Text message exchange between Jane Roe (Blue) and Individual 5 (Gray)*

416.    Jane Roe then informed her cousin (Individual 5) that she was speaking with Dean Colgrove.



(IMAGE #14) *Text message between Jane Roe (Blue) and Individual 5 (Gray) Spanish to English Translation: "Sorry, I am speaking with the Dean"*

92

417.  Thereafter, Jane Roe submitted her text messages exchange with her cousin (Individual 5) to Columbia University GBM to be used as evidence against John Doe.

418.  Jane Roe wanted to make Columbia aware that she planned to "start a movement" on campus as well as "give speeches" regarding her complaints with respect to her sexual misconduct complaint against John Doe.

419.  Columbia was cognizant of the practical disadvantages that might result if any "movements" or "speeches" ultimately materialized pertaining Jane Roe's allegations against John Doe of which Columbia was determined to avoid.

420.  This put additional pressure on Columbia to taking gender-biased action against John Doe to protect their reputation, mitigate the pressure from Jane Roe, and avoid the any practical disadvantages that could stem from Jane Roe's allegations against John Doe.

421.  Columbia was determined to prove to Jane Roe that Colombia took seriously

**FF.    May 5, 2022: John Doe Receives Notice of Jane Roe's Allegations**

422.  On May 5, 2022, John Doe received Notice of Jane Roe's sexual exploitation allegations.

423.  The noticed alleged that on April 23, 2022, while a guest at Jane Roe's "party" John Doe gained unauthorized access to her cell phone and sent himself

Deleted:

Deleted: e

Deleted: and to

Deleted: .

explicit videos and photos from her cell phone to his without her knowledge or affirmative consent.

424.  Columbia considered the fact that the accuser of the alleged misconduct (Jane Roe) was a female, and the accused, (John Doe) was a male in determining whether John Doe's  the alleged misconduct was "gender-based".

425.  Columbia determined that because Jane Roe was a female, and that John Doe was a male, John Doe's misconduct towards Jane Roe was based on Jane Roe's gender.

426.  Jane Roe also accused John Doe of Stalking her with his camera.

427.  Jane Roe's stalking allegation was later dismissed.

428.  Columbia informed John Doe that an investigation had commenced, that a No-Contact Directive had been issued between him and Jane Roe, and that "additional information would be forthcoming." Jane Roe's initial interview was conducted on June 23, 2022.

429.  Columbia informed John Doe that Title IX Investigator Jamie Kleidman was assigned as the leading investigator in John Doe's case.

430.  Investigator Kleidman was appointed by Columbia to the role of Title IX investigator with the expectation that her investigations and reports would inform Columbia's subsequent decisions.

94

**Moved down [1]:** Jane Roe also accused John Doe of Stalking her with his camera.¶

**Deleted:** Jane Roe's stalking allegation was later dismissed. …

**Moved (insertion) [1]**

431.   In her role as Title IX investigator, Jamie Kleidman was charged with creating the narrative account that was later adopted by the hearing panel.

432.   Investigator Kleidman had significant determinative influence over the Columbia's subsequent decision to sanction John Doe for alleged sexual misconduct.

433.   Investigator Kleidman was not impartial.

434.   Investor Kleidman was not unbiased.

435.   Investigator Jamie Kleidman, prior to being hired at Columbia,  was a career Assistant District Attorney and sex crimes prosecutor.

436.   Notably, while working as an Assistant District Attorney and sex crimes prosecutor, Kleidman was accused of prosecutorial misconduct.

437.   Kleidman was  sued in federal court for malicious prosecution of a black man named Taren Tyler who Kleidman had criminally charged with sexual misconduct.

438.   Kleidman was accused of lying under Oath, falsifying arrest reports and voluntary disclosures, "consciously, maliciously, and recklessly" engaging in several civil rights violations including rights to privacy, due process and equal protection under the United States Constitution 4th, 5th, and 14th Amendments, and conspiring to "cover it up".

439.   On December 1st 2025 Taren Tyler passed away in custody.

95

440.    Upon information and belief, Columbia was aware of Kleidman's past record and pattern of misconduct before hiring her as a Title IX Investigator and assigning her to John Doe's case.

**GG.    Columbia's Investigator Kleidman Refuses to Explore and Include Eyewitness Testimony Collected by Investigator Kleidman That Was Favorable to John Doe and John Doe's Defense of the Allegations and Unfavorable to Jane Roe and that Refuted Jane Roe's Sexual Misconduct Allegations Against John Doe and Related Version of Events**

441.    Between June 5, 2022, and July 18, 2022,   Investigator Kleidman interviewed 5 eyewitnesses who were present at the party at Jane Roe's apartment.

442.    Investigator Kleidman  determined that each eyewitness was credible, reliable, and without bias.

Investigator Kleidman wrote in her Investigative Report:

"After applying the common tests of credibility to each witness account, the  Investigative Team found the majority of the witnesses interviewed to be credible, and forthright in their interviews."

443.    Unsurprisingly, no eyewitness present at the party corroborated Jane Roe's narrative, version of events or allegations regarding John Doe's alleged possession of Jane Roe's phone and his alleged dissemination of her intimate images.

444.    Importantly, Jane Roe's and John Doe's phone's different greatly, and were easily distinguishable by the other  guests at the party.

445.   Particularly, Jane Roe testified that at the time in question, she had a bright flamboyant case on her phone which consisted of pink, orange, yellow, green and blue stripes on the case with glitter inside.

446.   In contrast, John Doe had a simple black case on his respective phone.

447.   It was easy for the eyewitnesses and guests at the party to distinguish the phones from each other.

448.   Each eyewitness corroborated John Doe's narrative and version of events with respect to his claim that he was not in possession of Jane Roe's phone throughout the night of the party.

449.   Each eyewitness wholly refuted Jane Roe's narrative, version of events and allegations with respect to John Doe's alleged possession of her phone.

450.   Eyewitness 1 stated that prior to, during, and after her "argument" with John Doe, she observed him with his phone for approximately 1 hour and that she observed him swiping from Uber, Lyft, and other applications on the phone.

451.   Eyewitness 2 stated that he observed John Doe holding a phone before leaving the room that he was in for a duration of 30 minutes to one hour. He further stated that when he returned to the room I was in, approximately 30 minutes to 1 hour later, he observed John Doe with the same phone he had seen me with when he left the room 30 minutes to 1 hour prior.

452.   Eyewitness 4 stated that she did not observe John Doe using Jane Roe's phone but instead recalled him using his own phone. In fact, Witness 4 went even further, and stated that she did not think that John Doe in possession of Jane Roe's phone, but rather his own, even after Jane Roe had alleged to her that John Doe was in possession of hers.

453.   Mack Roe stated that the only observance he recalled regarding John Doe's possession of Jane Roe's phone was at 11:30 PM, approximately 2 hours prior to the explicit pictures and media being transferred when John Doe was attempting to troubleshoot Jane Roe's charging issue with her phone, of which she requested his assistance.

454.   Investigator Kleidman mischaracterized and misconstrued each eyewitness statement in her Investigative Report to align with Jane Roe's narrative and version of events.

455.   Investigator Kleidman omitted critical portions of these eyewitness statements from the Investigative Report.

456.   Investigator Kleidman did so deliberately to disadvantage John Doe.

457.   These critical portions of these eyewitness statements fully exculpated John Doe.

458.   These eyewitness statements wholly supported John Doe's narrative and version of events and wholly refuted those of Jane Roe.

98

459.   Investigator Kleidman omitted these exculpatory eyewitness statements from her Investigative Report and concealed them from the Hearing Panel, Sanctioning Officer, and Appellate Panel.

460.   Kleidman knew that the eyewitness statements were evidence in John Doe's favor.

461.   Investigator Kleidman knew that the eyewitness statements proved John Doe's innocence by a preponderance of the evidence.

462.   The eyewitness testimonies provided by Eyewitnesses 1, 2, 3, 4, and Mack Roe consistently and unequivocally supported John Doe's version of events.

463.   The eyewitness testimonies provided by Eyewitnesses 1, 2, 3, 4, and Mack Roe consistently and refuted Jane Roe's narrative and version of events.

464.   Investigator Kleidman's conscious and bad faith mischaracterizations and deliberate omissions of these critical eyewitness statements from her Investigative Report significantly altered the narrative presented to the Hearing Panel, Sanctioning Officer, and Appellate Panel.

465.   Investigator Kleidman's deliberate omissions concealed exculpatory evidence favorable to John Doe that was pivotal in corroborating John Doe's innocence and undermining Jane Roe's allegations.

466.   Kleidman's deliberate omissions compromised the integrity of the investigation, contributing to a biased and erroneous finding against John Doe.

**HH.  Jane Roe's  Initial Interview With Title IX Investigator Jamie Kleidman**

467.   Between September 23,  2022 and February 24, 2023, Jane Roe was interviewed three times by Columbia regarding John Doe's alleged sexual exploitation.

468.   Investigator Kleidman provided Jane Roe thorough advice as to the resources available to her to assist her in the process..

469.   Investigator Kleidman took a narrative account from Jane Roe without leading questions and without hostility.

470.   Jane Roe had limited and inconsistent recall about the night in question, and alleged dissemination of images.

471.   Jane Roe lied to Investigator Kleidman stating that she was not in possession of her phone throughout the night.

472.   Jane Roe's statements were directly refuted by the evidence.

473.   Jane Roe gave inconsistent statements regarding the night and incident in question.

474.   Jane Roe gave inconsistent statements regarding her own possession of her phone throughout the night, and during the time that the transfer of images took place.

475.   Jane Roe gave inconsistent statements regarding how John Doe came to be in possession of her phone.

476.   Jane Roe gave inconsistent statements regarding the amount of times that John Doe was in possession of her phone.

477.   Jane Roe gave inconsistent statements regarding when John Doe first obtained possession of her phone, and when she regained possession of her phone.

478.    Jane Roe gave inconsistent statements regarding how many times she unlocked her phone for John Doe.

479.   Jane Roe gave inconsistent statements about the length of time that John Doe was allegedly in possession of her phone.

480.   Jane Roe gave inconsistent statements about where the explicit photos and videos were located in her phone.

481.   Incredibly, none of these inconsistent statements by Jane Roe were questioned, explored, or followed up on by Investigator Kleidman, the Hearing Panel, or the Appellate Panel.

482.   None of these inconsistent statements, were considered by Investigator Kleidman, the Hearing Panel, or the Appellate Panel in their assessment of Jane Roe's credibility.

483.   Investigator Kleidman's the Hearing Panel's, and Appellate Panel's refusals to impartially assess Jane Roe's credibility was deliberate and sex-biased.

484.   Investigator Kleidman, the Hearing Panel, and the Appellate Panel flat-out ignored these inconsistent statements from Jane Roe regarding her account of the alleged sexual exploitation.

485.   Despite this profusion of inconsistent statements from Jane Roe, Investigator Kleidman, the Hearing Panel, and the Appellate Panel determined that Jane Roe's account remained consistent over time, reliable, and credible.

## II.   Subpoenaed Text Message Communications Between Jane Roe and Mack Roe Establish That The Integrity of the GBM Proceeding was Severely Compromised, that Jane Roe's Account Was Not Credible, that Jane Roe Made Various False Statements to Columbia During the GBM Proceeding and That Jane Roe's Conduct with Mack Roe Throughout the Proceeding Was Calculated, Coordinated, and Contrary to the Account She Presented to Columbia

486.   Pursuant to a subpoena issued in this action, John Doe obtained confidential text message communications involving Jane Roe spanning from April 24, 2022 the morning after the incident at her apartment through April 11, 2024  the day Dean Colgrove issued his GBM Sanction Letter.

487.   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨

**Formatted:** Heading 2

488.

489.

490.

491.

492.



493.

494.

495.

496.



497. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

498. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

499. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

500. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

501. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

502.

503.

504.

505.

506.

507.

508.

106



509.

510.

511.

512.

513.

514.

515.

516.

517.

**Formatted:** Indent: Left: 0.5", No bullets or numbering

**JJ.    July 13, 2022: Mack Roe's Initial Interview With Investigator Kleidman**

518.   On July 13, 2022, Investigator Kleidman interviewed Mack Roe.

519.   Investigator Kleidman advised Mack Roe on the prohibition on retaliation.

520.   Investigator Kleidman advised Mack Roe on the policies governing disclosures of evidence.

521.   Mack Roe told Investigator Kleidman that he was requesting that any evidence that he shared with them to be classified and sealed from John Doe.

522.    Mack Roe explained that his "evidence" was only for the investigators to "judge the situation" and not for John Doe's review.

523.   Investigator Kleidman explained to Mack Roe that any evidence Mack Roe shared would be disclosed to the other parties.

524. Mack Roe said that it was "disappointing" and "gap" and that his evidence would be shared with John Doe.

525. Mack Roe told Investigator Kleidman that John Doe did not know that he was being called as a witness.

526. Investigator Kleidman told Mack Roe that if his evidence was not disclosed to John Doe, and if John Doe was found responsible after relying on the evidence, she "would risk losing the case on appeal" and "would have to start over again".

527. Mack Roe responded by telling Investigator Kleidman "that sounds excellent".

528. Mack Roe went on to tell Investigator Kleidman that his mission was to "serve justice" which made him "volunteer to be a witness" in the case against John Doe.

**KK.  Mack Roe Discloses a Secret Recording of John Doe and Jane Roe**

529. During his interview Mack Roe told Investigator Kleidman that he had recorded the conversation that took place between John Doe, Jane Roe, and himself when she called him after the party.

530. Mack Roe asked Investigator Kleidman if she wanted to hear it. Investigator Kleidman said "that would be great"

531.   Before playing the secret recording, Mack Roe told Investigator Kleidman that he had told John Doe that he had to write Jane Roe a letter, give up his PALS scholarship award and that he told John Doe that John Doe "had to give things up" to "show that he had learned."

532.   Mack Roe then played the recording for Investigator Kleidman.

533.   The secret recording was incomplete, and edited, only portraying a portion of the conversation between John Doe and Jane Roe.

534.   Conspicuously, a 2 minute and 50 second portion of the conversation, that was crucial to John Doe's defense, was missing from the secret recording.

535.   Mack Roe then told Investigator Kleidman that John Doe was given a list of actions to take and things to give to Jane Roe, but that John Doe was not cooperating "for some reason."

536.   Mack Roe told Investigator Kleidman that John Doe had written a letter to Jane Roe and subsequently submitted it to Investigator Kleidman as "evidence".

537.   Mack Roe told Investigator Kleidman that he had other secretly recorded conversations with John Doe but that he "had to listen to them first" before sharing them with Investigator Kleidman.

538.   Mack Roe said that he could "summarize" the secret recordings and that Investigator Kleidman "should just take his word" for what the secret recordings contained.

110

539. Twice, Investigator Kleidman asked Mack Roe for the dates of the secret recordings and both times

540. Mack Roe told Investigator Kleidman that he was "unwilling" to share the dates of the secret recordings.

541. Investigator Kleidman explained to Mack Roe that if he did not turn over the secret recordings, there was a risk that the recordings would be rejected by the hearing panel if they were submitted after the factual summary was written.

542. Investigator Kleidman then told Mack Roe that she would set up a second interview with him so that he could "listen to the recordings' to refresh his memory. Investigator Kleidman then scheduled a follow-up interview for July 18, 2022.

**LL.    July 18, 2022: Mack Roe's Follow Up Interview with Title IX Investigator Jamie Kleidman and Senior Director of Title IX Investigations Colleen Walsh**

543. On July 18, 2022, Mack Roe met with Investigator Kleidman and Senior Director of Title IX Investigations, Colleen Walsh.

544. Director Walsh noted  Mack Roe's prior refusal to share his secret recordings with Investigator Kleidman and asked him where he had "landed on sharing the calls"

545. Mack Roe informed Director Walsh that he had "reviewed the recordings" and that she "should just take his word" about what secret recordings contained.

546. Mack Roe did not want his secret recordings to be scrutinized.

547. Mack Roe informed Director Walsh that submitting the secret recordings would "complicate the situation"

548. Mack Roe further informed Director Walsh that "if the case goes to court, [he] Mack Roe will come to the court and "bring the recordings".

549. Director Walsh explained to Mack Roe that they were not prosecuting John Doe and that there would be no court case.

550. Mack Roe told Director Walsh that they should just "rely on his memory" of what was contained in the secret recordings.

551. Director Walsh explained to Mack Roe how the secret recordings could be used to find John Doe responsible.

552. Specifically, Director Walsh told Mack Roe that his secret recordings were "actual evidence" against John Doe.

553. Director Walsh told Mack Roe that his secret recordings and the "best evidence" against John Doe because John Doe "could not argue with a recording".

554. Director Walsh pleaded with Mack Roe to release his secret recordings with John Doe.

555. Mack Roe repeatedly told Director Walsh that he would not release the recordings.

556. Mack Roe explained that he was "asserting his rights" to the secret recordings.

557. Director Walsh responded by telling Mack Roe that his refusal to submit the recordings, and his withholding of evidence, and could be adverse to his "Credibility Assessment" that they would have to make of him later on in the process.

558. Mack Roe repeatedly asked Director Walsh who would have access to his credibility assessment, if one was conducted and what policies governed its disclosure.

559. Director Walsh told Mack Roe that the credibility assessment would be made available to the other parties, as well as campus partners.

**MM. Mack Roe Spars with Director Walsh Over Access to the Recording and Transcripts of His Investigative Interview**

560. Mack Roe asked Director Walsh if she could share with him the recording of his interview from July 13, 2022.

561. Director Walsh explained to Mack Roe that he was not a party to the case, and therefore the policy prohibited the disclosure of the recording of his investigative interview.

562. Director Walsh further explained  to Mack Roe that witnesses do not have access to transcripts of recordings of interviews, and therefore she was unable to provide it.

563. Mack Roe argued with Director Walsh and demanded access to the recording and transcript of his interview.

564. Director Walsh repeatedly asked Mack Roe why he wanted to access his recording and transcript and Mack Roe refused to answer.

565. Director Walsh proposed alternative ways that Mack Roe could review the transcript and recording of his interview that would not require Director Walsh to release it to him.

566. No other option was acceptable to Mack Roe.

567. Director Walsh told Mack Roe that she would check with Columbia's General Counsel's Office, and Title IX Coordinator Marjory Fisher to see if a special exception could be made for Mack Roe to access the transcript and recording of his investigative interview.

**NN. Mack Roe Barters with Director Walsh Over Secret Recordings**

568. Mack Roe informed Director Walsh that if she released the recording and transcript of his interview to him, he would release the secret recordings to her.

569. Mack Roe wanted to use his secret recordings as bartering chips.

114

570.  Director Walsh reiterated to Mack Roe that he was a witness, and not party to the case, and therefore the policy prohibited the disclosure of the recording of his interview.

571.  Director Walsh informed Mack Roe that witnesses do not have access to transcripts of recordings of interviews, and therefore she was unable to provide it pursuant to Columbia's policy.

572.  Director Walsh reiterated to Mack Roe that she would check with Columbia's General Counsel's Office, and Title IX Coordinator Marjory Fisher to see if a special exception could be made for Mack Roe.

573.  Again, Director Walsh asked Mack Roe to release his secret recordings. Mack Roe told Director Walsh that until she was willing to accept his recordings in exchange for access to his interview transcripts, "he would say Goodbye".

574.  A short time later, Mack Roe agreed to play a portion of a secret recording that he had made between himself and John Doe discussing aspects of the case.

575.  Unsurprisingly again, this secretly recorded conversation between John Doe and Mack Roe was  edited, incomplete.

576.  The secret recording was  missing approximately 30 crucial minutes of the conversation.

577.   Director Walsh again pleaded with Mack Roe to release his secret recordings.

578.   Director Walsh reiterated to Mack Roe that the recordings would be a major part of the credibility assessments of the parties later in the process.

579.   Mack Roe informed Director Walsh that he was still not willing to release the recordings, "at this time" but that "he would think about it".

**OO.   August 10, 2022: John Doe's Initial Interview With Investigator Kleidman and  Director Walsh**

580.   On August 10, 2022, Investigator Kleidman interviewed John Doe. It had been 106 days since Jane Roe filed her  false and fictious  complaint of sexual exploitation against John Doe.

581.   Investigator Kleidman prohibited John Doe from participating virtually from the privacy and comfort of his home.

582.   Investigator Kleidman had permitted Jane Roe to participate virtually from the privacy and comfort of her home.

583.   Investigator Kleidman mandated that John Doe report to his Attorney Advisor's Office for each Investigative interview.

584.   Investigator Kleidman did not require Jane Roe report to her Attorney Advisor's Office for each Investigative interview.

585.   Investigator Kleidman required that John Doe report to his Attorney Advisor's Office for each official meeting with investigators.

116

586. Investigator Kleidman had not required Jane Roe report to her Attorney Advisor's Office for each official meeting with Investigators.

587. John Doe's attorney advisor's office was a nearly 2 hour round trip commute from John Doe's home.

588. Investigator Kleidman required that John Doe's Attorney Advisor confiscate his personal electronic devices including his laptop, apple watch, and cell phone before each investigative interview and official meeting.

589. Investigator Kleidman did not require Jane Roe's Attorney Advisor to confiscate her personal electronic devices including her laptop, and cell phone before each investigative interview and meeting.

590. Investigator Kleidman required John Doe and his Attorney Advisor to verbally and physically confirm that John Doe's electronic devices had been confiscated.

591. Investigator Kleidman prohibited John Doe from accessing his personal electronic devices during investigative interviews and official meetings.

592. Investigator Kleidman permitted Jane Roe to access her personal electronic devices during investigative interviews and official meetings.

593. Investigator Kleidman gave John Doe no explanation for the mandates she imposed.

594.    Investigator Kleidman's draconian mandates she imposed on John Doe were procedurally irregular and not permitted by the Gender-Based Misconduct Policy.

595.    Kleidman's draconian mandates on John Doe adversely affected his ability to respond and effectively defend himself against Jane Roe's false and fictitious allegations of sexual misconduct.

596.    Investigator Kleidman never informed John Doe that he was entitled to seek the support of the Dean of his school.

597.    At no point did Investigator Kleidman inform John Doe of resources available to him to aid him in the process.

598.    During John Doe's  interview he provided a detailed account of what occurred on the night of April 22, 2023, and April 24, 2023. John Doe stated that Jane Roe's allegations were retaliatory, fictitious and false.

599.    John Doe described how Jane Roe had been sexually harassing him throughout the night of the party while requesting a sexy photoshoot.

600.    John Doe described how Jane Roe had attempted to solicit him for sex.

601.    John Doe described how Jane Roe had sent him sexually explicit pictures and videos of herself without his consent.

602.    John Doe described how Jane Roe had called Mack Roe and gave a false narrative as it pertained to what occurred.

118

**Deleted:** ed

603. John Doe described how Jane Roe coerced him and threatened him with "immense consequences" if the "trust was broken" , meaning a truthful disclosure to Mack Roe.

604. John Doe also described how he was coerced by Jane Roe and Mack Roe into sending the "apology text" to Jane Roe.

605. John Doe described how Jane Roe made coercive and extortionary demands of him, including the written letter of apology.

606. John Doe described how Jane Roe filed the false and fictitious complaint against him for telling Mack Roe that she had sent her explicit pictures and videos to him without his consent.

607. John Doe described how Jane Roe filed the false and fictitious complaint against him for not complying with the demands that Jane Roe made of him.

**PP.   September 15, 2022: Mack Roe Tells John Doe about His Secret Recordings and Continues his Coercive and Retaliatory Behavior Against John Doe**

608. On September 9, 2022, Mack Roe disclosed to John Doe that he had secretly recorded the conversation between himself, John Doe and Jane Roe on the night of April 23, 2022, and early morning of April 24, 2022.

609. Mack Roe informed John Doe that he had secretly recorded the entire conversation on his iPad.

610. Mack Roe informed John Doe that he had recorded every phone conversation between himself and John Doe since the incident had occurred.

611. Mack Roe informed John Doe that he gave Jane Doe a copy of the secret recording.

612. Mack Roe told John Doe that Mack Roe had "edited some parts" of the recordings that could be used against Mack Roe.

613. Mack Roe had falsified the recordings.

614. Mack Roe was concerned that his falsification of the recordings and tampering of evidence would be revealed to Columbia.

615. Mack Roe informed John Doe that he had only played "bits and pieces" of the recorded conversations for the Investigative Team.

616. Mack Roe informed John Doe that he played the recording for Jane Roe and provided Jane Roe a copy of the recording shortly after the incident. John Doe asked Mack Roe to give him a copy of the recordings and Mack Roe refused.

617. Mack Roe refused telling John Doe that he did not want him to be able to "mount a defense".

618. John Doe then asked Mack Roe to send a copy of the recordings to his Attorney Advisor for review. Mack Roe refused, again telling John Doe that he did not want him to be able to "mount a defense"

120

619.   Mack Roe told John Doe to not "freak out "Mack Roe informed John Doe that he had demanded of Director Walsh that the recordings not be used as evidence unless his demands were met.

620.   Mack Roe informed John Doe that he was giving John Doe the opportunity to comply with the demands that Jane Roe made of him.

621.   Mack Roe told John Doe that there were parts of the recordings that were "helpful" to John Doe but that he had "edited those out".

622.   Mack Roe told John Doe that if he complied with Jane Roe's demands, he would provide the entire recordings to Columbia, including the edited parts which would be "helpful" to John Doe.

623.   Mack Roe informed John Doe that if he did not comply with Jane Roe's demands, he would release the edited recordings to Columbia.

624.   John Doe informed Mack Roe that editing the recordings constituted falsification and retaliation and was in violation of the Gender-Based Misconduct Policy and Student Conduct Policy.

625.   Mack Roe informed John Doe that "he was not worried" because Director Walsh said that he was "protected as a witness" Mack Roe told John Doe that if  John Doe filed a falsification claim against him with Columbia, he would accuse him of retaliation.

626.    Mack Roe informed John Doe that he was being pressured by Director Walsh and Investigator Kleidman to release the full recordings.

627.    Mack Roe told John Doe that Director Walsh had threatened him with a credibility assessment if he did not release the full  recordings.

628.    Mack Roe showed John Doe an email chain between himself and Director Walsh discussing the production and usage of the secret recordings as evidence against John Doe.

629.    Mack Roe told John Doe that he would "fuckin kill" John Doe if Director Walsh found him "not credible"

630.    . Mack Roe told John Doe that he was in "negotiations" with Director Walsh about the usage and production of the recordings.

631.    Mack Roe informed John Doe that he had made "demands" of Director Walsh that she provide him an attorney advisor  at Columbia's expense, to advise him on what recordings to submit, and what recordings to withhold.

**QQ. Director Walsh and Mack Roe  Strike Deal Over Production and Usage of Secret Recordings, and Director Walsh Assigns Mack Roe an Attorney Advisor at Columbia's Expense.**

632.    At the behest of Mack Roe's demands, Director Walsh assigned Mack Roe an Attorney Advisor at Columbia's expense in exchange for Mack Roe's submission of his secret recordings with John Doe.

122

**RR.** **Columbia Deviates from Policy of Title IX and Withholds Relevant Evidence from John Doe That Columbia was Required to Disclose to John Doe Pursuant to Title IX and its Regulations.**

633. Mack Roe exchanged various communications and emails with Columbia concerning evidence that Mack Roe would eventually submit to Columbia to be used as evidence against John Doe.

634. John Doe became aware of these communications through Mack Roe in September of 2023 when Mack Roe showed John Doe the emails. .

635. John Doe identified the communications and discoverable in the proceeding and as a source of information favorable to him and relevant to his claims and defenses in the disciplinary proceeding.

636. The communications were highly relevant to John Doe's disciplonary proceeding.

637. The communications were vital to John Doe's defense in the disciplinary proceeding.

638. On three separate occasions, John doe requested that Columbia's Title IX Coordinator Marjory Fisher produce the communications and emails from Mack Roe that discussed the usage and production, of the secret recordings between Mack Roe and John Doe.

639. John Doe explained to Columbia that John Doe had the right under Title IX and its regulations to review the communications.

123

640.   John Doe also requested that Fisher disclose to him the "demands" that Mack Roe had made of her, and Director Walsh, because it was valuable evidence for his defense.

641.   John Doe was entitled to this evidence under Title IX and its regulations.

642.   Fisher was required to disclose this evidence to John Doe under Title IX and its regulations.

643.   Title IX and its regulations mandated that Columbia University disclose communications relevant to sexual misconduct proceedings between the University and any party participating in the disciplinary proceeding.

644.   Title IX and its regulations required Columbia to upload the communications to the evidence file so that John Doe could review the communications, and respond prior to the hearing.

645.   Fisher denied John Doe's requests and stated that the emails, and related demands from Mack Roe were "not relevant" to the facts or issues of the case and would not be disclosed to John Doe.

646.   Marjory Fisher lied to John Doe

647.   John Doe appealed the decision to Laura Kirschstein ,Columbia's Vice Provost for the Office of Institutional Equity.

124

**Deleted:** .

**Deleted:** .

648.   Kirschstein advised John Doe that the emails from Mack Roe were "irrelevant" and would not be produced to John Doe.

649.   The emails were relevant, and Laura Kirschstein was required to disclose the emails to John Doe pursuant to Title IX and its regulations.

**SS.    Mack Roe Releases Edited Secret Recordings of John Doe to Columbia to be Used as Evidence Against John Doe.**

650.   Shortly thereafter, Mack Roe released three secret recordings to Investigator Kleidman to be used as evidence against John Doe.

651.   Two of the secret recordings were selectively edited, and two recordings of the calls were missing altogether.

652.   Mack Roe informed John Doe that Mack Roe was concerned that parts of the recordings "could be used against [Mack Roe]" and implicate Mack Roe in violations of Columbia's Policies.

653.   Mack Roe informed John Doe that parts of the recordings could help John Doe defend himself against the sexual allegations brought by Jane Roe against John Doe.

654.   Mack Roe informed John Doe that parts of the recordings could "weaken" Jane Roe's position with respect to Jane Roe's sexual misconduct allegations against John Doe.

125

655. Mack Roe informed John Doe, that it was at the advice of his attorney advisor, that he edited the recordings, and excluded others, before submitting them to Investigator Kleidman.

## TT. November 1, 2022: John Doe's Follow Up Interview With Investigator Kleidman

Deleted: <#>

656. On November 1, 2022, Investigator Kleidman conducted a follow-up interview with John Doe.

657. At the outset of the interview Investigator Kleidman presented Mack Roe's edited recordings. This was the first time that John Doe heard the secret recordings.

658. It had been 191 days since the incident occurred at Jane Roe's apartment from which the secret recordings derived.

659. Mack Roe had been in possession of the secret recordings for 191 days.

660. Jane Roe was in possession of the recordings for 189 days.

661. Investigator Kleidman had been in possession of the recordings for approximately 150 days.

662. Investigator Kleidman did not inform John Doe that she possessed the secret recordings, nor did she give him a chance to review the secret recordings in advance of his investigative interview.

663. Investigator Kleidman was aware that John Doe had not had the chance to review the secret recordings prior to his interview, and that John Doe did not know what the secret recording contained.

664. Investigator Kleidman began to interrogate John Doe about what was captured in the secret recording.

665. Investigator Kleidman was hostile and fired rapid fire questions at John Doe designed to elicit a confession from John Doe.

666. Investigator Kleidman also fired leading questions at John Doe, designed to elicit a confession from John Doe.

667. Investigator Kleidman fired trick questions at John Doe designed to mislead and confuse John Doe.

668. When John Doe asked Investigator Kleidman about the dates and times of the recordings, Investigator Kleidman told John Doe, that was for him to figure out, and not for her to disclose.

669. Despite John Doe's repeated requests Investigator Kleidman refused to provide the dates and times of the secret recordings.

670. Investigator Kleidman repeatedly asked John Doe questions regarding the recordings that she knew he could not answer.

671. At one point Title IX Investigator Michelle Ashcroft burst out laughing at John Doe.

672. Investigator Kleidman's interrogation of John Doe became so hostile that John Doe's Attorney advisor was forced to end the interview mere minutes after it had started.

**UU.  December 20, 2022: Mack Roe Continues His Retaliation Against John Doe, Shoves Him in the Back at a Food Cart.**

673. On December 20, 2022, at 12:05 AM as John Doe was waiting to order food at a food truck nearby campus, Mack Roe approached John Doe from behind and shoved him in the back.

674. The shove knocked John Doe off balance.

675. Mack Roe then verbally accosted John Doe and asked him if he wanted to fight. John Doe told Mack Roe that he (John Doe) did not want any problems.

676. Mack Roe's shove was unwanted by John Doe. Mack Roe's shove was unwelcomed by John Doe. Mack Roe's shove put John Doe in fear for his safety.

677. Mack Roe then told John Doe that he was upset that John Doe was not admitting to Jane Roe's allegations.

678. Mack Roe told John Doe that he Mack Roe could seriously hurt John Doe. Mack Roe repeatedly told John Doe, that Mack Roe had several had a "very violent past".

679. Mack Roe told John Doe that he Mack Roe had "beat up" many people in the past. Mack Roe told John Doe that Mack Roe "would just snap" and hit people in the face, knocking them unconscious.

128

680.   Mack Roe told John Doe that John Doe needed to comply with Jane Roe's demands.

681.   Mack Roe told John Doe that Jane Roe was "paranoid about losing her scholarship" if John Doe reported Jane Roe's behavior at the party to Columbia.

682.   Mack Roe told John Doe that Jane Roe promised him, that if John Doe just admitted to the allegations, Jane Roe would tell Columbia to dismiss the Gender-Based misconduct complaint against John Doe.

683.   Mack Roe told John Doe that he Mack Roe would ensure that Columbia is "Merciful" to him. Mack Roe told John Doe that the choice was up to him John Doe but that if John Doe continued to refuse to comply with Jane Roe's demands, things would get "much worse."

684.   John Doe told Mack Roe that John Doe did nothing wrong and was determined to prove his innocence.

685.   Mack Roe told John Doe, "You will not survive this". John Doe told Mack Roe that Mack Roe and Jane Roe were coercing, extorting, and retaliating against him.

686.   Mack Roe told John Doe that he and Jane Roe were "doing the right thing for justice".

687.    Mack Roe told John Doe, that if John Doe reported him to Columbia for coercion, extortion, or retaliation, Mack Roe would file a complaint with Columbia's Gender-Based Misconduct Office accusing John Doe of retaliation.

**VV.    January 2, 2023: Investigator Kleidman Releases Three Edited Secretly Recorded Voice Recordings of John Doe That She Received from Mack Roe in September**

688.    On January 2, 2023, Investigator Kleidman notified John Doe that she would release the additional secret recordings that she received from Mack Roe in advance of his interview.

689.    Investigator Kleidman required that John Doe sign a confidentiality agreement before the recordings were released.

690.    John Doe signed the confidentiality agreement as requested, and Investigator Kleidman subsequently released the recordings.

691.    The secret recordings were not in native file format.

692.    The secret recordings contained no metadata.

693.    The secret recordings had no dates.

694.    The secret recordings had no times.

695.    Parts of the secret recordings were intelligible.

696.    The secret recordings were manipulated.

697.    The secret recordings were selectively edited.

698.    Secret recording #1 was missing 2:30 minutes.

130

699.    Secret recording #2 was missing 30.5 minutes.

700.    The secret recordings were incomplete.

701.    The secret recordings were unreliable.

702.    The secret recordings were inadmissible.

703.    The secret recordings were unable to be authenticated by Plaintiff.

704.    The secret recordings were unable to be authenticated by Columbia.

705.    Columbia was unable to authenticate the secret recordings.

706.    Pursuant to a discovery request for admission served on Columbia in this action, Columbia "admitted" that Columbia was "unable to admit or deny" that the secret recordings were edited in whole or in part prior to their submission to Columbia.

**WW. January 5, 2023: Investigator Kleidman Resumes Interview With John Doe**

707.    On January 5, 2023, Investigator Kleidman resumed her November 1st interview with John Doe. Investigator Kleidman focused mainly on Mack Roe's secret recordings.

708.    Investigator Kleidman asked John Doe to explain what was captured in the secret recordings.

709.    John Doe explained to Investigator Kleidman that the secret recordings were edited.

131

710. John Doe explained to Investigator Kleidman that the secret recordings were incomplete.

711. John Doe explained to Investigator Kleidman that the secret recordings were manipulated.

712. John Doe explained to Investigator  Kleidman that the secret recordings were edited.

713. John Doe explained to Investigator Kleidman that the secret recordings were falsified.

714. John Doe explained to Investigator Kleidman that parts of the secret recordings were unintelligible.

715. John Doe explained to Investigator Kleidman that the recordings were unreliable.

716. John Doe explained to Investigator Kleidman that due to the falsification, incompleteness, and unreliability of the recordings, he was unable to meaningfully respond but gave a detailed account and explanation nonetheless of what was captured.

717. After the interview John Doe referenced his call log that contained his calls with Mack Roe, and subsequently, submitted a written explanation of the calls to Investigator Kleidman, detailing how the recorded conversations were edited and incomplete.

132

718.    John Doe informed Director Walsh and Investigator Kleidman that I wished to pursue a retaliation and falsification complaint against Mack Roe due to actions towards John Doe, and his falsification of the Secret recordings.

**XX.    February 8, 2023: John Doe Reports Jane Roe and Mack Roe for Retaliation and files a Retaliation Complaint against Jane Roe and Mack Roe to Columbia.**

719.    On February 8, 2023, Investigator Kleidman and Director Walsh met with John Doe to follow up on his retaliation claims that he had submitted by email.

720.    Director Walsh informed John Doe that she had received his email outlining the retaliation allegations that he was making against Jane Roe and Mack Roe.

721.    Director Walsh informed John Doe that in response, she met with Mack Roe to "get his side of the story".

722.     Director Walsh explained to John Doe that she informed Mack Roe that John Doe had made retaliation allegations against him but had not yet filed an official complaint with the Gender-Based Misconduct Office (GBMO).

723.    Director Walsh informed John Doe that Mack Roe informed her that if John Doe did choose to file an official retaliation complaint,  he would file a cross-complaint against John Doe accusing him of retaliation.

724.    Director Walsh discouraged John Doe from filing an official report with GBMO, stating that Mack Roe would file a complaint against John Doe in response.

133

Deleted: .

725. John Doe told Director Walsh that his complaint was grounded in facts, and substantial evidence that would support his allegations against Jane Roe and Mack Roe.

726. Director Walsh was disinterested in taking John Doe's complaint.

727. John Doe explained to Director Walsh that Sexual Exploitation and Stalking allegations by Jane Roe, were due to his refusal to meet Jane Roe's demands, and to silence him from making a complaint against Jane Roe.

728. John Doe told Director Walsh how Mack Roe had disclosed recording Witness 6's exposed breasts without her knowledge or consent at Jane Roe's party on April 23, 2022, and was attempting to silence him.

729. John Doe explained to Director Walsh how Mack Roe threatened to kill him if he told anyone about the disclosure, and did not keep it a secret. John Doe explained to Director Walsh how Jane Roe had threatened him and coerced a false disclosure to Mack Roe.

730. John Doe explained how Jane Roe and Mack Roe colluded to coerce an apology text to Jane Roe against his will.

731. John Doe explained how Jane Roe and Mack Roe colluded to coerce an apology letter to Jane Roe against his will.

732. John Doe explained how Jane Roe and Mack Roe colluded to coerce him to suspend his photography business, resign from leadership positions, give up

his scholarship award, forfeit his leadership award, suspend his photography business, and admit to the allegations, and accept the sanctions without appeal.

733. John Doe explained to Director Walsh how Mack Roe had shoved him in the back at a food cart for John Doe's refusals to meet Jane Roe's demands.

734. John Doe explained to Director Walsh how Mack Roe was preventing him from seeking services and telling anyone else including the Investigative Team about his role and involvement in the matter, as well as his disclosure of recording Witness 6's breasts.

735. John Doe explained to Director Walsh how Mack Roe had repeatedly threatened to hurt him, kill him, and accuse him of retaliation.

736. John Doe explained to Director Walsh that he feared for his life, and that Mack Roe would seriously hurt, or try to kill him.

**YY. Investigator Kleidman and Director Walsh Ignore John Doe's Retaliation Complaint, Refuses to Investigate his Claims.**

737. Investigator Kleidman and Director Walsh did not take John Doe's complaints of retaliation seriously.

738. Kleidman and Director Walsh downplayed, and completely ignored John Doe's complaints of retaliation and refused to investigate them.

739. Investigator Kleidman and Director Walsh took every opportunity they could to blame John Doe and defend the actions of Mack Roe and Jane Roe.

740. Investigator Kleidman was hostile to John Doe's claims, and subsequently wrote in her report, that John Doe's retaliation allegations and complaints against Jane Roe and Mack Roe and complaints were mere grievances.

741. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were ,"exaggerated".

742. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were , "embellished".

743. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were "blaming".

744. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were "unreasonable".

745. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were "deflective".

746. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were "uncandid".

747. Investigator Kleidman wrote that John Doe's retaliation complaints against Jane Roe and were "not credible", despite John Doe providing objective, credible, undisputed, and incontrovertible evidence that wholly supported his claims.

ZZ. **Mack Roe Retaliates Against John Doe and Falsely Accuses John Doe of Retaliation**

136

748. Shortly thereafter, just as he had threatened, Mack Roe submitted a complaint falsely accusing John Doe of retaliation, claiming that John Doe only filed the retaliation complaint against him due to his role as a witness and for providing the recordings as evidence against John Doe.

749. Investigator Kleidman then informed John Doe that he was now charged with retaliation against Mack Roe due to Mack Roe's role as a witness against John Doe and for providing the secret recordings.

**AAA. March 1, 2023: Columbia Fails to Provide A Reasonable Disability Accommodation to John Doe and Columbia's Title IX Officer Blocks John Doe from Receiving Reasonable Disability Accommodations Hindering John Doe's Ability to Fully Respond to the Accusations**

Deleted: .

750. John Doe is a qualified individual with a disability under the meaning of The Americans With Disabilities Act (ADA)

751. John Doe is diagnosed with Attention-Deficit/Hyperactivity Disorder, (ADHD), Adjustment Disorders, ("AD") and Post Traumatic Stress Disorder (PTSD)

752. John Doe was diagnosed with ADHD as a small child.

753. John Doe's ADHD is mentally impairing for John Doe when John Doe is under stress.

754. John Doe's ADHD substantially limits his ability to process large amounts of written information in a timely and efficient manner.

755. Stress and anxiety exacerbate John Doe's ADHD

756.   John Doe's ADHD substantially limits his ability to stay focused when when writing large amounts of information in a timely matter when he is under stress.

757.   John Doe's ADHD causes him to suffer difficulty sustaining attention, difficulty with following through on work assignments, difficulty organizing tasks and activities, and avoidance and dislike of tasks requiring sustained attention.

758.   John Doe had been known by Columbia to have ADHD since April 25, 2022.

759.   Columbia had known how John Doe's ADHD effects him in relation to his academic coursework.

760.   Columbia had treated John Doe for his ADHD since April 25, 2022.

761.   Columbia had provided John Doe with academic accommodations for his ADHD since April 25, 2022.

762.   Since April 25, 2022 Columbia provided to John Doe various accommodations from Columbia for his ADHD  including reduced courseload, extension of time on coursework,

763.   John Doe had been registered with Columbia's Office of Disability Services ("ODS") since January of 2023.

764.   John Doe had received disability accommodations from Columbia since January of 2023 .

138

765. John Doe was actively receiving disability accomodations from Columbia.

766. John Doe received and was actively receiving extensions of time to complete his academic coursework.

767. On March 1st, 2023 John Doe contacted Columbia's disability services to request accommodations for his disability, to assist him in the Gender-based Misconduct proceeding.

768. Specifically John Doe sought a disability accommodation of 45 days additional time to review, and respond to Columbia's full Investigation Report of the allegations against John Doe.

769. The Investigation Report voluminous spanning over 1,000 pages in length, and including exhibits, transcripts, multiple parties and witnesses, and multiple counts of multiple charges being leveled by Columbia against John Doe.

770. Columbia's GBM Policy required that John Doe write the response to the investigation report himself, and prohibited John Doe from receiving any writing outside assistance.

771. Due to John Doe's disability, John Doe needed the 45 day extension of time to fully review and respond to Columbia's voluminous 1,000+ page investigative report.

139

772.   John Doe notified Columbia's Title IX coordinator Marjory Fisher, and Investigator Kleidman that he was in the process of seeking disability accommodations for his disability through Columbia's disability services to assist him in the Gender-based Misconduct proceeding specifically, regarding additional time to respond to Columbia's 1000+ page Investigation Report.

773.   John Doe met with Columbia's Office of Disability services to discuss his requested accommodations.

774.   Columbia's Office of Disability services informed John Doe that they concluded that his request for a 45 day extension of time was "reasonable" given John Doe's disabilities and the length of Kleidman's Investigative Report.

775.   However, Columbia's Disability Services further informed John Doe that they were unable to provide his reasonable disability accommodations because Investigator Jamie Kleidman had objected to John Doe's accommodation.

776.   Columbia's Office of Disability Services informed John Doe that Investigator Kleidman was unwilling to accept their recommended accommodations of a 45 day extension of time for John Doe.

777.   Columbia's Office of Disability Services informed John Doe that Investigator Kleidman thought their recommended accommodations were "unreasonable".

140

778.  Investigator Kleidman informed Columbia's Office of Disability Services that the Gender-based Misconduct Office would not honor ODS's recommended disability accommodation of a 45-day extension of time for John Doe to review and respond to Columbia's 1.000+page investigative report.

779.  Columbia's Office of Disability Services informed John Doe  that they were in a "difficult position" due to Investigator Kleidman's refusal to accept their recommended accommodations of which John Doe had requested.

780.  Columbia's Office of Disability Services informed John Doe that due to the objections of Columbia's Gender-Based misconduct office, they were unable to provide John Doe's requested accommodations.

781.  Subsequently, John Doe's requested reasonable disability accommodations were denied by Columbia's Office of Disability services.

**BBB. Columbia Breaches Confidentiality of the GBM Proceeding and Discloses John Doe's Participation in the GBM Proceeeding in Violation of the Family Educational Rights and Privacy Act ("FERPA")**

782.  Shortly thereafter, and without John Doe's written consent as required by FERPA, a Title IX Officer contacted a senior administrator for Columbia's disability services and disclosed John Doe's confidential and FERPA-protected disciplinary records, pertaining to the ongoing Gender-based misconduct investigation.

**Deleted:** due

**Deleted:** disability

783. The Title IX Officer informed the disability services administrator that the Gender-Based Misconduct office was investigating John Doe as "an alleged perpetrator in a gender-based misconduct complaint" and that John Doe was facing expulsion from Columbia University.

784. Investigator Kleidman had already concluded that John Doe was "responsible for sexual exploitation of Jane Roe, and that he would be expelled from Columbia.

785. Columbia's Title IX Officer had no reason to disclose John Doe's Title IX Investigation to Disability Services.

786. Columbia's Title IX Officer did not have John Doe's written consent to disclose John Doe's Title IX Investigation to Disability Services.

787. Columbia's Disability Services Director did not need to know any information relating to John Doe's gender-based misconduct in order to carry out their duties to provide reasonable accommodations to John Doe

788. Columbia's Gender-based Misconduct Policy expressly states the following:

> "The University will only reveal information about any report of gender-based misconduct to those who need to know the information in order to carry out their duties and responsibilities or as otherwise provided by law. "

142

789.   Columbia's Title IX Officer violated Columbia's own Gender-baes Misconduct Policy by improperly disclosing John Doe's Title IX Investigation to Disability Services

790.   Columbia's Title IX Officer violated FERPA by unlawfully disclosing John Doe's Title IX Investigation to Disability Services

**CCC. June 5, 2023: Investigator Kleidman's Biased and Slanted Factual Summary**

791.   On June 5, 2023, John Doe received the Factual Summary and Evidence File of Investigator Kleidman's Investigative Report. It had been 1 year since Jane Roe had filed her false and fictitious complaint against John Doe, and Columbia's investigation of John Doe first began.

792.   The Factual Summary was slanted against John Doe.

793.   The Factual Summary did not include any direct references to the Witness statements that wholly contradicted Jane Roe's allegations.

794.   The Factual Summary did not include any direct references to the Witness statements that fully corroborated John Doe's narrative and version of events.

795.   The Factual Summary presented a witness statement that was directly contradicted by photo and video evidence as credible and reliable.

143

**Formatted:** List Number Simple

**Deleted: Biased**

796. The Factual summary misconstrued all eyewitness statements to align with Jane Roes's narrative and version of events.

797. The Factual Summary quoted words and phrases selectively from the Investigative Team's interviews and included numerous misquotations and mischaracterizations of John Doe's statements.

798. The Factual Summary included irrelevant hearsay evidence.

799. The Factual Summary did not contain any substantive descriptions of the exculpatory photos and videos that fully corroborated John Doe's description of the night and early morning in question.

800. The Factual Summary made no mention of Mack Roe's selective disclosure of his secret recordings.

801. The Factual Summary made no mention of Mack Roe's refusal to answer the question of whether or not he was withholding any recordings.

802. The Factual Summary made no mention of the incomplete nature of the recordings.

803. The Factual Summary did not include any direct references to the concrete evidence that contradicted Jane Roe's allegations.

804. The Factual Summary made no mention of Jane Roe's and Mack Roe's refusals to submit their electronic communications.

805. The Factual Summary made no mention that in Mack Roe's final interview with Investigator Kleidman, when he was asked if he was withholding any recordings, he stated "I am not going to answer this".

806. John Doe was afforded a "final opportunity" to address the Investigative Team's fact finding, including identifying any relevant information missing from the Factual Summary; sharing any new information not previously known; providing "clarification to details" in the Factual Summary (but only as to his own statements); requesting interviews of any additional witnesses; and submitting questions for Complainant and/or the witnesses.

807. The "clarifications" that Columbia would permit were "generally typos, correction of names and/or dates, or other minor factual errors.

808. "The Pre-Determination Conference was postponed and ultimately held on August 23, 2023.

**DDD. August 7, 2023: Investigator Kleidman Receives John Doe's 45-Page Response to the Factual Summary of the Investigative Report.**

809. On August 7, 2023, John Doe sent Investigator Kleidman 45-page response to the Factual Summary of the Investigative Report.

810. In his response, John Doe noted that the Factual Summary was slanted against John Doe.

811. John Doe noted that the Factual Summary did not include any direct references to the Witness statements that wholly contradicted Jane Roe's allegations.

145

812.   John Doe noted that the Factual Summary did not include any direct references to the Witness statements that fully corroborated John Doe's narrative and version of events.

813.   John Doe noted that the Factual Summary presented a witness statement that was directly contradicted by photo and video evidence as credible and reliable.

814.   John Doe noted that the Factual summary misconstrued witness statements to align with Jane Roes's narrative and version of events.

815.   John Doe noted that the Factual Summary quoted words and phrases selectively from the Investigative Team's interviews and included numerous misquotations and mischaracterizations of John Doe's statements.

816.   John Doe noted that the Factual Summary included irrelevant hearsay.

817.   John Doe noted that the Factual Summary included negative character references about him by unrelated and irrelevant witnesses.

818.    John Doe noted that the Factual Summary did not contain any substantive descriptions of the photos and videos that corroborate John Doe's description of the night and early morning in question.

819.   John Doe noted that the Factual Summary made no mention of Mack Roe's selective disclosure of his secret recordings.

146

820. John Doe noted that the Factual Summary made no mention of Mack Roe's refusal to answer the question of whether or not he was withholding any recordings.

821. John Doe noted that the Factual Summary made no mention of the incomplete nature of the recordings.

822. John Doe noted that the Factual Summary did not include any direct references to concrete evidence that contradicted Jane Roe's allegations.

823. John Doe noted that the Factual Summary made mention of Jane Roe's and Mack Roe's refusals to submit their electronic communications.

824. John Doe noted that the Factual Summary made no mention, that in Mack Roe's final interview with Investigator Kleidman, when he was asked if he was withholding any recordings, he stated "I am not going to answer this".

**EEE. August 23, 2023: John Doe's "Pre-Determination Conference"**

825. On August 23, 2023, John Doe met with Investigator Kleidman in a Pre-Determination Conference to discuss the factual summary and the evidence file.

826. It had been 484 days since Jane Roe filed her false Gender-Based misconduct complaint against John Doe.

827. Investigator Kleidman asked John Doe if there were any issues he would like to raise, or corrections that he would like to make to the factual summary.

828. John Doe noted that the Factual Summary was slanted against him.

147

829.   John Doe noted that The Factual Summary made no reference to the eyewitness 4 statements that wholly contradicted Jane Roe's allegations and requested that references to these statements be included. Investigator Kleidman denied John Doe's request and refused to include them.

830.   John Doe noted that  the Factual Summary made no reference to the 4 eyewitness statements that fully corroborated John Doe's narrative and version of events and requested that these statements be included. Investigator Kleidman denied John Doe's request and refused to include them.

831.   John Doe noted that  the Factual Summary incorrectly presented an eyewitness statement that was directly contradicted by photo and video evidence and requested that the presentation of these statements be corrected to reflect the true nature of the statement. Investigator Kleidman  denied John Doe's request and refused to correct them.

832.   John Doe noted that   the Factual summary misconstrued witness statements to align with Jane Roes's false narrative and version of events and requested that the presentation of these statements be corrected to reflect the true nature and content of the statements. Investigator Kleidman  denied John Doe's request and refused to correct them.

833.   John Doe noted that  the Factual Summary quoted words and phrases selectively from the Investigative Team's interviews and included numerous

misquotations and mischaracterizations of John Doe's statements and requested that these quoted words and phrases be corrected. Investigator Kleidman denied John Doe's request and refused to correct them.

834. John Doe noted that the Factual Summary included irrelevant hearsay statements that only served to unfairly impugn his character and requested that these irrelevant hearsay statements be redacted or removed from the factual summary. Investigator Kleidman denied John Doe's request and refused to redact or remove these statements.

835. John Doe noted that the Factual Summary did not include any references to Jane Roes coercive threats and requested that a reference to Jane Roe's coercive threats be included in the summary. Investigator Kleidman denied John Doe's request and refused to include them.

836. John Doe noted that the Factual Summary did not contain any substantive descriptions of the exculpatory photos and videos that fully corroborated John Doe's description of the night and early morning in question and requested that substantive descriptions of these exculpatory photos and videos be included in the report. Investigator Kleidman denied John Doe's request and refused to include them.

837. John Doe noted that the factual summary included substantial references to Mack Roe's secretly obtained, edited, selectively disclosed and

149

unreliable recordings. And requested that Investigator Kleidman remove the edited and unreliable recordings, and any mention of the recordings from the factual summary and evidence file of the Investigative Report. Investigator Kleidman denied John Doe's request and refused to remove the edited secret recording, stating that the recordings to were "reliable".

838.    John Doe noted that  the Factual Summary made no mention of Mack Roe's selective disclosure of his secret recordings and requested that Investigator Kleidman include a reference to Malawi's selective disclosure of evidence. Investigator Kleidman denied John Doe's request and refused to reference Mack Roe's selective disclosures of evidence.

839.    John Doe noted that the Factual Summary made no mention of Mack Roe's refusal to answer the question of whether or not he was withholding any recordings and requested that Investigator Kleidman include a reference to Mack Roe's refusal to answer this question. Investigator Kleidman denied John Doe's request and Investigator Kleidman refused to include a reference to Mack Roe's refusal to answer the question.

840.    John Doe noted that the Factual Summary made no mention of the incomplete nature of the recordings and requested that Investigator Kleidman include a reference to the incomplete nature of the recordings. Investigator Kleidman

denied John Doe's request and refused to include reference to the incomplete nature of the recordings.

841.  John Doe noted that the Factual Summary made no mention, that in Mack Roe's final interview with Investigator Kleidman, when he was asked if he was withholding any recordings, he stated "I am not going to answer this", and requested that Investigator Kleidman include a reference to Mack Roe's refusal to answer this question as to whether or not he was withholding any recordings. Investigator Kleidman denied John Doe's request and refused to include a reference to Mack Roe's refusal to answer.

**Formatted:** Indent: Left: 0.5", No bullets or numbering

**FFF.  September 15, 2023: John Doe's "Pre-Hearing Conference"**

842.   On September 15, 2023, Investigator Kleidman and Director Walsh met with John Doe to discuss their "Findings and Analysis" and "Recommended Findings of Responsibility".

843.   It had been 507 days since Jane Roe had filed her false and fictitious complaint against John Doe.

844.   Investigator Kleidman informed John Doe that she was recommending that he be found responsible for sexual exploitation, and two counts of retaliation against Mack Roe Mack Roe.

845.   Investigator Kleidman informed John Doe that she was recommending that Jane Roe be found not responsible on all counts of retaliation against John Doe.

846.   Investigator Kleidman also informed John Doe that she was likewise recommending that Mack Roe be found not responsible on all counts for retaliation against John Doe.

847.   Investigator Kleidman informed John Doe that she  found John Doe "not credible on with any  allegation he had made."

848.   Investigator Kleidman informed John Doe that she found Jane Roe "credible and reliable".

849.    Investigator Kleidman further informed John Doe that she found Mack Roe "credible witness".

**GGG.    Investigator Kleidman tells John Doe that He "Has no Rights Under Title IX" in the GBM Sexual Misconduct Disciplinary Proceeding.**

850.   After hearing Investigator Kleidman's recommended findings John Doe told Investigator Kleidman that her recommended findings were erroneous, biased, and contrary to the preponderance of the evidence.

851.   John Doe  asked Investigator Kleidman to "inform him of his rights under Title IX" that applied to him in the proceeding.

852.    Investigator Kleidman told John Doe that "He had no rights under Title IX".

| Deleted: . |
| --- |

853. Director Walsh, despite being present at the meeting, did not correct Investigator Kleidman.

854. Director Walsh informed John Doe "that investigator Kleidman [was right] that "John Doe "had no right under title IX"

855. Investigator Kleidman  and Director Walsh told John Doe that any concerns about his Title IX rights, or lack thereof should be addressed in his response to the Investigative Report.

856. On September 25, 2025, John Doe sent an email to Columbia's Title IX Coordinator Marjory Fisher and informed Ms. Fisher that during the meeting, Investigator Kleidman told John Doe that "He had no rights under Title IX".

857. John Doe requested a response from Ms. Fisher and further clarification as to his rights under Title IX.

858. Ms. Fisher never responded to John Doe's email.

859. Investigator Kleidman and Ms. Fisher willfully ignored John Doe's legal rights under Title IX federal law.

860. Investigator Kleidman willfully ignored John Doe's procedural rights under Columbia's  own policies.

861. Investigator Kleidman demonstrated a clear gender-bias against John Doe.

**HHH.    John Doe Receives Investigator Kleidman's  Final Investigative Report, Recommended Findings, and Credibility Assessments.**

Deleted: .

Deleted:

862.   Later that day John Doe received Investigator Kleidman's Final Investigative Report, Recommended Findings, and Credibility Assessments.

863.   The Investigative Report was over 1,000 pages in length.

864.   The Investigative Report was biased against John Doe.

865.   The Investigative Report was biased in favor of Jane Roe.

866.   The Investigative Report was riddled with falsehoods, inaccuracies, inconsistencies, omissions, and misrepresentations of the evidence and facts.

867.   The Investigative report falsely depicted John Doe as having inflicted sexual exploitation on Jane Roe, by gaining unauthorized access to her cell phone, and sending himself sexually explicit photos and videos of Jane Roe for an "illicit purpose".

868.   Investigator Kleidman's "Credibility Assessments" were erroneously assessed unsupported, and contrary to the evidence and facts presented in the case.

**Deleted:** and were

869.   The Investigative Report did not include any direct references to the Eyewitness statements that fully exculpated John Doe, and that wholly contradicted Jane Roe's allegations.

870.   The Investigative Report did not include any direct references to the eyewitness statements that fully corroborated John Doe's narrative and version of events.

871. The Investigative Report misconstrued witness statements to align with Jane Roes's narrative and version of events.

872. The Investigative Report quoted words and phrases selectively from the Investigative Team's interviews and included numerous misquotations and mischaracterizations of John Doe's statements.

873. The Investigative Report did not contain any substantive descriptions of the photos and videos that corroborate the majority of John Doe's description of the night and early morning in question.

874. The Investigative Report made no mention of Mack Roe's selective disclosure of his secret recordings.

875. The Investigative Report made no mention of Mack Roe's refusal to answer the question of whether or not he was withholding any recordings.

876. The Investigative Report made no mention of the incomplete nature of the recordings.

877. The Investigative Report did not include any direct references to the concrete evidence obtained during the investigation that contradicted Jane Roe's allegations against John Doe.

878. The Investigative Report made mention no mention of Jane Roe's and Mack Roe's refusals to submit their electronic communications.

155

879. The Investigative Report made no mention, that in Mack Roe's final interview with Investigator Kleidman, when he was asked if he was withholding any recordings, he stated "I am not going to answer this".

## III. Investigator Kleidman's Flawed and Gender Biased "Credibility Assessments"

880. Columbia's Gender-based Misconduct Policy expressly states the following:

> "The Investigative Team considers the following factors when assessing the credibility of parties and witnesses: consistency or inconsistency of accounts of events over time; demeanor during interviews; motive to lie; any corroborating evidence; and reasonable and logical statements and details. "

881. Investigator Kleidman found John Doe "not credible" and "unreliable" despite his narrative and version of events being consistent and corroborated by the evidence and facts.

882. John Doe's accounts of the incident were consistent over time.

883. Investigator Kleidman refused to consider the consistency of John Doe's statements over time when conducting her credibility of John Doe.

884. Jane Roe's accounts were wholly inconsistent over time.

885. Investigator Kleidman refused to consider the inconsistency of Jane Roe's accounts over time when conducting her credibility of Jane Roe.

886. John Doe's demeanor was candid, and forthcoming during interviews.

887. Jane Roe's demeanor was uncooperative and evasive during interviews.

156

888.  Investigator Kleidman refused to consider John Doe's and Jane Roe's contrasting interview demeanors during her credibility assessments of John Doe.

889.  Jane Roe had a plethora  motives to lie including a desire to elevate her status in the "survivor" community at Columbia by "starting a movement", and "giving speeches" about her allegations, saving face with Mack Roe, with whom she shared romantic interest, and facing a sexual harassment complaint by John Doe which could jeopardizing her employment position and full tuition scholarship from Columbia's medical center.

890.  Investigator Kleidman refused to consider Jane Roe's clear and unequivocal motives to lie in her credibility assessment of Jane Roe.

891.  Incredibly, Investigator Kleidman stated that "[Jane Roe] had no motive to lie" but stated that "[John Doe] had a clear motive to lie" because [John Doe's] academic future was at stake.

892.  Investigator Kleidman found Jane Roe "credible" and "candid" despite a plethora of  inconsistent and verifiably false and inaccurate statements by Jane Roe, and a plethora of evidence contradicting her narrative and version of events.

**JJJ.  Columbia's Sex-Biased and Erroneous  Theory of "Sexual Exploitation" and Deviation from Columbia's GBM Policy Which Required Proof of the Act, and Proof of Illicit Purpose for the Act by a Preponderance of the Evidence.**

893. Columbia's Gender-based misconduct policy provides clear, and unambiguous terms, as to what specific conduct meets the definition of sexual exploitation under the policy.

894. Columbia's Policy defines sexual exploitation as:

"Non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage, or any other illicit purpose"…Acts of sexual exploitation include, but are not limited to: "Non-consensual streaming, sharing, or distribution of images, photography, video, or audio recording of sexual conduct, nudity, or state of undress when and where there is a reasonable expectation of privacy, without the knowledge and affirmative consent of all participants;"

895. According to the policy, each element—non-consensual nature, purpose, and the specific act—must be established to meet the policy's criteria for sexual exploitation.

896. These elements must be established to prove sexual exploitation by a preponderance of the evidence under Columbia's GBM policy.

897. Columbia must prove by a preponderance of the evidence, that the act took place, and that the act was for the purpose sexual gratification, financial gain, personal benefit or advantage of any other illicit purpose.

898. With respect to the act itself, Columbia had no evidence of the alleged act of sexual exploitation and instead relied on Kleidman's flawed and sex biased credibility assessment of John Doe and Jane Roe, despite having concrete and actual physical evidence upon which to rely to reach their conclusions.

158

**Deleted:** the

**Deleted:** Columbia's

899.   Kleidman instead, chose to ignore the concrete evidence, and make it a he said/she said "credibility" contest.

Deleted: .

900.    In Kleidman's erroneous and sex-biased recommended findings, upon which Columbia relied in finding John Doe responsible, she stated the following:

> "Because the Investigative Team found NPS to be credible and reliable, it followed that the Investigative Team credited her statements that she did not send the picture and videos from her phone to KDM's phone as some sort of sexual invitation, as there was no other evidence that such a relationship existed between them—or any relationship at all, for that matter. In addition, NPS informed the Investigative Team that she did not provide KDM with permission or consent to access her saved pictures and videos and send any to herself. The Investigative Team further credited NPS's statements that she did not provide KDM with permission or consent to access or send pictures from her phone. Accordingly, the Investigative Team determined by a preponderance of the evidence that KDM accessed NPS's saved pictures and videos and sent one picture and three videos to himself without NPS's permission or affirmative consent."

### KKK.   Investigator Kleidman Concedes That There Was Insufficient Evidence to Find John Doe Responsible for Sexual Exploitation

901.   Investigator Kleidman stated the following in her recommended findings:

> [T]he Investigative Team had to determine whether at the time John Doe sent the picture and videos to his cellphone, he did so for the purpose of sexual gratification, financial gain, personal benefit or advantage of any other illicit purpose. There was no legitimate or lawful reason why John Doe would share the picture and videos of [Jane Roe] with himself, other than for an illegitimate or illicit purpose. By nature, the sharing of sexually explicit pictures and videos of another person, without their consent, is done for an illicit purpose. The Investigative Team could not conceive of a legitimate reason for John Doe to access or share the picture and videos with himself. Accordingly, the

Investigative Team found that there was sufficient information to conclude, by a preponderance of the evidence, that John Doe was responsible for the sexual exploitation of [Jane Roe]."

902.   Columbia's conclusion that John Doe's actions were done for an "illicit purpose" relied on an assumption rather than concrete evidence.

903.   Columbia's conclusion failed to meet the preponderance of evidence standard required by Columbia's Gender-based Misconduct Policy.

904.   Columbia's conclusion did not adhere to the policy's requirement to prove a specific purpose behind the act.

905.   The policy requires proving a specific purpose behind the act, such as sexual gratification, financial gain, personal benefit, or any other illicit purpose.

906.   The Investigative Team's finding relied on an assumption rather than concrete evidence.

907.   Columbia stated that they "could not conceive of a legitimate reason" and therefore concluded that John Doe acted with an illicit purpose.

908.    This assumption did not satisfy the requirement of proving the purpose by a preponderance of the evidence as required by the GBMPP.

909.   Columbia conceded that they could not find a "legitimate reason" for John Doe's alleged misconduct but still concluded that the purpose was "illicit."

910.   Columbia suggested  that the lack of a legitimate reason automatically implied an illicit one.

160

911.   This reasoning was  circular and did not provide objective evidence of John Doe's motive, much less prove it by the required standard of proof.

912.   The preponderance of the evidence standard requires that the conclusion must be more likely true than not.

913.   Columbia's inability to conceive of a legitimate reason did  not meet this standard. It simply reflected a lack of evidence for a legitimate purpose, which is not the same as having evidence for an illicit purpose.

914.   The policy explicitly states that sexual exploitation involves the non-consensual abuse or exploitation of another person's sexuality for specific purposes.

915.   By failing to establish evidence of John Doe's intent or motive, not to mention John Doe's responsibility for the act itself, Columbia did not fulfill the policy's requirements for proving sexual exploitation.

916.    The conclusion that the act itself implied an illicit purpose without direct evidence is erroneous and undermines the policy's intent.

917.   The policy explicitly requires proof of purpose for sexual gratification, financial gain, personal benefit, or another illicit purpose, none of which were established by the evidence presented.

918.   Put simply, Columbia applied the preponderance of the evidence standard, to evidence that, by their own admissions and concessions,  did not exist.

919.   This alone, is reason doubt the accuracy of the outcome.

**Deleted:** s

**Deleted:** intent

**LLL. September 18, 2023: Investigator Kleidman Falsely Accuses John Doe of Retaliation and Initiates Retaliatory Concurrent Dean's Discipline Case**

920.   On September 18, 2023, at 11:11 AM Investigator Kleidman submitted a complaint to Columbia's Center for Student Success and Intervention (CSSI) against  John Doe using a separate  Dean's Discipline Process, accusing John Doe of retaliating against Mack Roe.

921.   At 11:24 AM Investigator Kleidman submitted a second complaint against  John Doe using the Dean's Discipline Process, accusing John Doe of retaliating against Mack Roe.

922.   Investigator Kleidman stated that John Doe had violated the No Contact Directive and Confidentiality Agreement put in place by GBMO.

923.   Investigator Kleidman cited a message that John Doe had previously posted in a group chat.

Deleted: .

924.   The message Investigator Kleidman cited was a short message

925.   John Doe's message stated"

"Many of you have been asking me about why I chose not to share my story at the PALS meeting. Since April of 2022 I have been working through a conflict with a person unrelated to PALS. Sadly, a member of PALS, who, at one time had romantic interest in this person, made the decision to assist this person in blackmailing , coercing, and extorting me into giving up my PALS award among several other things. In doing so, this PALS individual posed as a close confidant that was willing to help us work through our issue. Little did I know that this PALS individual, whom I trusted deeply was secretly recording our private conversations without my knowledge or consent and leaking them to the other individual and Columbia. Columbia, with the help and

162

assistance of this PALS individual recruited at least two other fellow PALS, who defamed me to Columbia by giving false, inaccurate, negative, and grossly exaggerated character statements about me. In fact, these fellow PALS even disclosed to Columbia without my consent, personal and sensitive information that I had shared in PALS meetings. Columbia is using their statements, and details of my personal story and struggles, to violate my human, civil, and due process rights. At one point this PALS individual told me "I hope you can survive this" For the aforementioned reasons I will likely never share in PALS again even when this nightmare of my life is over, in whichever way that comes. I am grateful for the friends that I do have in PALS and wish everyone a successful semester. Take care."

926. John Doe's WhatsApp message did not constitution retaliation against Mack Roe.

927. John Doe's WhatsApp message did not breach the No Contact Directive as it involved no direct or indirect communication through a third party with Mack Roe Mack Roe.

928. John Doe's WhatsApp did not violate the Confidentiality Agreement with the Gender-Based Misconduct Office (GBMO) and was in full compliance with the Agreement.

929. ⌷SEP⌷    In compliance with Point 1 of the Confidentiality Agreement, John Doe's WhatsApp message did not share any confidential evidence, and was devoid of any details from the inspection, review process, or any information provided by another party or witness.

930. In compliance with Point 2 of the Confidentiality Agreement, the content of John Doe's message did not reveal any information from the confidential Investigative Report.

931. In compliance with Point 3 of the Confidentiality Agreement John Doe's WhatsApp message did not disclose any evidence or details from the Investigative Report.

932. Points 4 and 5 of the Confidentiality Agreement were not applicable as the Gender-Based Misconduct Hearing had not yet occurred, and the disciplinary process was ongoing.

933. Importantly, per point 6 of the Confidentiality Agreement, the Agreement did not prohibit John Doe from discussing the incident itself and his subsequent experiences, which is what his WhatsApp message explicitly entailed.

**MMM.    September 23, 2024: Investigator Kleidman and Columbia University Subject John Doe to Interim Discipline tells Mack Roe to file a Retaliation complaint against John Doe Using the Dean's Discipline Process of Columbia's Center for Student Success and Intervention (CSSI)**

Deleted: .

934. On September 23, 2024 Investigator Kleidman told Mack Roe to file a retaliation complaint against John Doe through the Dean's Discipline Process at Columbia's Center for Student Success and Intervention (CSSI)

Deleted:

Deleted: using the

935. Investigator Kleidman instructed Mack Roe to file the claim on "his own" "due to policy constraints on how the matter would be addressed"

936.  At 4:43 PM, Mack Roe filed a retaliation complaint against John Doe John Doe through the Dean's Discipline Process at Columbia's Center for Student Success and Intervention (CSSI) accusing John Doe of violating GBMO's No Contact Directive and Confidentiality Agreement.

NNN. **October 12, 2023: Investigator Kleidman and Columbia University Subject John Doe to Interim Discipline and Interferes With Concurrent Dean's Discipline Investigation, Breaches Privacy of GBMO's Investigation.**

937.  On October 12, 2023, 8 months before John Doe was sanctioned and suspended in relation to the sexual misconduct allegations, and related retaliation allegations, Investigator Kleidman emailed Sashagay Laytoya Watt-Pettaway, investigator on John Doe's Dean's Discipline Case.

938.  Investigator Kleidman informed Watt-Pettaway that she (Investigator Kleidman) and Title IX Investigator Michelle Ashcroft had investigated John Doe in an ongoing Gender-Based Misconduct Case, and that they were recommending that he be found responsible for a violation of the Gender-Based Misconduct Policy.

939.  Investigator Kleidman informed Watt-Pettaway that Columbia was pursuing interim discipline against John Doe concerning one of the retaliation allegations that Mack Roe had made against John Doe.

940.  On October 26, Watt-Pettaway and the Associated Director of Student Housing Jonathan Wiggins met with John Doe for a Dean's Discipline Hearing.

Deleted: <#>

941. John Doe explained that his What's App message did not violate GBMO'S  No Contact Directive between him and Mack Roe.

942. John Doe explained that his WhatsApp message was in full compliance with the GBMO's Confidentiality Agreement.

943. John Doe further explained that the GBMO'S Confidentiality Agreement did not prohibit John Doe from discussing the incident itself and his subsequent experiences, which is what his WhatsApp  message explicitly entailed.

**OOO.    November 9, 2023: Columbia Subjects John Doe to Interim Sanctions and Finds John Doe "responsible" for retaliation against Mack Roe  and Imposes Interim Sanctions on John Doe**

944. On November 9, 2023,  John Doe received Sasha Watt -Pettaway's letter informing him that Columbia's Center for Student Success and Intervention (CSSI) was finding him responsible for retaliation against Mack Roe for violating GBMO's No Contact Directive and Confidentiality Agreement.

945.  Watt-Pettaway's letter further informed John Doe that Columbia's Center for Student Success and Intervention (CSSI)  was sanctioning him with suspension from Columbia for a period of 1 and a half years (3 semesters), a ban from all University property, and eviction and removal from his student apartment (his home of 3 years).

166

946.   On November 16, 2023, John Doe appealed the sanction rendered by Columbia's Center for Student Success and Intervention (CSSI) to the appellate Dean on two grounds (a) numerous procedural errors, and (b) excessive sanction.

947.   On  December 21, 2023, John Doe was notified by the Appellate Dean found no procedural errors, and that the finding of responsibility was affirmed.

948.   However, the Appellate Dean found that the sanction rendered by Columbia's Center for Student Success and Intervention (CSSI) was "excessive" given the "mitigating factors of the case".

949.   The Appellate Dean, Modified John Doe's sanction and imposed a saction of two years of disciplinary probation, and permission to remain in student housing.

**PPP. December 1, 2023: John Doe Falls Ill, is taken to Hospital, Title IX Coordinator Denies John Doe's Request for a Medical Adjournment on Investigative Report Response Deadline**

950.   On December 1, 2023, John Doe became extremely ill due to a severe upper respiratory illness.

951.   John Doe was losing Oxygen, struggling to breath and was in and out of consciousness. John Doe was taken by CUEMS ambulance to Mount Sinai Medical Center Emergency Center for treatment where he was seen by two medical doctors and diagnosed with an "Acute Upper Respiratory Illness" that "would last for several weeks".

167

Deleted: and

Deleted: to

Deleted: Extension

952. John Doe was prescribed medication, a respiratory device, and was told by the medical doctors to rest for several weeks to allow for his respiratory system to heal.

953. The doctors warned that John Doe's failure to rest as directed could further exacerbate his illness and cause him additional harm.

**QQQ.   Title IX Coordinator Marjory Fisher Denies John Doe's Request for a Good Cause Medical Adjournment Despite John Doe Submitting Detailed Medical Documentation to Columbia**

Deleted: Two-Week
Deleted: Extension
Deleted: .

954. On December 2, John Doe emailed Titled IX Coordinator Marjory Fisher and requested a 2-Week medical extension on the deadline to his response to Investigator Kleidman's Investigative Report due to his recent hospital visit, and acute illness which required extensive rest, and a several weeks "recovery period."

955.  John Doe included comprehensive medical documentation related to his hospital stay, and illness, with information related to his specific medical prescriptions redacted.

956. Title IX Coordinator Fisher demanded that John Doe redact the information about his specific medical prescriptions, and other private health records.

957. John Doe informed Director Walsh that the redacted information was personal, private, and  privileged, and not relevant to his request.

958. Subsequently, Title IX Coordinator Fisher informed John Doe that without access to his full medical records related to his medical prescriptions, and other private health records, "she was unable to make a determination" on whether or not John Doe's request for an extension was "for good cause", and therefore his request was denied.

959. As a result, John Doe was forced to work through his illness, bedridden, and to submit his Response to Investigator Kleidman's Investigative Report by the deadline as Investigator Kleidman and Director Walsh previously advised John Doe that if he did not submit his response by the deadline, it would be rejected.

960. Columbia wanted to hinder John Doe's preparation and defense to the sexual misconduct allegations.

961. Columbia's refusal to grant John Doe's request hampered John Doe's defense to the sexual misconduct allegations against levelled against John Doe.

**RRR. Columbia Grants Jane Roe a Medical Extension Without Good Cause and Does not Require any Supporting Medical Documentation From Jane Roe to Grant Jane Roe's Request**

962. While Columbia required that John Doe submit unredacted medical documentation to Columbia in order for Columbia to determine whether John Doe's request for a medical extension was "for good cause" Columbia did not require the same of Jane Roe.

Deleted: <#>The Title IX Coordinator granted Jane Roe a requested delay in the process due to "medical" issues.

963.   [REDACTED]

[REDACTED]

964.   Columbia granted Jane Roe's request for a medical adjournment of the hearing without requiring that Jane Roe submit any supporting medical documentation to Columbia.

965.   Columbia did not have good cause to grant Jane Roe's request for a medical adjournment of the hearing.

966.   Columbia did not have *any* cause to grant Jane Roe's Request for a medical adjournment of the hearing.

967.   Jane Roe lied to Columbia as to the basis for her request for a medical adjournment of the hearing.

968.   [REDACTED]

969.   [REDACTED] sick with COVID, and bedridden and unable to attend the scheduled hearing.

970.   [REDACTED]

971.

972.

973.

974.

975.

976.

977.

978. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨

979. Columbia granted Jane Roe's request for a medical adjournment of the hearing without requiring supporting medical documentation from Jane Roe, despite requiring detailed and unredacted medical documentation from John Doe.

980. John Doe was sick, with supporting medical documentation, including doctors orders and John Doe's request for a medical extension was denied by Columbia.

981. Jane Roe was not sick, and had no supporting medical documentation and Jane Roe's request for a medical adjournment was granted by Columbia.

982. There was good cause for Columbia to grant John Doe's request for a medical extension but Columbia still denied John Doe's Request.

983. There was no good cause, or any cause at all, for Columbia to Grant Jane Ro''s request for a medical adjournment, and Columbia still Granted Jane Roe's Request.

984. Shortly thereafter Mack Roe requested that Columbia disqualify the hearing chair from chairing the hearing because the Hearing was Jewish and Columbia Granted Mack Roe's request and removed the chosen hearing chair due to what Columbia called "a conflict of interest in the hearing chair's participation"

**Formatted:** List Number Simple

172

**SSS. December 12, 2023: Investigator Kleidman Receives John Doe's 13,000-Word Response to Investigator Kleidman's Investigative Report**

985. On December 12, 2023, John Doe submitted his response to Investigator Kleidman's Investigative Report.

986. In his response, John Doe noted that there was no evidence to support Investigator Kleidman's recommended findings of responsibility for sexual exploitation.

987. John Doe noted that the evidence contained in the report, overwhelmingly supported his narrative and version of events over Jane Roe's.

988. John Doe noted that the evidence contained in the report refuted Jane Roe's allegations.

John Doe wrote in his response

"When the evidence presented in this case is viewed through an objective lens rather than through the Investigative Team's biased, misleading, and unfounded characterizations, it substantially favors my narrative and version of events over [Jane Roe's]. Despite the evidentiary favor and complete corroboration of my version of events, the Investigative Team incorrectly analyzed the presented information and formed biased and incorrect conclusions in favor of [Jane Roe] without an apparent reason based on the evidence. The Investigative team accepted her unsupported and accusatory version of events over mine and arrived at incorrect and erroneous conclusions."

989. John Doe noted that the "Credibility Assessments" were erroneously assessed and were contrary to the evidence and facts presented in the case.

173

990.    John Doe noted that the Investigative Report was riddled with falsehoods, inaccuracies, inconsistencies, and misrepresentations of the evidence and facts.

991.    John Doe noted that the Investigative Report omitted facts and information that proved his innocence.

992.    John Doe concluded his written response by imploring the panel to find him not responsible for sexual exploitation and retaliation.

### TTT. March 21, 2024: The Hearing Panel and The Erroneous Finding of Responsibility Against John Doe

993.    On March 21, 2023, after granting several Hearing delay requests to Jane Roe , including a medical delay, Columbia assembled a 3-member hearing Panel.

994.    It had been 695 days since Jane Roe filed her false and fictitious complaint against John Doe.

995.    The Panel consisted of Columbia University Assistant Dean of Student Support Herbert Hugh, Columbia University Director of Student Wellness Stephanie King, and Bowditch Attorney Of Counsel Meaghan Borys, who Columbia retained to serve as the hearing Chair.

996.    Director Walsh was in charge of the hearing.

### UUU. Columbia University Deviates From the Gender-based Misconduct Policy and Procedures and Allows Witness to Participate in the Hearing

174

**Process Concerning Jane Roe's Sexual Misconduct Allegations Against John Doe.**

997.   In a clear, and indisputable procedural irregularity, and violation of the Gender-based Misconduct Policy and procedures , and deviation from the GBM Policy, and  despite and John Doe's prior objections, Director Walsh allowed Mack Roe to participate in John Doe and Jane Roe's disciplinary hearing.

998.  The GBM Policy does not allow for the consolidation of GBM Complaints.

999.   Mack Roe was not a complainant in the underlying sexual exploitation investigation.

1000. The Gender-Based Misconduct Policy and Procedures (GBMPP) explicitly prohibits witness participation in GBM hearings and expressly states the following:

"Witnesses are not involved in the hearing process" *See GBM Policy* P.60.

1001.  Despite this, Director Walsh allowed Mack Roe to participate in John Doe's hearing with Jane Roe and permitted him to advocate for a finding of responsibility against John Doe in both his opening and closing statements.

1002. Director Walsh did so, because Mack Roe's testimony and participation was adverse to John Doe's defense and supportive of Jane Roe.

1003. In Mack Roe's opening statement to the Hearing Panel Mack Roe attacked John Doe's opening statement to the Hearing Panel and falsely accused John Doe of fabricating lies and accusations against Jane Roe.

1004. Mack Roe stated to the Hearing Panel:

"I'm quite shaken at this moment from what [John Doe] has said. I am shaken and I feel deeply sad and troubled by the insistence of fabrication and lies and accusation, not only against me but against [Jane Roe] as well."

1005. Mack Roe continued in his statement to the Hearing Panel falsely stating to the Hearing Panel that John Doe was abusive women in John Doe's scholarship program stating:

"John Doe has an abusive relationship with women within John Doe's scholarship program".

1006. Mack Roe further stated the to the Hearing Panel:

"I had helped John Doe "prior to John Doe's attack and abuse against Jane Roe"

1007. Mack Roe further stated to the Hearing Panel:

"I did not want John Doe to be punished further than the actions that John Doe had done with [Jane Roe]"

1008. Mack Roe Further stated to the Hearing Panel:

"John Doe had turned the table against a victim, [Jane Roe]"

1009. Mack Roe concluded his opening statement to the hearing panel, attacking John's claims of innocence stating"

176

"John Doe has not only hurt Jane Roe once but has hurt [Jane Roe] twice by not acknowledging and admitting to the wrongdoing that [John Doe] has done to [Jane Roe]"

1010. Mack Roe mentioned Jane Roe, and John Doe's alleged sexual misconduct against Jane Roe no less than eleven (11) times in his opening and closing statements to the Hearing Panel.

1011. During the Hearing Panel, Columbia's Hearing Chair questioned Mack Roe in relation to what Mack Roe witnessed on the night in question in relation to John Doe's alleged possession of Jane Roe's phone.

1012. Columbia's Hearing Chair asked Mack Roe questions and initiated Q&A related to Jane Roe's sexual misconduct allegations against John Doe, mentioning Jane Roe's name no less that sixty-five (65) times during the hearing, including but not limited to the following questions that were directly related to Mack Roe's role as a witness to Jane Roe's allegations against John Doe:

"[i]n your first interview, you said you were "a bit surprised" to see [John Doe] at [Jane Roe's] party. Why was that?

"In your first interview you said that [John Doe] was engaged in a conversation before you left, not engaged with the Uber thing. Do you recall who [John Doe] was conversing with as you were leaving [Jane Roe's] Apartment?"
Did you ever observe [John Doe] speaking with [Jane Doe] alone at the party at any time?

"If you had seen a conversation between just [John Doe] and [Jane Roe] is that something you would remember"?

"You heard me talk to "[Jane Roe] about the physical layout of her apartment in April 2022. Does your memory of that layout differ from [Jane Roe's] in any way?"

"How would you describe the size of [Jane Roe's] kitchen?

"Is there anything else that was different about the layout of the apartment in your memory compared to what [Jane Roe] described?"

1013. In Mack Roe's closing statement to the hearing panel Mack Roe again advocated for a finding of responsibility against John Doe.

1014. Mack Roe stated to the hearing panel:

"[John Doe], harmed [Jane Roe] twice by first violating her rights, accessing the information. And second, by lying and insisting that she actually is the one who tried to cause him harm.

1015. In Mack Roe's closing statement to the Hearing Panel Mack Roe urged the hearing Panel to find John Doe responsible for sexual exploitation against Jane Roe.

1016. Mack Roe told the Hearing Panel that Columbia should find John Doe responsible so that John Doe "doesn't go on to hurt other people"

1017. Director Walsh directly violated Columbia's Gender-based Misconduct Policy by allowing Mack Roe to participate in John Doe's disciplinary hearing involving Jane Roe.

178

1018. In Jane Roe's opening statement to the hearing panel, Jane Roe read from a typed statement written by her Attorney Advisor.

**Deleted:** was

1019. Columbia's GBM policy prohibited Jane Roe's attorney adviser from drafting jane Roe's opening statement to the hearing panel.

1020. Despite Columbia's prohibition on Jane Roe's written statement, Columbia accepted it and made it part of the official hearing record.

1021. Jane Roe had limited and inconsistent recall pertaining to the facts surrounding her allegations against John Doe.

1022. Jane Roe told the Hearing Panel that she had no recollection of creating the "evidence list" that was submitted to GBMO that was used to find John Doe responsible.

1023. Jane Roe told the Hearing Panel that she had not viewed the evidence file since it was submitted nearly two years prior to the Hearing.

1024. In a clear procedural irregularity, the Hearing Panel not only permitted Jane Roe to present new, and previously undisclosed evidence against John Doe at the hearing which was explicitly prohibited by the GBM Policy while John Doe was prohibited from presenting any new evidence that was not included in the evidence file, and not previously disclosed to Jane Roe.

1025. The Hearing Chair questioned John Doe about his mental health and mental health treatment at the hearing despite the Gender-Based Misconduct Policy prohibiting questions regarding mental health treatment to be asked.

1026. In a clear procedural irregularity, Director Walsh called a 5 minute ex parte off the recording meeting with the Hearing Chair during the Chair's questioning of Jane Roe, and did not inform John Doe as to what was discussed.

1027. During Jane Roe's questioning, the Hearing Chair asked Jane Roe leading as well as asked and answered questions until she received the answer that she needed to align with Jane Roe's Narrative find John Doe responsible.

1028. Neither John Doe nor his Attorney Advisor were permitted to cross examine Jane Roe at the Hearing.

1029. The Panel had no questions for Jane Roe.

1030. The Panel had no questions for Investigator Kleidman.

1031. In John Doe's closing statement to the Hearing Panel, he implored the Panel to find him not responsible for sexual exploitation and retaliation.

1032. In Jane Roe's closing statement to the hearing panel, Jane Roe read from a statement written by her attorney advisor.

1033. Columbia's GBM Policy prohibited Jane Roe's attorney advisor from writing Jane Roe's closing statement.

1034. Despite Columbia's prohibition on Jane Roe's closing statement, Columbia accepted it and made it part of the official hearing record.

## VVV. The Hearing Panel's Erroneous Findings of Reasonability Against John Doe

1035. On April 2, 2024, John Doe received the Hearing Panel's decision.

1036. The decision was copied and pasted with large swaths of writing from Investigator Kleidman's Investigative Report.

1037. The Hearing Panel relied on investigator Kleidman's Investigative Report advocating discipline against John Doe.

1038. Investigator Kleidman's Investigative Report significantly influenced the Hearing Panel's decision to find John Doe responsible for Sexual Exploitation of Jane Roe.

1039. The decision relied heavily on Investigator Kleidman's Investigative Report and adopted Investigator Kleidman's flawed biased, and erroneous theories and conclusions.

1040. Investigator Kleidman's erroneous theory of sexual exploitation was adopted by the Hearing Panel.

1041. The Hearing Panel refused to consider any information that was favorable to John Doe.

1042. Columbia's Hearing Panel, seeking to protect Columbia from criticism both among students and the public to the effect that it was not taking women's

sexual misconduct complaints seriously and took a pro-female, sex-biased stance on Jane Roe's allegations, leading them to decide against John Doe, erroneously, and contrary to the weight of the evidence.

1043. The Hearing Panel informed John Doe that James Dean Colgrove, Dean of Columbia's Postbaccalaureate Premedical Program would serve as the Sanctioning Officer of John Doe.

**WWW.    Columbia Initiates a New and Separate Retaliatory Student Conduct Disciplinary Proceeding Against John Doe**

1044. On April 9, 2024 two days before Dean Colgrove issued his GBM Sanction Letter on April 11, 2024, and nine days before John Doe filed his Title IX appeal on April 18, 2024 Columbia's Student Conduct Office of Student Success and Intervention ("CSSI") issued a formal Notice of Allegations to John Doe, charging him failure to comply with an unnamed University Official.

1045. The charges were baseless.

1046. Columbia brought the baseless charges against John Doe through its Center for Student Success and Intervention ("CSSI") the same office that Columbia used to initiate the interim discipline against John Doe related John Doe's GBM proceedings.

182

1047. According to the Charging Report, Columbia's own Department of Public Safety had already investigated the underlying allegations and determined they were unfounded and that no legitimate basis existed for the charges.

1048. Notwithstanding this finding by its own internal investigative body, Columbia's Student Conduct team formalized disciplinary charges against John Doe and issued the April 9, 2024 Notice of Allegations

1049. Thereafter, John Doe sent a letter to Claudia Marin Andrade Columbia's director of CSSI requesting that the disciplinary charges be dismissed for lack of merit.

1050. Columbia did not respond to John Doe's request.

**XXX. John Doe Is Erroneosly Sanctioned and Suspended by Dean James Colgrove**

1051. On April 11, 2024, Columbia issued the Sanction Letter authored by Dean Colgrove.

1052. It had been 716 days since Jane Roe filed her false and fictitious complaint against John Doe.

1053. Dean Colgrove stated that after considering the file in its entirety, he determined that the appropriate sanction on John Doe was a one and a half year (3 semester suspension) until January 2026.

183

1054. Dean Colgrove stated that if John Doe chose to return to Columbia after the suspension period he would be placed on disciplinary probation for the remainder of his time at Columbia.

1055. Dean Colgrove stated that John Doe's transcript would be noted to reflect that John Doe was not in good disciplinary standing.

1056. Dean Colgrove stated that as part of the sanction John Doe was required to participate in training on the Gender-based Misconduct and Title IX Policy with Title IX Coordinator Marjory Fisher.

1057. Dean Colgrove also stated that as part of the sanction John Doe was ineligible for student housing during his suspension period and would be removed from his residence.

1058. Dean Colgrove stated that John Doe was banned and trespassed from all University property, and that if he returned, he would be arrested.

1059. Dean Colgrove stated that John Doe was considered "persona non grata" during his suspension period.

1060. Dean Colgrove stated that if John Doe wished to return to Columbia after his suspension period, he would be required to petition the Gender-Based Misconduct Office with a 3–5-page paper requesting reinstatement.

1061. Dean Colgrove stated that upon John Doe's return to Columbia, he would be required to meet with Title IX Coordinator Marjory Fisher to be trained on the Gender-based misconduct Policy.

**YYY. Dean James Colegrove's Biased  Reasoning, Deviation from Columbia's GBM Policy in Imposing the Sanction, and Double Jeopardy Imposed  on John  Doe  in Relying on Columbia's Prior Inappropriate Interim Discipline of Plaintiff.**

1062. Dean Colgrove stated that in imposing the sanction, he considered John Doe's "other disciplinary matter," referring to the Dean's Discipline Process and interim discipline initiated by Investigator Kleidman.

1063. Columbia's GBM Policy did not allow James Colgrove to consider John Doe's "other" disciplinary proceeding because that disciplinary proceeding was related to allegations brought forth in the GBM Proceeding.

1064. Columbia should not have subjected John Doe to interim discipline.

1065. Columbia's interim discipline of Plaintiff created the illusion that at the time of John Doe's sanction in the GBM proceeding,  John Doe was already found guilty of misconduct in an unrelated matter which John Doe was not.

1066. Dean Colgrove stated that findings of John Doe's interim discipline imposed by Columbia was evidence of  "prior bad acts" on behalf of John Doe.

1067. Dean  Colgrove  stated  that  John  Doe's  "prior  bad  acts"  was  an "aggravating factor" that Dean Colegrove considered in imposing the GBM sanction on John Doe.

185

Deleted:  and

Deleted: sanction he considered John Doe's "other disciplinary matter" referring to the Dean's Discipline Process initiated by Investigator Kleidman that were part of the GBM proceeding. …

1068. Put simply, Dean Colgrove considered nonexistent prior bad acts of Plaintiff and imposed a harsher sanction.

1069. Dean Colgrove falsely stated that John Doe formed "a web of lies". and that John Doe "fabricated gender-based misconduct allegations against Mack Roe.

1070. Dean Colgrove falsely stated that John Doe "made up his retaliation allegations against Jane Roe and Mack Roe out of whole cloth"

1071. Dean Colgrove falslely stated that John Doe "lied" in his impact statement  in what Dean Colgrove called "an attempt to elicit leniency from the Sanctioning Officer"

1072.  Dean Colgrove falsely stated that John Doe had committed "prior bad acts"  referring to the Dean's Discipline Process initiated by Investigator Kleidman that was part of the GBM proceeding.

1073. Dean Colgrove stated that John Doe's impact statement was simply John Doe's attempts to "relitigate the facts of the case" , and to "elicit leniency from the Sanctioning Officer"

1074. Incredibly, Dean Colgrove faulted John Doe for maintaining his innocence throughout the proceeding and for not accepting responsibility for the alleged misconduct during the investigation and hearing.

Dean Colgrove wrote the following in his sanctioning letter to John Doe:

"In his impact statement, the Respondent attempts to relitigate the facts of the case. The Respondent utterly failed throughout the investigation, hearing, and

186

impact statement to accept responsibility for his actions or demonstrate any remorse for the impact his behavior had on the other Parties, and the larger PALS community."

1075. It was John Doe's right to maintain his innocence and defend himself against Jane Roe's false and fictitious allegations.

1076. Dean Colgrove punished John Doe for maintaining his innocence and exercising his rights.

1077. Dean Colgrove assumed John Doe's guilt from the very beginning.

1078.  Dean Colgrove concluded his decision advising John Doe of his rights to appeal the sanction on four grounds for appeal. (1) Procedural Irregularity,  (2) New Information, (3) Excessiveness of Sanction, and (4) Conflict of Interest or Bias.

1079.  Dean Jame's Colgrove seeking  to protect the University from criticism both among students and the public to the effect that it was not taking women's sexual misconduct complaints seriously took a pro-female, sex-biased stance on Jane Roe's  allegations, leading him to excessively sanction John Doe, erroneously and contrary to the weight of the evidence.

**ZZZ. Two Out of the Three Members of Columbia's Appointed Appellate Panel Were Unqualified to Decide John Doe's Appeal.**

1080. Attached to John Doe's sanction, was Columbia's notice of the appellate panel.

1081. Columbia notified John Doe that the appellate panel would consist of Shih-Fu Chang Dean of Columbia's undergraduate School of Engineering and

187

Applied Science (SEAS) Troy Eggers Dean of Columbia's graduate School of Professional Studies (SPS), and Carlos J. Dean of Columbia's Graduate School of Arts and Science (GSAS).

**Deleted:** Alonso

1082. Dean Shih-Fu Chang was the only member of the appellate panel that was qualified to decided John Doe's appeal.

**AAAA.    Dean Carlos Alonso Deviated From Columbia's Gender-based Misconduct Policy and Procedures and Failed to Disclose an actual Conflict of Interest or a potential conflict of interest and Bias or potential bias in Favor of Jane Roe**

1083. Dean Alonso was the Dean of Jane Roe's School.

1084. Dean Alonso had previously discussed Jane Roe's allegations against John Doe with her on April 27, 2022, shortly after she made her complaint against John Doe.

1085. Dean Alonso advised Jane Roe on how to proceed with her allegations against John Doe.

1086. Dean Alonso developed a personal relationship with Jane Roe.

1087. Dean Alonso maintained his personal relationship with Jane Roe throughout the duration of John Doe's GBM proceeding.

1088. Dean Carlos Alonso committed to supporting Jane Roe in Jane Roe's pursuit of sexual misconduct proceedings against John Doe.

1089. Dean Alonso proved guidance to Jane Roe in Jane Roe's pursuit of sexual misconduct proceedings against John Doe.

1090. For these reasons, Dean Alonso had an actual conflict of interest or potential conflict of interest in serving as an appellate officer in John Doe's appeal of Columbia's findings against John Doe.

1091. Columbia's Gender-based Misconduct Policy and Procedures require that all Columbia administrators involved in gender-based misconduct proceedings disclose to Columbia any actual or potential conflicts of interest.

1092. Columbia's mandatory GBM Training's for Columbia administrators require that all Columbia administrators involved in gender-based misconduct proceedings disclose to Columbia any actual or potential conflicts of interest.

1093. Columbia's GBM Policy and Procedures requires any Columbia administrator participating in the disciplinary process, including an Appellate Officer, to disclose to Columbia's Student Conduct and Community Standards office ("SCCS") any potential or actual conflict of interest.

1094. Columbia requires that even potential conflicts of interest must be disclosed to Columbia.

1095. Given Dean Alonso's personal relationship with and prior involvement with Jane Roe specifically with respect to Jane Roe's complaint against John Doe, Dean Alonso had a duty to disclose to Columbia that he had an actual or potential conflict of interest in serving as an appellate officer in John Doe's appeal of Columbia's findings against John Doe.

189

1096. Dean Alonso  had a bias in favor of Jane Roe given the advisory role that Dean Carlos Alonso held with Jane Roe.

1097. Dean Alonso had a bias in favor of Jane Roe given Dean Alonso's personal relationship with Jane Roe.

1098. Dean Alonso had a conflict of interest in serving on the appellate panel.

1099. As mandated by Columbia's Gender-Based Misconduct Policy Dean Alonso was required to raise this conflict of interest with Columbia.

1100. Dean Alonso  failed to do so,  in violation of Columbia's Gender-Based Misconduct Policy governing mandatory disclosures of conflicts and/or potential conflicts of interest and remained on the panel.

1101. Regarding conflicts of interest (potential or actual), Columbia's Gender-Based Misconduct Policy states:

> The University requires any individual participating in the investigation, adjudication process, sanctioning or appeal determinations to disclose to the Gender-Based Misconduct Office any potential or actual conflict of interest. [...And that] the University will take steps to address the conflict in order to ensure an impartial process."

1102. Dean Alonso and Jane Roe kept their personal and professional relationship secret from the GBMO and the other members of the Appellate Panel and Dean Alonso did not disclose the conflict of interest when he was assigned to the Appellate Panel.

1103. Dean Alonso subsequently voted to reject John Doe's appeal.

**Deleted:** .

1104. Dean Alonso's advisory relationship with Jane Roe affected Dean Alonso's ability to impartially evaluate John Doe's appeal.

**BBBB.    Columbia Deviated from its Gender-based Misconduct Policy and Proceedures and assigned Dean Troy Evers to serve as an appellate officer to decide John Doe's Appeal.   Dean Evers Was Unqualified to Serve on the Appellate Panel of John Doe's Appeal**

1105. Dean Troy Evers was Dean of Columbia University's School of Professional Studies (SPS) .

1106. Columbia's School of Professional Studies is Graduate level school.

1107. John Doe was an undergraduate student.

1108. Columbia's Gender-Based Misconduct Policy requires that: "at least two of the three appellate Deans  must be Deans from the academic level of the respondent."

1109. John Doe was a student at the undergraduate academic level.

1110. Dean Evers was a dean of a graduate level school.

1111. Dean Evers was not qualified to decide John Doe's appeal.

1112. John Doe objected to Dean Ever's  appointment directly to the Title IX Coordinator Marjory Fisher and requested that Dean Evers be replaced in compliance with the Gender-based Misconduct Policy and Proceedures.

1113.  Marjory Fisher denied John Doe's request and permitted Dean Evers to remain on the panel, in violation of Columbia's Gender-based misconduct policy and procedures.

191

**CCCC.      April 18, 2024: John Doe's Appeal**

1114. On April 18, 2024, John Doe submitted a 15-page appeal based on three of the grounds permitted by the Gender-Based Misconduct Policy.

1115. John Doe based his appeal on (1) procedural irregularities (2) decision maker bias and (3) excessive sanction.

1116. John Doe appealed based on 21 procedural irregularities, various instances of bias on behalf of Investigator Kleidman and Director Walsh, and excessiveness of the sanction.

1117. In his appeal John Doe argued that significant procedural irregularities and instances of bias during the investigation, hearing panel, and sanctioning stages of his case led to an erroneous finding of responsibility and excessive sanction against him, and to his detriment, greatly affected the outcome of his case.

1118. John Doe began his appeal with the following, and alleges the same in this complaint:

"Dear Appellate Panel,

This appeal arises from significant procedural irregularities and indicators of bias during the investigation, hearing panel, and sanctioning stages of this case. These irregularities led to an erroneous finding of responsibility and excessive sanction against me, greatly affecting the outcome of the case to my detriment. This appeal details instance after instance where procedural guidelines were not followed or completely disregarded and/or were applied inconsistently, directly violating the Gender-Based Misconduct Policy and Procedures."

192

1119. Subsequently throughout his appeal John Doe detailed various instances of blatant bias on behalf of Investigator Kleidman.

1120. John Doe's detailed instance after instance where procedural policy and guidelines were not followed or completely disregarded and/or were applied inconsistently, directly violating the Gender-Based Misconduct Policy and Procedures.

1121. John Doe implored the Hearing Panel to read his 13,000-word comprehensive response to the Investigative Report and his opening statement to the Hearing Panel to gain additional context and background as to the grounds of his appeal.

1122. John Doe stated the following to the Panel:

"I strongly encourage you to read my 13,000-word comprehensive response to the Investigative Report and my opening statement to the Hearing Panel. These two documents will provide additional context and background as to the grounds of my appeal."

1123. John Doe's Appeal also argued that the case relied on incomplete, edited, and selectively disclosed audio recordings furnished by Mack Roe, and refused to investigate the discrepancies that they contained.

1124. John Doe argued that The Investigative Team, Hearing Panel, and Sanctioning Officer's overreliance on incomplete and selectively disclosed audio recordings that omitted approximately two hours of crucial conversations was significantly detrimental to the outcome of his case.

193

1125.  John Doe argued that the culmination of these procedural irregularities skewed the fact-finding process, ultimately leading to an erroneous finding of responsibility against him and excessive sanction(s) based on an incomplete and inaccurate portrayal of the evidence.

1126. John Doe argued that the refusal of the Investigative Team and Hearing Panel to fully investigate these discrepancies, the integrity of the investigative and adjudicative process and denied him the opportunity for a fair defense, and to his detriment, significantly affected the outcome of his case.

1127. John Doe stated the following in his appeal, and alleges the same in this complaint:

> "Consequently, this procedural irregularity skewed the fact-finding process, ultimately leading to an erroneous finding of responsibility against me and excessive sanction(s) based on an incomplete and inaccurate portrayal of the evidence. The refusal of the Investigative Team and Hearing Panel to fully investigate these discrepancies despite my fervent pleas not only compromised the integrity of the investigative and adjudicative process but also denied me the opportunity for a fair defense, and to my detriment, significantly affecting the outcome of the case."

1128. John Doe's Appeal also highlighted the preferential treatment that Columbia gave to Jane Roe during the investigation.

1129. Specifically, John Doe noted that while Jane Roe was allowed to participate in investigative interviews from the comfort of her home, he (John Doe) was required to attend in person at his attorney's office and was deprived of access to his electronic devices.

1130. John Doe argued that these discrepancies suggested bias in favor of Jane Roe impacting his ability to fully engage in his defense.

1131. John Doe stated the following in his appeal and alleges the same in this complaint:

> "This procedural irregularity placed an undue logistical and psychological burden on me, affecting my ability to engage comfortably and candidly during the interviews. It also influenced the outcome to my detriment by not affording me the same level of comfort and security as NPS during the investigative interviews, impacting my responses and the perception of my testimony. Furthermore, this procedural irregularity indicates that the Investigative Team was biased against me and biased in favor of [Jane Roe]"

1132. John Doe pointed out that the Hearing Panel allowed Jane Roe to introduce new evidence during the hearing, which he did not have the opportunity to review or respond to in advance, while John Doe was prohibited from presenting new evidence at the hearing.

1133. John Doe argued that this was a direct violation of the Gender-Based Misconduct Policy and Procedures, which prohibited the introduction of new evidence at the hearing and put him at a significant disadvantage and undermined the fairness of the hearing.

1134. John Doe explained in vivid detail, that the Sanctioning Officer erroneously considered nonexistent "prior bad acts" that were inaccurately characterized as separate misconduct, not separate instances but were part of the ongoing case.

195

1135. John Doe's Appeal also highlighted how Columbia's Investigative Team deliberately manipulated witness statements to align with Jane Roe's false and fictitious narrative and versions of events.

1136. John Doe stated the following in his appeal and alleges the same in this complaint:

"The Investigative Team deliberately misconstrued witness statements to favor [Jane Roe's] narrative and version of events. (See My 13,000-word response to the Investigative Report Pages 5-8 for a deeper analysis) This Investigative behavior is strictly prohibited and needs no further explanation. This procedural irregularity in skewing witness statements to align with [Jane Roe's] narrative led to a distorted portrayal of events, wherein my actions and intentions were inaccurately represented, and the context of interactions was misunderstood and misrepresented. Such a biased presentation of evidence inherently disadvantaged me as it framed the narrative in a manner that did not reflect the reality of the circumstances or the nuances of the interactions in question. This procedural irregularity impacted the outcome to my detriment by leading to findings of responsibility based on a constructed narrative rather than an objective assessment of the facts. The Hearing Panel and Sanctioning Officer relied on the Investigative Report and made determinations influenced by this skewed narrative, which resulted in sanctions that were disproportionate and unfounded based on the actual events."

1137. John Doe argued that the sanction was excessive and would render him homeless, deprive him of food, healthcare, and employment, and leave him without adequate support during his suspension period if the sanction was affirmed.

1138. John Does stated the following in his appeal and alleges the same in this complaint:

I am a first-generation low-income student 1 semester shy of completing my degree. I am completely independent and do not have any supportive family. I am a food, housing, and healthcare insecure and have a plethora of health issues and several documented disabilities. I have been dependent on on-campus student housing since arriving at Columbia in July of 2021. Iam also dependent on my student health care plan for physical and mental healthcare and dependent on my Scholarship-provided meal plan, as well as my on-campus employment. The sanction imposed is a 3 semester-long complete separation from Columbia University and a ban from campus property. It is also an eviction from my student housing apartment, my home of nearly 3 years, and a permanent stain on my academic transcript and educational record. This sanction is heartless and would render me homeless on the streets of New York City with no place else to go. It would deprive me of food and access to healthcare and would remove me from my gainful on-campus employment of nearly two years, the very things that ensure my survival."

1139. John Doe argued that due to the sheer magnitude of procedural irregularities and instances of bias during the investigation, hearing panel, and sanctioning stages of his case, and their direct and significant impact on the outcome and excessive sanction of his case, the Hearing Panel's findings and associated sanctions should be reversed.

1140. John Doe implored the Panel to vacate the findings and reverse the sanction.

1141. John Doe Stated:

Due to the sheer magnitude of procedural irregularities and instances of bias during the investigation, hearing panel, and sanctioning stages of my case, and their direct and significant impact on the outcome and excessive sanction of my case, I kindly request a complete reversal of the Hearing Panel's findings and associated sanction(s).

197

**DDDD.    May 10, 2024: Jane Roe's Hostile Response to John Doe's Appeal and False Statements to Columbia's Appellate Panel**

1142. On May 10, 2024, Jane Roe submitted a response to John Doe's appeal, for the Appellate Panel to consider. Jane Roe's statements to the panel were riddled with false and inaccurate statements.

1143. Specifically, in her written objection to John Doe's appeal, Jane Roe falsely stated to the Panel that John Doe was found responsible for retaliating against her for reporting him for sexual exploitation.

1144. John Doe was not found responsible for retaliating against Jane Roe, nor was John Doe ever charged with, or even accused of retaliating against Jane Roe.

1145. Jane Roe knew this, but shamelessly attempted to enflame the appellate panel by relaying false and inaccurate information about John Doe.

1146. Columbia refused to redact the false and inaccurate statements before distributing Jane Roe's statement to the Appellate Panel in violation of the Gender-Based Misconduct Policy.

1147. Columbia did so because they were biased against John Doe and deliberately indifferent to John Doe's right to a fair process.

1148. Jane Roe's statements were so egregiously false and inaccurate that, it required John Doe to make a formal request to Title IX Coordinator Marjory Fisher

198

to give "curative instruction" to the panel to disregard Jane Roe's false and inaccurate statements to the Panel.

John Doe's Letter to Fisher stated:

"Dear Marjory.

I have reviewed [Jane Roe's] response to my appeal and identified significant factual inaccuracies1 that were not redacted before it was distributed, and that could potentially bias or mislead the Appellate Panel. Given the importance of accurate facts and information at this stage, I am requesting curative instruction to the Appellate Panel to address these significant inaccuracies.
As you are aware, curative instruction regarding inaccurate facts or information is permitted by the GBMPP, and as such, I request your intervention." The inaccuracies, false statements, and misrepresentations in Jane Roe's response to my appeal have the potential to severely mislead the Appellate Panel and unfairly prejudice their decision. It is crucial for the panel to have a clear and accurate understanding of the facts. These inaccuracies must be addressed to ensure a fair and impartial review of my appeal."

1149. In response Title IX Coordinator Fisher, agreed to give curative instruction to the Appellate Panel to disregard the false and inaccurate statements that Jane Roe  stating:

"With respect to your request for a curative instruction in response to [Jane Roe's] appeal, I will address the inaccuracies that you noted in my instructions to the Panel."

1150. Despite Columbia having knowledge of Jane Roe's false statements to the appellate Panel, Columbia took to action to address Jane Roe's false statements.

199

1151. Columbia's Gender-based Misconduct Policy explicitly prohibits a student from making false statements to Columbia administrators during a proceeding.

1152. Columbia ignored Jane Roe's false statements and refused to enforced the Gender-based misconduct Policy, and took no disciplinary action against Jane Roe for her false statements to Columbia administrators.

1153. Jane Roe stated that John Doe's appeal was "wholly vague and conclusory".

1154. Jane Roe told the Panel that John Doe's appeal was "merely a protracted litany of grievances, which he labeled procedural irregularities."

1155. "Jane Roe told the Panel that John Doe's appeal of the Sanction due to its excessiveness was "completely baseless".

1156. Jane Roe told the Panel that John Doe's appeal "only further diminished his "abysmal credibility".

1157. Jane Roe told the Panel that any allegation of bias on behalf of the Investigative Team "Should be rejected by the Appellate Panel"

1158. Jane Roe told the Panel that John Doe's arguments in his appeal were "almost comically nonsensical"

1159. Jane Roe told the Panel that John Doe's arguments were "ludicrous"

1160. Jane Roe told the Panel that John Doe's requests for a reversal of the findings and sanction were "an absurd demand."

**EEEE.    June 5, 2024, Appellate Panel Denies John Doe's Appeal**

1161. On June 5, 2024, the Appellate Panel denied John Doe's Appeal.

1162. It had been two years since Jane Roe filed her false and fictitious complaint against John Doe, and Columbia's investigation of John Doe first began.

1163. The Panel completely disregarded the 21 procedural irregularities, and various claims of bias that John Doe raised in his appeal.

1164. The Appellate Panel stated. "We find no errors".

1165. The appellate panel refused to even acknowledge that bias was one of John Doe's grounds for his appeal.

1166. John Doe cited  bias 35 times in his appeal.

1167. The Appellate Panel refused to consider John Doe's argument that the Hearing Panel's findings were contrary to the preponderance of the evidence.

1168. The Appellate Panel stated that there were no procedural errors because "there was no evidence that John Doe's stated procedural irregularities affected the investigation and sanction in the case."

1169. The Appellate Panel stated that nothing that John Doe raised in his appeal affected the outcome.

1170. The Appellate Panel stated:

"Characterizing these conclusions as "procedural errors" is an attempt to ask us to re-characterize the facts in your favor." "We find no procedural errors"

1171. Further, the Appellate Panel stated that the Sanction was not excessive and upheld the Hearing Panel's decision.

1172. The Appellate Panel stated that they felt that the Sanction was actually "too lenient" and not severe enough.

1173. The Appellate Panel concluded by faulting John Doe for "wasting enormous institutional resources dedicated to the investigation and adjudication of the case"

1174. Columbia's Appellate Panel seeking to protect the University from criticism both among students and the public to the effect that it was not taking women's sexual misconduct complaints seriously and took a pro-female, sex-biased stance on Jane Roe's allegations, leading them to reject John Doe's appeal erroneously and contrary to the weight of the evidence.

1175. In a clear procedurally irregularity, and violation of Columbia's own Gender-Based Misconduct Policy, Columbia assumed John Doe's guilt from the very beginning, and shifted the burden to John Doe depriving him of a fair and impartial process.

**FFFF.    June 10, 2024: Columbia's Title IX Coordinator Retaliates against John Doe and Imposes Additional Sanctions on John Doe Including Imposing Restrictions on John Doe's University Employment.**

202

1176. On June 10, 2024, John Doe received a letter from Columbia's Title IX Coordinator Marjory Fisher notifying him that he was restricted from his Columbia University employment during his suspension period.

1177. John Doe had been employed with Columbia for two-years without incident.

1178. John Doe's employment with Columbia earned John Doe approximately $3,300.00 per month.

1179. John Doe's employment with Columbia was independent of John Doe's academic studies.

1180. John Doe's employment with Columbia was not connected to Jane Roe's sexual misconduct allegations against John Doe.

1181. This restriction on John Doe's University employment was not included in the sanction imposed on John Doe by Dean Colgrove.

1182. Dean Colgrove did not impose a termination of John Doe's Columbia employment even though termination of University employment was a possible sanction.

1183. John Doe sent a letter to Marjory Fisher explaining that the restrictions on his University employment were not part of the sanction and requested that the restrictions on his employment be lifted.

1184. Marjory Fisher flat out ignored John Doe's letter for weeks, but eventually responded informing John Doe that his request to remove the additional sanctions she imposed on his University employment was denied.

1185. Marjory Fisher did not give John Doe a reason for terminating John Doe's employment with Columbia.

1186. On September 20, 2024, John Doe received notice from Columbia, that his University employment was terminated.

1187. On September 17, 2024, John Doe received a letter from Title IX Coordinator Marjory Fisher, notifying that he was prohibited from participating in non-official peer to peer group chats and discussion groups meant for Columbia Students.

**GGGG.    August 15, 2024: Columbia Retaliates Against John Doe and Revokes John Doe's Full Tuition Scholarship With no Opportunity to Appeal.**

1188. On August 15, 2024, John Doe received a letter from his Columbia scholarship committee, notifying him that due to the Gender -Based Misconduct findings and Sanctions, his full tuition scholarship was permanently revoked.

1189. The Scholarship Committee informed John Doe that he was permanently dismissed from the scholarship program.

1190. The Scholarship Committee informed John Doe that his scholarship would not be reinstated upon his return to Columbia.

204

1191. The Scholarship Committee informed John Doe that the decisions was final, and that  he was not permitted to appeal the Committees Decision.

1192. Scholarship revocation was not imposed as part of the Sanction that Dean Colgrove imposed on John Doe despite Columbia Gender-based misconduct Policy naming scholarship revocation as a possible sanction.

1193. John Doe was in good standing with the scholarship requirements.

1194. The Scholarship Committee relied on Columbia's erroneous and sex-biased findings against John Doe leading to their permeant and unappealable retaliatory revocation of John Doe's scholarship.

**HHHH.   Columbia Awards Investigator Kleidman With a Promotion to a University Leadership Role**

On or about September 1st 2024, Columbia University promoted Title IX Investigator Jamie Kleidman to Associate Director of Investigations at Columbia University's newly established Office of Institutional Equity (OIE) which oversees the review and arbitration of all reports of discrimination and discriminatory harassment at Columbia.

**IIII.   The Conclusion of John Doe's Suspension and Columbia's  Continued Retaliation Against John Doe**

1195. On October 6, 2026 John Doe notified Columbia that he intended to return to classes at Columbia at the conculsion of his suspension.

1196. On December 5, 2025, John Doe's erroneous suspension from Columbia was officially concluded.

1197. Due to the conclusion of John Doe's suspension John Doe was eligible to register for classes for the Spring 2026 semester.

1198. The disciplinary sanction imposed on Plaintiff by Defendant provided that "Plaintiff would be eligible to return for the Spring 2026 semester" following the completion of his 18-month suspension, which concluded on December 5, 2025.

1199. Notwithstanding that promise, Columbia imposed additional procedural and administrative requirements on Plaintiff that were not part of the sanction, including demands that Plaintiff resolve unrelated disciplinary matters, and pay costs and fees allegedly accrued as the result of Plaintiff's suspension, before Defendant will permit Plaintiff to re-enroll in classes.

1200. On October 23, 2025 Columbia informed John Doe that Columbia was commencing **yet another** disciplinary matter against John Doe for an alleged violation of University Policy allegedly occurring two-years prior in April of 2024.

1201. Columbia informed John Doe that Columbia was commencing the charges against John Doe through Columbia's Center for Student Success and Intervention (CSSI) the same office through which Columbia commenced the inappropriate interim discipline related to John Doe's GBM proceeding.

1202. The disciplinary charges were baseless.

206

**Formatted:** Font: Bold

1203. The disciplinary charges were inconsistent with a violation of any university Policy.

1204. The charging report contained edited evidence, and false statements by Columbia university administrators.

1205. Columbia informed John Doe that both sets of the pending disciplinary charges that Columbia had to be resolved prior to John Doe's reinstatement to Columbia which was not part of John Doe's original sanction.

1206. Columbia informed John Doe that Columbia's operative policy had "changed" since John Doe's suspension and that Columbia would not provide the names of the administrators involved in John Doe's pending student conduct matters to Plaintiff ahead of the hearings, as they would have under the policy and procedures in place at the time of the alleged violations.

1207. Columbia informed John Doe that due to the "changes" in Columbia's policies, John Doe would not be permitted to do a "conflict of interest check" on the administrators that were involved in the pending student conduct proceedings.

1208. Columbia also informed John Doe, that John Doe's exposure in both of the pending student conduct proceedings was up to expulsion from Columbia University.

1209. Columbia informed John Doe that Columbia would take into consideration the findings and sanctions from John Doe's GBM proceedings in their pursuit of additional student conduct charges against John Doe.

1210. Columbia has also demanded that John Doe pay to the University thousands of dollars in costs and fees related to John Doe's suspension but refuses to provide John Doe with an accounting of all of the charges.

1211.

1212.

1213. In response, Columbia continues to retaliate against John Doe.

**JJJJ. TITLE IX AND ITS APPLICATION**

1214. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

208

1215. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

1216. Columbia has received and continues to receive over $700 million in annual federal funding.

1217. Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, Davis v. Monroe Bd. of Education, 526 U.S. 629 (1999), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline, Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action.

1218. Challenges to university disciplinary proceedings for sex discrimination generally fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender. Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994).

1219. "Erroneous outcomes" occurred in this case because John Doe was innocent and wrongly found responsible for sexual exploitation and the totality of the circumstances establish gender bias was a motivating factor.

1220. Instances of "selective enforcement" occurred in this case because John Doe was subject to a 3-semester suspension from Columbia without sufficient justification and this "unduly severe penalty" was affected by John Doe's male gender.

1221. Columbia exhibited a distinctly consistent pattern of decision-making against a male party and in favor of a female one, see Prasad v. Cornell, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016), John Doe being found less credible than every Jane Doe, despite: no witnesses corroborating any accusation; Jane Doe 1 submitting evidence that corroborated John Doe's allegation of sexual exploitation; Jane Doe 2 being contradicted by her witnesses and all evidence; Jane Doe 3 completely changing her allegations after her original ones were disproved by evidence; Jane Doe 4 not remembering the night/incident in question due to passage of time; Defendant's undue, arbitrary dismissal of John Doe's sexual exploitation claim; Defendant's totally process-deficient suspension of Plaintiff, whose appeal thereof was handled by Defendant's Title IX Coordinator who imposed the suspension; Columbia downplaying or downright ignoring inconsistencies in female complainant's accounts and exaggerating any perceived in John Doe's.

210

1222. Columbia's hearing panelists never diverted from the recommendation(s) made by Columbia's "investigators"; "investigators" ignored bad-faith motive as possible for accuser but suspected the same of John Doe, even as Jane Roe 1 told Columbia that she filed in large part because John Doe did not meet her "Demands".

1223. Columbia refused to follow leads that were potentially exculpatory; distributed biased reports via "investigators" to hearing panelists, largely ignoring John Doe's requested edits thereto; tolerated hearing panelists occasionally speaking over John Doe during "hearings,", though of course they listened reverently to the complainant. in an apparent violation of the Gender-Based Misconduct Policy.

1224. Columbia's propagation of "Believe all women" in conjunction with their 'victim-centered,' 'trauma-informed' approach to evidence and deliberation, transformed its a pro-complainant bias into a pro-female bias; whereas, their profession of belief in "rape culture" and "believe all women" transforms their anti-respondent bias into an anti-male bias. These gendered biases, contrary to Title IX, were present in John Doe's cases.

1225. John Doe was denied the opportunity to cross-examine "witnesses" or his accuser. The inability to cross- examine one's accusers or question witnesses, as encouraged by Dear Colleague Letters, has been recognized as flaws that per se cast

211

an "articulable doubt" on the results of the processes which lack them. See, Doe v. Baum, 903 F.3d 575. 585-586 (6th Cir. 2018).

1226. Plaintiff alleges that gender bias, procedural deficiencies, like those previously described, lacking compelling evidence and inconsistency in accuser's statements cast a substantial and articulable doubt on the fairness and Title IX compliance of Columbia's policies as experienced. See, Doe v. Marymount Univ., 297 F. Supp. 3d 573, 585-586 (E.D. Va. 2018).

1227. These procedural disadvantages, each supposedly neutral yet each disfavored males and favored female complainants, provided a pretextual basis for Columbia's desired results. Collectively, this raises the suspicion of gender bias contrary to Title IX which renders the results thereby reached plausibly biased and illegitimate. Doe v. Miami University, 882 F.3d 579, 593-594 (6th Cir. 2018). Not only does Columbia find males guilty with disproportionate frequency, but they also find most females innocent; Columbia's refusal to investigate John Doe's complaint regarding Jane Doe 1 supports the wider allegation of a pattern of gender-biased decision-making.

## DAMAGES

1228. As the direct result of Columbia's discriminatory actions, John Doe has received a permanent notation on his otherwise stellar and unblemished academic transcript and educational record branding him a sexual predator forever.

212

1229. As the direct result of Columbia's discriminatory actions, John Doe has been unable to apply to internships and fellowships.

1230. As the direct result of Columbia's discriminatory actions, John Doe has been unable to obtain employment for which he would otherwise be qualified.

1231. As the direct result of Columbia's discriminatory actions John Doe has been forced to turn down several prestigious and once in a lifetime academic and professional opportunities that he has been offered.

1232. As the direct result of Columbia's discriminatory actions, John Doe's academic trajectory has been delayed by two years, ultimately causing a two-year delay in his entrance to the workforce.

1233. As the direct result of Columbia's discriminatory actions, John Doe's lease to his student apartment and home of 3 years has been terminated, leaving him without stable housing.

1234. As the direct result of Columbia's discriminatory actions, John Doe was forcibly withdrawn from enrollment , causing him to lose the grace period on his student loan deferment , causing his burdensome student loans to become due prematurely requiring immediate repayment.

1235. As the direct result of Columbia's discriminatory actions, John Doe's University employment of two years was terminated, leaving him without gainful employment.

1236. As the direct result of Columbia's discriminatory actions, John Doe's student healthcare plan was abruptly  canceled leaving him without healthcare amidst ongoing medical care and treatment for his disabilities.

1237. As the direct result of Columbia's discriminatory actions,  John Doe's student meal plan was canceled leaving him without access to safe and nutritional food.

1238. As the direct result of Columbia's discriminatory actions John Doe was banned from campus with the threat of arrest if he returned, separation him from his family of friends.

1239. As the direct result of Columbia's discriminatory actions, John Doe's full tuition scholarship has been revoked, leaving him without a way to finance the completion of his degree upon his return to Columbia.

1240. As the direct result of Columbia's discriminatory actions John Doe has faced significant harassment, retaliation, and social alienation from other  students in the Columbia Community.

1241. As the direct result of Columbia's discriminatory actions John Doe has faced significant damages to his reputation, economic losses, loss of educational opportunities, and loss of future career prospects.

**FIRST CAUSE OF ACTION:**
**(Erroneous Outcome and Violation of Title IX of the Education Amendments of 1972)**

1242. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1243. Title IX of the Education Amendments of 1972 provides, in relevant part, that No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

1244. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

1245. In its fiscal year ending June 30, 2024, Columbia received hundreds of millions of dollars in federal funding for research and development.

1246. A school violates Title IX when it fails to prevent or remedy sexual harassment or sexual assault.

1247. Title IX prohibits the imposition of discipline where gender is a motivating factor.

1248. A school violates Title IX when gender is a motivating factor in its decision to impose discipline.

Deleted: :¶

Deleted: 17

215

1249. Title IX requires schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.

1250. Title IX requires that all educational institutions have policies and procedures that afford due process to both parties involved.

1251. Title IX requires that all educational institutions have policies and procedures in place that protect the rights of students accused of sexual misconduct.

1252. Title IX requires that all educational institutions abide by its policies and procedures designed to protect the rights of students accused of sexual misconduct.

1253. Title IX prohibits educational intuitions from giving preferential treatment to female accusers of sexual misconduct over that of the male accused.

1254. The evidentiary and procedural errors rampant throughout the investigation, hearing, and appeal constituted a denial of due process in this case resulting in an erroneous outcome based on an erroneous and distorted conception of the facts.

1255. Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature.

1256. Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found

216

to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

1257. Contemporaneous, University-specific institutional pressure on a University to find male students guilty or "responsible" for alleged sexual misconduct against female students supports a plausible inference of sex-based discriminatory motive

1258. At the time of John Doe's GBM proceeding, Columbia faced precisely the kind of contemporaneous, Columbia-specific institutional pressure that the Second Circuit in *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) found sufficient to support a plausible inference of sex-based discriminatory motive.

1259. That pressure the institutional pressure that Columbia faced to find John Doe responsible for sexual misconduct against Jane Roe operated on four distinct and simultaneous fronts: federal regulatory, legal, and national press, and campus each of which created powerful institutional incentives for the same administrators who handled John Doe's case to favor female complainants over male respondents.

1260. Columbia was under active investigation by the United States Department of Education's Office for Civil Rights in at least five separate Title IX investigations concerning its handling of sexual misconduct complaints brought by female Columbia students against male Columbia students during the pendency of John Doe's GBM proceeding.

1261. At least three of the  OCR investigations into Columbia had been pending against Columbia since 2015.

1262.  Columbia was fully aware that failing to demonstrate to the OCR that it was taking female students' complaints of sexual misconduct against male students seriously could result in the withholding of Columbia's approximately $800 million in annual federal funding,  funding administered through the same administrative infrastructure that oversaw John Doe's GBM proceeding.

1263. Columbia simultaneously faced a pending federal lawsuit *Jane Doe v. The Trustees of Columbia University*, Case No. 1:21-cv-05839-ER (S.D.N.Y.)  filed on July 20, 2021 by a female Columbia student targeting Columbia's Gender-Based Misconduct Office and the same administrators who handled John Doe's case, accusing Columbia of not taking female students' sexual misconduct complaints against male students seriously, demanding that Columbia be stripped of its federal funding, and remaining pending for the entire duration of John Doe's disciplinary proceeding. Columbia made multiple unsuccessful attempts to settle that lawsuit and feared that acquitting male students of sexual misconduct would invite additional federal lawsuits from female students.

1264. Columbia was simultaneously the target of a campus pressure campaign by a female student political action group operating on Instagram under the handle "@cusurvivors," which directly tagged Columbia's Gender-Based

218

Misconduct Office in its posts, submitted formal demands to Columbia's administrative offices, and ultimately extracted a settlement agreement from Columbia under which Columbia agreed to the group's demands in exchange for the group ceasing its pressure campaign.

1265. Columbia's capitulation to this organized female student pressure campaign which targeted the same office that adjudicated John Doe's case establishes that Columbia's administrators were institutionally responsive to exactly this kind of pressure during the period of John Doe's proceedings.

1266. Columbia's own Title IX Coordinator who played a direct role in advising on Columbia's $71.5 million settlement with survivors of sexual misconduct by a Columbia-affiliated physician sat on the committee that advised Columbia on that settlement. That settlement, finalized in December 2021 — four months before Jane Roe filed her complaint against John Doe — made plain to every Columbia administrator involved in sexual misconduct proceedings, including those who handled John Doe's case, that Columbia faced catastrophic financial and reputational consequences when it failed to act aggressively on female students' complaints of sexual misconduct against male students.

1267. Jane Roe herself generated direct, contemporaneous, complaint-specific institutional pressure on Columbia. Jane Roe told Columbia at the time of filing that she was an active sexual assault awareness advocate, that her complaint

219

against John Doe would "lowkey start a movement," that she had "written enough to give speeches" about her allegations, and that she "needed action to be taken" against John Doe.

1268. Jane Roe filed her sexual misconduct complaint against John Doe on April 26, 2022 — the day after Columbia's Sexual Assault Awareness Month programming began and the day before Columbia's "Denim Day" awareness event.

1269. On April 27, 2022 — the day after Jane Roe filed her complaint — Dean Carlos Alonso, the Vice President for Graduate Education and Dean of Jane Roe's school, personally reached out to Jane Roe, discussed her allegations, offered to support her, advised her on how to proceed, and committed to supporting her throughout the proceedings. Dean Alonso maintained an ongoing personal relationship with Jane Roe for the full duration of John Doe's GBM proceeding.

1270. Viewed together, these contemporaneous pressure sources including five active OCR investigations threatening Columbia's federal funding, a pending federal lawsuit targeting the same office and administrators, a campus pressure campaign to which Columbia capitulated, a $71.5 million sexual misconduct settlement implicating Columbia's own Title IX Coordinator, and direct institutional pressure from Jane Roe herself including a senior dean's personal advocacy on her behalf make it entirely plausible, as the Second Circuit held in the 2016 *Doe* decision, that Columbia's decision-makers and investigators were motivated to favor

220

the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual misconduct by Male Columbia students.

1271. An erroneous outcome occurred in this case because John Doe was innocent and wrongly found responsible for sexual exploitation and gender bias was a motivating factor.

1272. Evidentiary weakness and procedural flaws, and deviatons from University Policies and procedures designed to protect students accused of sexual misconduct support a case of an erroneous outcome under Title IX.

1273. In the context of Title IX an educational institution's deviation from its policy and procedures are considered procedural irregularities.

1274. Procedural irregularities that advantage the accuser support a case of an erroneous outcome under Title IX.

1275. Columbia deviated from its GBM Policy and procedures designed to protect accused students through a series of specific, documented procedural irregularities that, viewed individually and cumulatively, support a plausible inference that gender was a motivating factor in the disciplinary outcome.

1276. Each of the following irregularities consistently disadvantaged John Doe as the male respondent and consistently advantaged Jane Roe as the female complainant.

Deleted:

Deleted: .

1277. Columbia allowed Mack Roe, a witness hostile to John Doe's defense and supportive of Jane Roe's allegations  to participate in the GBM hearing process related to Jane Roe's sexual misconduct allegations against John Doe and to advocate for a finding of responsibility against John Doe.

1278.  Columbia's GBM Policy explicitly prohibited witness participation in the GBM hearing process.

1279. No provision of Columbia's GBM Policy authorized the consolidation of complaints or the participation of a witness in the manner in which Mack Roe participated.

1280. Columbia's GBM Policy does not allow for consolidation of GBM complaints.

1281. Columbia's GBM Policy expressly prohibits witness participation in GBM hearings.

1282.  Columbia's decision to permit Mack Roe's participation in John Doe's GBM Hearing disadvantaged John Doe and constituted a clear deviation from Columbia's GBM Policy designed to protect accused students and a procedural irregularity that disadvantaged John Doe and advantaged Jane Roe.

1283. Dean Carlos Alonso,  a member of John Doe's appellate panel,  had a personal conflict of interest that he was required under the GBM Policy to disclose and failed to disclose.

222

1284. Dean Alonso had developed and maintained an ongoing personal relationship with Jane Roe from the day after she filed her complaint, advised her on how to proceed with her allegations throughout the GBM proceeding, and committed to supporting her pursuit of sexual misconduct proceedings against John Doe. Columbia's GBM Policy expressly required any individual participating in the adjudication or appeal process to disclose to the Gender-Based Misconduct Office any actual or potential conflict of interest.

1285. Dean Alonso failed to make that disclosure, remained on the appellate panel, and voted to deny John Doe's appeal. His failure to disclose a personal advisory relationship with the complainant constitutes a violation of Columbia's mandatory GBM Policy conflict disclosure requirement and a procedural irregularity that directly prejudiced John Doe's appeal.

1286. Columbia violated the specific GBM Policy requirement that at least two of the three appellate deans serving on a respondent's appellate panel must be deans from the respondent's academic level.

1287. John Doe was an undergraduate student. Dean Troy was the Dean of Columbia's School of Professional Studies, a graduate level school.

1288. John Doe raised this objection directly to Title IX Coordinator Marjory Fisher and requested that Dean Evers be replaced in compliance with the GBM Policy.

223

1289. Fisher denied the request and permitted Dean Evers to remain on the panel. Columbia's imposition of an unqualified appellate panelist over John Doe's specific objection constitutes a violation of the GBM Policy's plain mandatory requirement.

1290. Investigator Kleidman subjected John Doe to interim discipline through a parallel Dean's Discipline proceeding that she herself initiated and directed filing two separate complaints against John Doe through Columbia's Center for Student Success and Intervention and directing Mack Roe to file a third all while simultaneously serving as John Doe's Title IX investigator.

1291. The interim disciplinary proceeding found John Doe responsible, and Dean Colgrove then explicitly cited John Doe's "other disciplinary matter" as evidence of "prior bad acts" constituting an aggravating factor in the GBM sanction, effectively double-counting discipline that Kleidman herself had engineered.

1292. Columbia's GBM Policy did not permit Dean Colgrove to consider John Doe's "other disciplinary proceeding" because that proceeding was related to allegations brought forth in the GBM proceeding itself. This constitutes a procedural irregularity that directly inflated the sanction imposed on John Doe based on discipline that his own investigator manufactured.

1293. Columbia withheld from John Doe communications between Mack Roe and Columbia that John Doe was entitled to review under Title IX and its regulations.

224

1294. Mack Roe exchanged emails and communications with Columbia including Director Walsh and Investigator Kleidman regarding the terms under which he would submit evidence to the investigation.

1295. John Doe made three separate documented requests to Title IX Coordinator Marjory Fisher to produce those communications. Fisher denied all three requests, characterizing the emails as not relevant. The Vice Provost for Institutional Equity upheld the denial in violation of Title IX and its regulations.

1296. Title IX regulations required Columbia to disclose communications directly related to the proceedings to both parties. Columbia's refusal to produce communications that would have revealed Mack Roe's negotiations over evidence submission and Mack Roe's coordination with Jane Roe throughout the proceedings, as established by subpoenaed communications deprived John Doe of evidence directly relevant to his defense and constitutes a regulatory violation and procedural irregularity.

1297. Investigator Kleidman omitted the exculpatory testimony of five eyewitnesses each of whom she determined was credible and forthright, from her investigative report and concealed those statements from the hearing panel, the sanctioning officer, and the appellate panel.

1298. Each of the five witnesses interviewed by Investigator Kleidman corroborated John Doe's account and refuted Jane Roe's. Kleidman omitted this

225

testimony despite her own written determination that it was credible, and despite the fact that it directly addressed the central factual question, whether John Doe was in possession of Jane Roe's phone when the alleged transfer of images occurred.

1299. The phones were easily distinguishable. Jane Roe's had a distinctive multicolored glitter case; John Doe's was a plain black case and all five witnesses saw John Doe with his own phone. Kleidman's deliberate omission of credible exculpatory eyewitness testimony from the investigative record constitutes a direct failure to act in accordance with Columbia's GBM Policy requiring the investigator to synthesize all available evidence including both inculpatory and exculpatory evidence.

1300. Subpoenaed text message communications between Jane Roe and Mack Roe, produced as documents in this action, establish that the integrity of Columbia's GBM proceeding was severely compromised by coordination between Columbia's two key witnesses throughout every phase of the proceeding.

1301. Investigator Kleidman wrote in her investigative report that there was "no evidence of collusion or coordination between Jane Roe and Mack Roe." The subpoenaed communications directly contradict that finding, establishing that Jane Roe and Mack Roe coordinated Jane Roe's complaint filing strategy before submission, coordinated evidence disclosures to investigators, coordinated the fabrication of a medical emergency to adjourn the hearing, discussed the confidential

226

investigative materials in violation of their confidentiality agreements, and celebrated each adverse outcome against John Doe in real time.

1302. Jane Roe further lied to Columbia's hearing chair under direct questioning stating she had no communications with Mack Roe related to the GBM case after May 2023 when the subpoenaed communications establish she had extensive communications with Mack Roe about the confidential investigative materials in August 2023. Kleidman's finding of "no evidence of collusion or coordination" was demonstrably erroneous.

1303. Each of the foregoing procedural irregularities including Columbia's denial of a good cause medical adjournment requested by John Doe, and Columbia's granting of a medical adjournment to Jane Roe without good cause, Mack Roe's unauthorized hearing participation, Dean Alonso's undisclosed conflict of interest, Dean Evers' qualification violation, the investigator-engineered interim discipline and double-counting, the exulpatory evidence withholding, the omission of credible exculpatory eyewitness testimony, the investigative record's false finding of no witness coordination ran in the same directions, withholding of exculpatory evidence from John Doe: consistently disadvantaging John Doe as the male respondent and consistently advantaging Jane Roe as the female complainant.

1304. Viewed against the backdrop of the immense contemporaneous institutional pressure described above, this one-directional pattern of procedural

227

deviations supports more than a minimal plausible inference that gender was a motivating factor in Columbia's disciplinary decision.

1305. As fully described above with pertinent examples detailed below, Columbia committed numerous evidentiary and procedural deviations and missteps throughout the disciplinary process indiciative of sex-bias.

1306. The erroneous outcome is further supported by the profound evidentiary weakness of the two categories of evidence Columbia relied on most heavily to find John Doe responsible  secret audio recordings submitted by Mack Roe and an apology letter authored by John Doe Both were fundamentally unreliable. Columbia's reliance on them despite documented reliability concerns constitutes an independent basis for finding that the outcome was erroneous under *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994), which requires only that the allegations cast articulable doubt on the accuracy of the outcome.

1307. Columbia's own investigators acknowledged that the secret recordings could not be authenticated.

1308.  Columbia informed John Doe that it was unable to authenticate the recordings and unable to determine whether they had been edited in whole or in part prior to submission.

1309. The recordings were objectively incomplete.

**Deleted:** .

1310. Secret Recording No. 1 was missing 2 minutes and 30 seconds of audio, Secret Recording No. 2 was missing 30 minutes and 30 seconds of audio, and two additional recordings of the relevant calls were missing altogether. The recordings had no timestamps. Parts were unintelligible.

1311. Mack Roe himself admitted to John Doe that he had edited the recordings and excluded portions he acknowledged would be "helpful" to John Doe's defense meaning Mack Roe affirmatively removed exculpatory content before submission.

1312. Mack Roe further refused to submit the recordings at all until Columbia agreed to assign him a Columbia-funded attorney advisor  a negotiated exchange that directly compromises the independence and reliability of the evidence.

1313. An investigator operating impartially would not have relied on selectively edited, unauthenticated, secretly obtained recordings submitted by a witness who admitted editing them and who negotiated the terms of their production.

1314. Columbia also relied on John Doe's handwritten apology letter and apology text as evidence "consistent with Jane Roe's account of events." This reliance was erroneous for three independent reasons. First, both communications were coerced  Mack Roe told John Doe he "had no choice" but to send the apology text, threatened him with a false complaint if he refused, and demanded the

229

handwritten letter as a prerequisite to Jane Roe not proceeding with sexual misconduct allegations.

1315. First, Coerced statements are not reliable evidence of guilt and are inadmissible under Columbia's GBM Policy.

1316. Second, both apologies were for "breaking Jane Roe's trust" by disclosing to Mack Roe that Jane Roe had sent John Doe explicit photographs of herself not admissions of stealing those photographs and not consistent with Jane Roe's allegations against John Doe.

1317. Third, the handwritten letter was submitted to Columbia by Mack Roe without John Doe's knowledge or consent, in direct violation of John Doe's explicit instructions not to share it meaning Columbia relied on evidence obtained through a third party's unauthorized disclosure of a private communication.

1318. Fourth, Jane Roe informed Columbia during the proceedings that Jane Roe never saw the apology letter authored by John Doe.

1319. Columbia's characterization of these coerced, contextually misread, and improperly obtained communications as evidence of guilt reflects the same one-directional interpretive bias that infected every other aspect of its investigation.

1320. Columbia's finding of responsibility against John Doe thus rested on unauthenticated recordings that Columbia itself could not verify were unedited, that were admittedly missing approximately 30 minutes of content, that were submitted

230

by a witness who admitted editing them and who negotiated their production; and on apology communications that were coerced under threat, misread as admissions of conduct they did not address, and in the case of the handwritten letter obtained through unauthorized disclosure.

1321. No finding of responsibility supported by this evidentiary record could survive scrutiny under the preponderance of the evidence standard and Columbia's acceptance of this evidence without authentication, without addressing the documented editing, and without investigating the coercion John Doe reported constitutes the kind of evidentiary weakness that casts articulable doubt on the accuracy of the outcome within the meaning of *Yusuf*, 35 F.3d at 715.

1322. The *Yusuf* standard requires only that a plaintiff allege specific facts casting articulable doubt on the accuracy of the outcome. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The following allegations do not merely assert disagreement with Columbia's findings. They identify, with specificity, the documented evidence that proves Columbia found John Doe responsible for an offense that the evidence failed to establish not only as to the purpose of the act, but as to the act itself.

1323. Columbia charged John Doe with sexual exploitation under its GBM Policy. Columbia's GBM Policy defines sexual exploitation as the non-consensual abuse or exploitation of another person's sexuality "for the purpose of sexual

231

gratification, financial gain, personal benefit or advantage, or any other illicit purpose."

1324. Columbia's GBM Policy further specifies that non-consensual streaming, sharing, or distribution of images of nudity without the knowledge and affirmative consent of all participants constitutes sexual exploitation. Under Columbia's own GBM Policy, two independent elements must each be established by a preponderance of the evidence to sustain a finding of sexual exploitation: first, that the act itself occurred that John Doe accessed Jane Roe's phone and sent himself explicit images without her consent; and second, that the act was committed for the purpose of sexual gratification, financial gain, personal benefit, or another illicit purpose. Columbia failed to prove either element by the required preponderance of the evidence.

1325. As to the act itself, Columbia's finding that John Doe was in possession of Jane Roe's phone and used it to send himself explicit images was directly and specifically contradicted by physical evidence in Columbia's own evidentiary record.

1326. Jane Roe took a photograph at 11:47 PM showing that she was in possession of her own phone at that time. At 12:50 AM Jane Roe took a photograph of John Doe sitting on the couch engaged with his own phone with two eyewitnesses

visible in the background demonstrating that John Doe was using his own phone at 12:50 AM.

1327. At 12:50 AM Jane Roe also took a series of additional photographs of party guests, demonstrating that Jane Roe was in continuous possession of her own phone throughout the period she claimed John Doe possessed it.

1328. Despite Jane Roe telling investigators that she was not in possession of her phone throughout the night and that John Doe was in possession of her phone during those times, these timestamped photographs taken by Jane Roe herself prove that she was in possession of her phone at 11:47 PM and at 12:50 AM, during the precise period she claimed John Doe had taken it.

1329. The physical distinction between the two phones made this evidence unambiguous. Jane Roe testified that at the time in question her phone had a bright, flamboyant case with pink, orange, yellow, green, and blue stripes and glitter inside. John Doe's phone had a plain black case. The phones were easily distinguishable by anyone present at the party. All five eyewitnesses whom Investigator Kleidman interviewed and whom Kleidman's own written determination found credible and forthright stated that they observed John Doe with his own plain black phone throughout the night, not with Jane Roe's multicolored glitter-cased phone.

1330. Columbia therefore found John Doe responsible for the act itself, accessing Jane Roe's phone and transferring explicit images without any affirmative

233

evidence that the act occurred, in the face of timestamped photographs, five credible eyewitness accounts, and John Doe's own contemporaneous denial on the record, all of which directly contradict the central factual finding.

1331. As to the purpose of the act, Columbia's own investigator conceded that she could not find evidence of illicit purpose. Investigator Kleidman wrote in her recommended findings that the investigative team "had to determine whether at the time John Doe sent the picture and videos to his cellphone, he did so for the purpose of sexual gratification, financial gain, personal benefit or advantage of any other illicit purpose." Kleidman then wrote that the investigative team "could not conceive of a legitimate reason" for John Doe to have accessed or shared the pictures with himself, and on that basis alone concluded that the act was done for an illicit purpose. This reasoning is circular and constitutes no evidence of purpose whatsoever. The inability to conceive of a legitimate reason is not the same as evidence of an illicit one. Columbia's own GBM Policy requires proof by a preponderance of the evidence that the act was committed for a specific identified purpose sexual gratification, financial gain, personal benefit, or another illicit purpose. Columbia identified none of these. Columbia produced no evidence of John Doe's motive or intent. Columbia substituted a gender-biased assumption for the evidentiary showing the policy requires.

234

1332. Columbia's own investigator conceded, in writing, in the official investigative report, that there was insufficient evidence to establish the purpose element of the charged offense.

1333. Columbia nonetheless found John Doe responsible. Columbia applied the preponderance of the evidence standard to evidence that, by its own investigator's admission, did not exist.

1334. The accuracy of the outcome is further undermined by the fact that the entire evidentiary foundation of the proceeding was compromised by the documented, two-year course of coordinated conduct between Jane Roe and Mack Roe throughout every phase of the GBM proceeding against John Doe.

1335. Furthermore, throughout the GBM Investigation John Doe pointed to relevant, objective, and uncontroverted evidence showing that he was not in possession of Jane Roe's phone during the time that the transfer of explicit images took place.

1336. John Doe pointed to relevant, objective, and uncontroverted evidence that directly contradicted Jane Roe's  testimony that Columbia improperly relied upon to find John Doe responsible.

1337. John Doe pointed to relevant, objective, and uncontroverted evidence that directly contradicted Columbia's factual findings.

235

1338. John Doe pointed to relevant, objective, and uncontroverted photo and video evidence that firmly established that Jane Roe was in possession of her phone when the transfer of the explicit images and videos took place.

1339. The Hearing Panel chose to credit Complainant's implausible claim that she "was not in control of her phone" throughout the night of the party, and during the time when the transfer of explicit photo and videos took place despite the clear photo and video evidence to the contrary.

1340. Columbia ignored evidence that established that John Doe was not in possession of Jane Roe's phone when the transfer of the explicit images and videos took place.

1341. In spite of the relevant, objective, and uncontroverted evidence that John Doe 1 pointed to, Columbia found him responsible for violating the Gender-Based Misconduct Policy.

1342. Columbia ignored evidence that Complainant violated the Gender-Based Misconduct Policy.

1343. Columbia's actions, including the imposition of a wildly disproportionate sanction on John Doe, were motivated by his male gender.

1344. If a male student had harassed a female student for sex, sent her explicit pictures and videos of his genitalia without her permission or consent, prevented her from leaving his apartment when she tried to leave, and made coercive and

236

extortionary demands of her, Columbia would not have suspended the female student, yet that is exactly what happened to John Doe.

1345. Incredibly, the evidence obtained and presented in this case substantially favored John Doe's narrative and version of events yet, Columbia reached a conclusion in favor of Jane Roe without any reason based in the evidence.

1346. This erroneous finding was the result of the anti-male, female protectionist gender- biases permeating Columbia's disciplinary process.

1347. Based on its erroneous determination of responsibility motivated by gender bias, Columbia sanctioned John Doe by suspending him for one and a half years, terminating his lease for his off-campus student apartment (his home of 3 years) and ordering him to leave, banning him from University property, restricting him from his gainful University-related on-campus employment of two years, and withholding his academic transcript.

1348. Jane Roe  repeatedly begged John Doe to stay the night at her apartment, take sexy photos of her, and have sex with her and refused to take no for an answer.

1349. Jane Roe repeatedly sexually harassed John Doe.

1350. Jane Roe sent John Doe sexually explicit pictures as videos of herself without John Doe's consent.

1351. On the audio recording that was provided to Columbia, John Doe is heard telling Jane Roe, that he did not send the explicit photos and videos to himself from Jane Roe's phone.

1352. Columbia impermissibly delayed completing the disciplinary process related to John Doe's and Jane Roe's allegations.

1353. Investigator Kleidman inexplicably delayed the disciplinary process.

1354. Investigator Kleidman refused to conduct requested follow up interviews that would have impacted Complainant's credibility.

1355. The Hearing Panel did not ask John Doe any questions about his allegations against Jane Roe.

1356. The Hearing Panel did not question Investigator Kleidman or Ashcroft

1357. The Hearing Panel's disinterest in the truth was predetermined.

1358. Investigator Kleidman and Ashcroft did not attend the Hearing.

1359. Several Columbia administrators directly involved in the disciplinary process are attorneys.

1360. Despite their professional training, these administrators allowed the disciplinary process to proceed unchecked against the evidentiary and procedural errors.

1361. The evidentiary and procedural errors occurred because of John Doe's male gender.

238

1362. In response to a spate of recent bad press, Columbia sought to appear responsive to allegations by female students.

1363. Specifically, Investigator Kleidman made it her mission to use John Doe's case as vindication for various attacks against her by survivor advocates.

1364. Columbia could not afford to have another female "victim" pillory them in a public forum.

1365. Columbia also feared public campus activism and a Title IX lawsuit from Jane Roe if they did not find John Doe responsible.

1366. Thus, Columbia adopted a policy of bias favoring female students over male students in order to avoid liability and bad publicity.

1367. Such behavior constitutes illegal sex discrimination.

1368. As a result of its stated efforts to change its response to alleged gender-based misconduct in the face of increased litigation exposure and public scrutiny, Columbia ignored the relevant, objective, and uncontroverted evidence proving John Doe's innocence in order to find him responsible for sexual misconduct.

1369. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

1370. John Doe, when interviewed by Columbia investigators, pointed to witness statements, multiple videos, and several photos from the night of the incident

239

showing John Doe that did not have Jane Roe's phone and that Jane Roe was, in fact, in possession of her phone during the time that she alleged that the nonconsensual transfer of intimate images occurred.

1371. Neither Columbia nor Jane Roe has denied the authenticity of the photographs, videos presented as evidence.

1372. Despite clear and uncontroverted evidence to the contrary, as well as Columbia's own admission, that there was insufficient evidence to prove the necessary elements required by Columbia's Policy to substantiate the charge against John Doe, Columbia determined that John Doe had gained unauthorized access to Jane Roe's cell phone and sent himself sexually explicit images from Jane Roe's phone without her knowledge and affirmative consent "for an illicit purpose" and found John Doe "responsible" for sexual exploitation of Jane Roe.

1373. There was not a preponderance of the evidence or any that supported Columbia's finding of responsibility for sexual exploitation against John Doe.

1374. There was no evidence whatsoever that that supported Columbia's finding of responsibility against John Doe for sexual exploitation against Jane Roe.

1375. The discipline of a 3-semester suspension was erroneously imposed. The allegation in Jane Roe's case for which John Doe was found responsible involved Jane Roe intending to hook up with John Doe and seduce him for a sexy photoshoot.

240

1376. Gender bias was a motivating factor behind the erroneous responsibility finding against John Doe resulting in the three-semester suspension.

1377. Columbia demonstrated an anti-male gender bias in accepting the account of Jane Roe by erroneously reaching the conclusions that John Doe sexual exploited Jane Roe by gaining access to her phone and camera roll and sending himself explicit pictures from her phone to his without her consent.

1378. The investigative report and the hearing panel treated the female complainant Jane Roe as the victim, presumed the female was telling the truth, and viewed as the male respondent John Doe as a predator who had sexually exploited Jane Roe.

1379. Gender bias is implicit in the foregoing, reflecting Columbia's gender biased victim-centered procedures and Columbia's gender biased campus culture.

1380. A "dubious [disciplinary] decision . . . taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" supports "an inference that a university is biased based on sex." Doe v. Univ. of Arkansas, 974 F.3d 858, 865 (8th Cir. 2020). This is especially the case here as Columbia refused to permit, let alone investigate John Doe's complaints against Jane Roe which were wholly corroborated by the evidence submitted. Further, Columbia's adjudication of this case, as with the others, was marred by

gender bias via cherry-picking evidence and a faulty finding of credibility for female complainant and against male John Doe.

1381. As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decisions, , expungement of John Doe's transcript of the disciplinary record, and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe.

1382. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries, and other direct and consequential damages.

1383. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction vacating John Doe's disciplinary findings and decisions, expungement of John Doe's transcript of the disciplinary record and enjoining future violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints against John Doe.

**<u>SECOND CAUSE OF ACTION:</u>**
**(Selective Enforcement and Violation Of Title IX Of The Education Amendments of 1972)**

1384. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1385. A selective enforcement claim under Title IX asserts that regardless of the student's guilt or innocence, the decision to initiate proceedings, the manner in which those proceedings were conducted, or the severity of the penalty imposed was affected by the student's gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

1386. A plaintiff must plead specific facts supporting a minimal plausible inference that gender was a motivating factor in the institution's disciplinary decisions. *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

1387. John Doe and Jane Roe were similarly situated in that each was accused of committing sexual misconduct against the other under Columbia's GBM Policy.

1388. John Doe was accused by Jane Roe of sexual exploitation, and Jane Roe was accused by John Doe of sexual harassment both arising from the same incident, involving the same parties, on the same night, and governed by the same GBM Policy.

**Deleted:** John Doe and Jane Roe were similarly situated male and female students.

243

1389. Jane Roe's conduct toward John Doe on the night of April 23-24, 2022 constituted sexual harassment under Columbia's GBM Policy.

1390. Jane Roe made repeated unwanted sexual comments to John Doe throughout the night, persistently asked him to take explicit photographs of her despite his repeated refusals, sent John Doe unsolicited explicit photographs and videos of herself without his affirmative consent, propositioned John Doe for sex multiple times, and refused to accept his repeated rejections. John Doe declined Jane Roe's sexual advances each time. This course of unwanted, repeated, sexually explicit conduct directed at John Doe constitutes sexual harassment under Columbia's GBM Policy.

1391. John Doe formally reported Jane Roe's sexual harassment to Columbia's investigators multiple times throughout the investigation and Columbia's investigators were provided with documented evidence of Jane Roe's conduct including John Doe's account of events corroborated by eyewitness testimony and physical evidence including a screenrecording.

1392. John Doe was not required to make a formal complaint online with Columbia's GBMO regarding Jane Roe's sexual harassment of John Doe for Columbia to investigate Jane Roe's Sexual Harassment of John Doe.

1393. All Columbia administrators involved in John Doe's proceedings were mandatory reporters.

244

1394. Columbia's mandatory reporting policy provides that "All Columbia University employees have a Duty to Report any instance or allegation of prohibited conduct - discrimination, harassment, retaliation or gender-based misconduct - that involves any **undergraduate or any graduate student**. Columbia employees are required to report any information that they learn about or observe."

COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

**OFFICE OF INSTITUTIONAL EQUITY**    Report an Incident · Blue Folder · Staff Maxient Log in

About ▾    Divisions ▾    Policies    Resources

Home    Mandatory Reporters and Witnesses

## Mandatory Reporters and Witnesses

### Frequently Asked Questions

#### How do I know if I am a mandatory reporter?

All Columbia University community members who experience or witness prohibited conduct are strongly encouraged to report it.

All Columbia University employees have a Duty to Report any instance or allegation of prohibited conduct - discrimination, harassment, retaliation or gender-based misconduct - that involves any **undergraduate or any graduate student**. Columbia employees are required to report ☑ any information that they learn about or observe.

**Screenshot of Columbia University's Mandatory Reporting Policy**

1395. All of Columbia's administrators involved in John Doe's GBM proceedings were employees of Columbia and had a duty to report and investigate John Doe's allegations of sexual harassment of John Doe.

1396. None of Columbia's administrators involved in John Doe's GBM proceedings reported or investigated John Doe's allegations of sexual harassment of John Doe.

245

1397. Columbia declined to charge Jane Roe with sexual harassment, or any other sexual misconduct and charged her instead with a single count of retaliation, which Columbia refused to impartial investigate.

1398. Columbia simultaneously investigated John Doe for sexual exploitation based on Jane Roe's complaint, found him responsible after a full investigative and adjudicative process, and imposed a three-semester suspension, a ban from campus, loss of employment, and loss of his full tuition scholarship.

1399. John Doe and Jane Roe were therefore similarly situated each accused of sexual misconduct against the other under the same GBM Policy arising from the same incident.

1400. Columbia subjected the male accused of sexual misconduct  to a full investigation, a formal hearing, a finding of responsibility, and severe sanctions.

1401. Columbia refused to investigate the female accused of similar misconduct. The only material variable in Columbia's differential response was the gender of the accused party.

1402. Columbia's refusal to investigate Jane Roe for sexual harassment despite John Doe's formal complaint and documented evidence, while simultaneously subjecting John Doe to the full weight of its disciplinary machinery on Jane Roe's complaint, supports a plausible inference that gender was a motivating factor in Columbia's selective enforcement of its GBM Policy.

246

1403. Both Jane Roe and John Doe were both students at Columbia, under the same student policies specifically the GBM policy's Confidentiality Policy.

1404. Columbia enforced the Confidentiality Policy against John Doe, barred him from discussing the disciplinary process with other students, and charged him with violating it.

1405. Columbia did not enforce the Confidentiality Policy against Jane Roe and permitted Jane Roe the Complainant to discuss the disciplinary process freely with other students without fear of reprisal.

1406. When Jane Roe gave vague descriptions of alleged misconduct, it was broken into 2 separate charges against John Doe.

1407. When John Doe gave detailed descriptions and actual evidence of multiple instances of sexual misconduct by Jane Roe they only charged her with 1 charge of retaliation of which they refused to impartially investigate.

1408. Columbia did not investigate Jane Roe for sexual harassment or retaliation despite her making knowingly false statements to Columbia's investigators, the sanctioning officer, and appellate panel.

1409. Columbia did not investigate Complainant for sexual harassment or retaliation despite being informed of evidence that she sexually harassed John Doe, coerced him, and retaliated against him for not meeting her pre-complaint demands.

247

1410. Columbia's Gender-Based Misconduct Policy explicitly prohibits any student from making false statements to Columbia administrators during a GBM proceeding.

1411. Jane Roe made the following documented false statements to Columbia administrators during the GBM proceeding against John Doe:

1412. During her investigative interview Jane Roe lied to Investigator Kleidman, stating that she was not in possession of her phone throughout the night of April 23-24, 2022. This statement was directly refuted by photographic evidence including photographs taken by Jane Roe herself at 11:47 PM and 12:50 AM showing Jane Roe in possession of her phone during the period she claimed not to have it.

1413. During her investigative interview Jane Roe lied to Columbia, stating that Mack Roe had not given her any guidance or advice on what actions to take with respect to her allegations against John Doe or the GBM proceeding. Subpoenaed text message communications establish that Mack Roe was advising Jane Roe on evidence submissions, witness strategy, and adjournment tactics throughout the proceeding.

1414. At the GBM hearing Jane Roe was directly asked by the hearing chair whether she had any communications with Mack Roe related to the GBM case after May 2023. Jane Roe flatly lied to the hearing chair, stating that she "did not have

248

any communications with Mack Roe after May of 2023 in relation to the GBM Case." Subpoenaed text message communications establish that Jane Roe had extensive communications with Mack Roe about the confidential investigative materials in August 2023 in direct violation of her confidentiality agreement and in direct contradiction of her statements to the hearing chair.

1415. In her written response to John Doe's appeal submitted to the appellate panel, Jane Roe falsely stated that John Doe had been found responsible for retaliating against her. John Doe was never charged with, accused of, or found responsible for retaliating against Jane Roe.

1416. Jane Roe's false statement to the appellate panel was so demonstrably incorrect that Columbia's own Title IX Coordinator Marjory Fisher agreed to issue curative instruction to the appellate panel to disregard it acknowledging on the record that the statement was false.

1417. Columbia had actual knowledge of many of Jane Roe's false statements described above. Columbia was present for Jane Roe's investigative interviews, presided over the GBM hearing at which Jane Roe lied to the hearing chair under direct questioning, distributed Jane Roe's false appellate statement to the panel, and issued curative instruction acknowledging the falsity of Jane Roe's appellate statement. Despite this actual knowledge, Columbia took no disciplinary action

249

against Jane Roe for any of these false statements did not charge her, did not investigate her, and did not impose any sanction on Jane Roe.

1418. Columbia simultaneously found John Doe not credible throughout the proceedings, characterized his account as inconsistent and unreliable, and imposed a three-semester suspension in part based on a credibility determination that favored Jane Roe over John Doe.

1419. Columbia's decision to credit Jane Roe's account over John Doe's while simultaneously ignoring Jane Roe's documented false statements to investigators, to the hearing chair, and to the appellate panel reflects the same asymmetric application of its GBM Policy that infected every other aspect of this proceeding.

1420. A female complainant who lied to investigators, lied to the hearing chair under direct questioning, and made false statements to the appellate panel was found credible and protected from disciplinary consequences.

1421. A male respondent whose account was corroborated by five eyewitnesses and physical evidence was found not credible and sanctioned with a three-semester suspension. The only variable was gender.

1422. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

250

1423. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**THIRD CAUSE OF ACTION:**
**(Retaliation and Violation Of Title IX Of The Education Amendments of 1972)**

1424. John Doe incorporates all other paragraphs in this Complaint by reference as though fully written here.

1425. Title IX prohibits retaliation against any individual for exercising rights protected under Title IX, including participating in a sexual misconduct proceedings as a respondent, and asserting rights within that proceeding.

1426. John Doe's protected activity under Title IX consisted of his participation as a respondent in Columbia's Gender-Based Misconduct proceeding initiated against him, and his exercise of the specific rights afforded to respondents under Title IX and Columbia's GBM Policy throughout that proceeding.

1427. As a respondent formally accused of sexual misconduct, John Doe had a protected right to participate in the investigative and adjudicative process, to contest the allegations against him, to assert procedural rights, to challenge evidence, to file counter-complaints, and to appeal adverse findings.

251

1428. Columbia had actual knowledge of each instance of John Doe's protected participation at the time it occurred.

1429. John Doe's protected participation in Columbia's GBM proceeding included the following specific acts, each of which Columbia was aware of at the time:

1430. On May 5, 2022, John Doe received formal notice of Jane Roe's sexual exploitation allegations and became an official respondent in Columbia's Gender-Based Misconduct proceeding governed by Columbia's GBM Policy. From that date forward, John Doe's participation in the GBM proceeding as a respondent constituted protected activity under Title IX.

1431. On August 10, 2022, John Doe participated in his initial investigative interview with Investigator Kleidman and Director Walsh, maintained his innocence, contested Jane Roe's allegations, and asserted his right to a fair and impartial investigation all in his capacity as a respondent in Columbia's GBM proceeding.

1432. On January 5, 2023, John Doe participated in a follow-up investigative interview in which he contested the integrity of Mack Roe's recordings, alleged that the recordings were incomplete, edited, and falsified, and asserted his right to a fair investigation constituting protected participation in Columbia's GBM proceeding.

252

1433. On January 10, 2023, John Doe formally reported to Columbia's Deputy Title IX Coordinator and Senior Director of Title IX Investigations Colleen Walsh that he was being racially coerced, blackmailed, and harassed by Mack Roe in connection with Jane Roe's sexual misconduct complaint against him constituting protected participation in Columbia's GBM proceeding.

1434. On February 8, 2023, John Doe exercised his right as a respondent in Columbia's GBM proceeding to file a formal counter-complaint against Jane Roe for sexual harassment and against Jane Roe and for retaliation, coercion, extortion, and falsification of evidence a right expressly provided to respondents under Title IX and Columbia's GBM Policy.

1435. On August 7, 2023, John Doe exercised his right as a respondent in Columbia's GBM proceeding to formally contest the investigative record, submitting a 45-page written response to the Factual Summary in which he identified specific procedural deficiencies, challenged Investigator Kleidman's characterizations of witness statements, contested the reliability of the recordings, and asserted his right to a fair and impartial process.

1436. On April 18, 2024, John Doe exercised his right as a respondent in Columbia's GBM proceeding to appeal Columbia's findings of responsibility and sanctions, filing a 15-page appeal grounded in 21 specific procedural irregularities,

253

decision-maker bias, and the excessiveness of the sanction  the fullest possible exercise of his rights as a GBM respondent.

1437. Columbia retaliated against John Doe for his participation in Columbia's GBM proceeding and his assertion of rights within that proceeding through the following materially adverse actions:

1438. On September 18, 2023  directly following John Doe's 45-page written response contesting the investigative record Investigator Kleidman took adverse action against John Doe submitted two separate complaints against John Doe through Columbia's Center for Student Success and Intervention using a separate Dean's Discipline Process.

1439. On September 23, 2023, Investigator Kleidman took adverse action against John Doe by directing Mack Roe a witness adverse to John Doe's defense in the GBM proceeding to file a separate retaliation complaint against John Doe through the Dean's Discipline process, instructing Mack Roe to file "on his own" due to "policy constraints on how the matter would be addressed."

1440. On November 9, 2023, Columbia's Center for Student Success and Intervention took adverse action against John Doe by finding John Doe responsible based on the complaints Investigator Kleidman had initiated and directed, initially imposing a sanction of a three-semester suspension, a ban from all University property, and eviction from his student housing ,materially adverse actions taken

while John Doe's exercise of his GBM respondent rights was ongoing, and directly caused by Investigator Kleidman's retaliatory use of a parallel disciplinary process against him.

1441. On October 12, 2023, Investigator Kleidman communicated directly with the investigator on John Doe's parallel Dean's Discipline case, disclosed that she had been investigating John Doe in an ongoing GBM proceeding, disclosed that she was recommending he be found responsible, and disclosed that Columbia was pursuing interim discipline against him thereby injecting prejudicial pre-decisional findings from her own GBM investigation into a separate proceeding against John Doe, compounding the retaliatory harm to him as a GBM respondent asserting his rights.

1442. On April 9, 2024 two days before Dean Colgrove issued his GBM Sanction Letter on April 11, 2024, and nine days before John Doe filed his GBM appeal on April 18, 2024 Columbia took adverse action against John Doe through Columbia's Center for Student Success and Intervention ("CSSI") and issued a formal Notice of Allegations to John Doe, charging him with disruptive behavior, harassment, and failure to comply with an unnamed University official.

1443. Columbia thus brought baseless new disciplinary charges and adverse action against John Doe in the precise window between his GBM hearing, his

255

sanction, and his GBM appeal, while he was actively exercising his rights as a GBM respondent.

1444. Columbia took adverse action against John Doe and brought baseless new disciplinary charges against John Doe upon learning John Doe's intent to re-enroll in classes at the conclusion of John Doe's GBM suspension.

1445. Columbia's own Department of Public Safety had already investigated the underlying allegations prior to the issuance of the Notice of Allegations and determined that they were unfounded and that no legitimate basis existed for the charges against John Doe.

1446. Notwithstanding its own Public Safety investigation's finding that the allegations lacked any legitimate basis, Columbia's Student Conduct team formalized the disciplinary charges against John Doe and issued the April 9, 2024 Notice of Allegations pursuing charges against John Doe that its own internal investigative body had already discredited, at the precise moment John Doe was exercising his rights as a GBM respondent.

1447. Thereafter, John Doe sent a formal letter to Claudia Marin Andrade, Columbia's Director of CSSI, requesting that the disciplinary charges be dismissed for lack of merit, on the grounds that Columbia's own Public Safety investigation had found the underlying allegations unfounded and that no legitimate basis existed for the charges.

256

1448.

1449.

1450. On June 5, 2024, Dean James Colgrove imposed a three-semester suspension, a ban from University property, and separation from Columbia as GBM sanctions against John Doe and in doing so took adverse action against John Doe by explicitly citing John Doe's "other disciplinary matter," meaning the Dean's Discipline proceeding that Investigator Kleidman had engineered, as evidence of "prior bad acts" constituting an aggravating factor in the sanction.

1451. By importing the findings of the retaliatory parallel proceeding into the GBM sanction, Columbia compounded the retaliatory harm to John Doe as a respondent who had contested his GBM proceedings at every stage.

1452. On June 10, 2024, five days after the appellate panel denied John Doe's appeal the final act of his participation in Columbia's GBM proceeding Title IX Coordinator Marjory Fisher took adverse action against John Doe and imposed

additional sanctions on John Doe that were not included in Dean Colgrove's sanction and were not authorized by the GBM Policy as consequences of his finding of responsibility, restricting John Doe from his Columbia University employment during his suspension period.

1453. These employment restrictions were imposed without explanation, without any stated basis in the GBM Policy, and in immediate temporal proximity to John Doe's exhaustion of his appellate rights as a GBM respondent making plain that they were a response to his participation in and contestation of the GBM proceeding rather than a legitimate consequence of it.

1454. On August 15, 2024, Columbia's scholarship committee took adverse action against John Doe by permanently revoking John Doe's full tuition scholarship based on Columbia's GBM findings, findings John Doe had formally challenged through every available process as a GBM respondent.

1455. The scholarship revocation was not imposed as part of the sanction Dean Colgrove issued under the GBM Policy, was not appealable, and was imposed permanently and without opportunity for John Doe to be heard despite his being in good standing with all scholarship requirements.

1456. The Scholarship Committee's explicit reliance on Columbia's findings, findings John Doe had continuously contested as a GBM respondent, establishes

258

that the revocation was a direct consequence of his participation in and opposition to Columbia's GBM proceedings.

1457. On September 20, 2024, Columbia took adverse action against John Doe by terminating John Doe's University employment entirely.

1458. John Doe had been employed by Columbia for two years without incident, earning approximately $3,300.00 per month.

1459. John Doe's university employment was independent of his academic studies, unconnected to Jane Roe's allegations, and not a sanction authorized by the GBM Policy or imposed by Dean Colgrove.

1460. The termination was imposed after John Doe had fully exhausted his GBM respondent rights, without justification, and in the same period as the other post-appeal adverse actions constituting retaliatory action against him for his participation in Columbia's GBM proceedings.

1461. The causal connection between John Doe's protected participation in Columbia's GBM proceeding and the plethora of adverse actions taken against him is established by multiple independent bases.

1462. First, the causal connection is established by the close and documented temporal proximity between each exercise of John Doe's rights as a GBM respondent and the adverse action that immediately followed.

259

1463. Second, the causal connection is established by Investigator Kleidman's own explicit statement that John Doe was charged with retaliation against Mack Roe specifically "due to Mack Roe's role as a witness against John Doe and for providing the secret recordings," a direct admission by Columbia's own Title IX investigator that adverse action was taken because of John Doe's participation in the GBM proceeding.

1464. Third, the causal connection is established by Director Walsh's active discouragement of John Doe's counter-complaint before he filed it warning him that Mack Roe would retaliate if he proceeded demonstrating Columbia's awareness of and acquiescence in the retaliatory dynamic.

1465. Fourth, the causal connection is established by the pattern of adverse actions escalating in direct proportion to how vigorously John Doe asserted his rights as a GBM respondent from the engineered Dean's Discipline proceeding when he contested the investigation, to the employment restriction and scholarship revocation after he exhausted his appeal.

1466. Fifth, the causal connection is established by the imposition of employment restrictions, scholarship revocation, and communication prohibitions entirely outside the GBM sanction framework actions that can only be explained as responses to John Doe's participation in and contestation of the GBM proceeding rather than as legitimate disciplinary consequences.

260

1467. Columbia's retaliation against John Doe was carried out by and through its employees and agents acting within the scope of their authority, including Investigator Jamie Kleidman, Senior Director of Title IX Investigations Colleen Walsh, Title IX Coordinator Marjory Fisher, and Dean James Colgrove, each of whom took adverse actions against John Doe in their official capacities and in direct connection with his status as a respondent in Columbia's GBM proceeding.

1468. As a direct and proximate result of Columbia's retaliation against him, John Doe has suffered substantial damages including the permanent revocation of his full tuition scholarship, the loss of University employment income of approximately $3,300.00 per month over the period of his suspension and beyond, the loss of stable housing, the loss of educational opportunities and access to campus, permanent notation on his academic transcript, the impairment of his ability to attend law school and pursue his career aspirations in federal government and child advocacy, and other direct and consequential damages.

1469. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction vacating Columbia's disciplinary findings and decisions, expunging the disciplinary record from John Doe's academic transcript, and enjoining Columbia from further violations of Title IX in connection with the investigation and adjudication of complaints involving John Doe.

**Formatted:** List Number Simple

**FOURTH CAUSE OF ACTION:**
**(Failure to Provide Reasonable Accommodations and Violation of the Americans with Disabilities Act)**

1470. John Doe incorporates all other paragraphs in this Complaint by reference as though fully written here.

1471. Under the Americans with Disabilities Act, it is unlawful for an educational institution to discriminate against an individual on the basis of disability in the full and equal enjoyment of the services, programs, and activities provided by the institution. To state a claim under the ADA, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that the defendant is subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against, by reason of his disability. *Dean v. Univ. at Buffalo Sch. of Med.*, 804 F.3d 178, 187 (2d Cir. 2015).

1472. John Doe is a qualified individual with a disability within the meaning of the ADA. John Doe is diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), and Post-Traumatic Stress Disorder (PTSD). John Doe was diagnosed with ADHD as a small child. Each of these conditions constitutes a physical or mental impairment that substantially limits one or more of John Doe's major life activities within the meaning of the ADA.

1473. John Doe's ADHD substantially limits the following major life activities: his ability to process large volumes of written information in a timely and efficient manner; his ability to stay focused and sustain attention when writing large amounts of information under stress; his ability to follow through on work assignments; his ability to organize tasks and activities; and his ability to avoid distraction when performing tasks requiring sustained mental effort. Stress and anxiety directly exacerbate John Doe's ADHD, making these limitations significantly more severe during high-pressure situations such as responding to a 1,000-plus page disciplinary investigative report.

1474. Columbia University is an educational institution receiving federal funding and is therefore subject to the requirements of the ADA. Columbia received approximately $800 million in annual federal funding during the relevant period.

1475. Columbia had actual knowledge of John Doe's ADHD since April 25, 2022 — the day after the incident giving rise to this proceeding. Columbia had treated John Doe for his ADHD, provided him with academic accommodations for it including reduced courseload and extensions of time on coursework, and John Doe had been registered with Columbia's Office of Disability Services since January 2023 and actively receiving accommodations throughout the period relevant to this claim.

263

1476. On March 1, 2023, John Doe contacted Columbia's Office of Disability Services to request a reasonable accommodation for his disability to assist him in responding to Investigator Kleidman's GBM Investigative Report. Specifically, John Doe requested a 45-day extension of time to review and respond to the Investigative Report. The Investigative Report was over 1,000 pages in length and included exhibits, transcripts, multiple parties and witnesses, and multiple counts of charges. Columbia's GBM Policy required John Doe to write his response himself without outside writing assistance. Due to his ADHD, John Doe required the 45-day extension to fully and meaningfully review and respond to the voluminous report.

1477. Columbia's Office of Disability Services evaluated John Doe's request and determined that his request for a 45-day extension was reasonable given John Doe's disabilities and the length of the Investigative Report. Columbia's ODS communicated to John Doe that his requested accommodation was reasonable.

1478. However, Columbia's Office of Disability Services further informed John Doe that it was unable to provide the accommodation because Investigator Kleidman had personally objected to John Doe's accommodation request and refused to accept ODS's recommendation. Investigator Kleidman informed Columbia's ODS that the Gender-Based Misconduct Office would not honor ODS's recommended accommodation. Columbia's ODS told John Doe that it was in a "difficult position" due to Investigator Kleidman's refusal and that it was unable to provide the requested

accommodations due to the objections of Columbia's Gender-Based Misconduct Office.

1479. John Doe's requested accommodation  a 45-day extension to respond to a 1,000-plus page investigative report he was required to write himself without outside assistance was facially reasonable. Columbia's own ODS concluded it was reasonable. The denial of that reasonable accommodation was not based on any legitimate determination that the accommodation was unreasonable  it was based on Investigator Kleidman's personal objection and the GBM Office's refusal to honor ODS's professional recommendation.

1480. The denial of accommodation impaired John Doe's ability to participate effectively and equally in the GBM proceedings, placed him at a significant disadvantage in preparing his defense, and exacerbated his disability.

1481. Columbia's denial of John Doe's reasonable disability accommodation, through the interference of its GBM Office with the ODS's professional determination, constitutes discrimination against John Doe on the basis of his disability in violation of the ADA. Columbia denied John Doe the opportunity to participate equally in its GBM proceedings by reason of his disability  specifically by refusing to provide a reasonable accommodation that its own disability services office had determined was warranted.

1482. As a direct and proximate result of Columbia's violations of the ADA, John Doe suffered substantial harm including an impaired ability to respond to the disciplinary charges against him, a compromised defense in the GBM proceeding that contributed to an erroneous finding of responsibility, and the resulting consequences of that finding including a three-semester suspension, loss of his scholarship, loss of employment, and permanent notation on his academic transcript.

1483. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**FIFTH CAUSE OF ACTION:**
**(Deliberate Indifference and Violation of Title VI of the Civil Rights Act of 1964)**

1484. Plaintiff John Doe incorporates all other paragraphs in this Complaint by reference as though fully written here.

1485. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities receiving federal financial assistance. An educational institution may be liable under Title VI when it has been deliberately indifferent to peer harassment of a student. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-65 (2d Cir. 2012).

266

**Deleted:** <#>¶ [... [1]]

**Formatted:** Indent: Left:  0.5",  No bullets or numbering

1486. To assert a deliberate indifference claim, a plaintiff must allege: (1) substantial control by the institution over the context in which the harassment occurs; (2) severe and discriminatory harassment; (3) actual knowledge by the institution; and (4) deliberate indifference.

**Formatted:** Font: Times New Roman, Not Bold, Not Italic

1487. John Doe is a and a member of a protected class under Title VI. Columbia University is an educational institution receiving approximately $800 million in annual federal funding and is therefore subject to Title VI.

1488. Mack Roe, a fellow Columbia student who served as a key witness against John Doe in Columbia's GBM proceeding  subjected John Doe to severe, pervasive, and racially discriminatory harassment over a period of more than eight months, beginning in April 2022 and continuing through the duration of Columbia's GBM proceeding. The harassment was directly connected to John Doe's status as a Black man and specifically targeted his participation in the GBM proceeding.

1489. : Mack Roe repeatedly told John Doe that John Doe would face "excessive punishment" by Columbia if Jane Roe filed a claim against him "because John Doe was black."

1490. Mack Roe repeatedly told John Doe that as a "black man" he "did not stand a chance" in proceedings at Columbia. Mack Roe told John Doe that because he was Black his best choice was to admit that he had stolen nude photographs of Jane Roe from her phone effectively pressuring John Doe to falsely confess to the

267

charged conduct based on his race. When John Doe refused to capitulate and stated he would prove his innocence, Mack Roe repeatedly told John Doe that his decision was "stupid" because John Doe was "black." This racial harassment directly affected John Doe's ability to concentrate on his studies and meaningfully participate in the PALS scholarship program.

1491. The racial harassment was severe and pervasive. It was not a single incident or isolated comment it was a sustained course of racially targeted conduct spanning more than eight months that specifically exploited John Doe's race to coerce him into abandoning his defense of false sexual misconduct charges. The harassment was designed to make John Doe believe that his race made a fair proceeding impossible and that his only rational choice was to capitulate to false allegations.

1492. Columbia had substantial control over the context in which the harassment occurred. Mack Roe was a participant in Columbia's GBM proceeding as a witness and, later, as a respondent to John Doe's counter-complaint. His access to John Doe and his ability to harass John Doe in connection with the proceeding was entirely a product of his role in Columbia's institutional disciplinary process.

1493. Columbia had actual knowledge of the racial harassment through the following specific documented reports, each of which was made to a named Columbia administrator with authority to address it:

1494. On January 10, 2023 at 4:00 PM, John Doe met in person with Columbia's Deputy Title IX Coordinator and Senior Director of Title IX Investigations Colleen Walsh and formally reported that he was being racially coerced and harassed by Mack Roe and that the racial harassment had been ongoing for over eight months. Director Walsh acknowledged John Doe's report, told him she "took his report of racial coercion and harassment from Mack Roe seriously," and thanked him for reporting it. Director Walsh was a designated mandatory reporter at Columbia, required to report John Doe's complaint to the appropriate offices. Director Walsh never followed up with John Doe, never initiated any investigation, and never took any action in response to his report.

1495. On April 7, 2024, John Doe submitted a signed written statement to Dean James Colegrove, a senior administrative Dean at Columbia, reporting the racial harassment he had experienced from Mack Roe. Dean Colegrove never followed up with John Doe in response to his report and took no action.

1496. Columbia was repeatedly, willfully indifferent to John Doe's reports of racial harassment and coercion. Not once did Columbia ask or attempt to ask Mack Roe about John Doe's allegations. Columbia did not investigate John Doe's complaints of racial coercion and harassment at any level of its administration despite receiving three separate formal reports from John Doe to three separate named senior administrators. Columbia's complete failure to respond to documented

racial harassment by a participant in its own disciplinary proceeding  a participant Columbia had assigned a Columbia-funded attorney advisor and whose cooperation Columbia had actively solicited was clearly unreasonable in light of the known circumstances.

1497. Columbia's deliberate indifference to the racial harassment permitted it to continue for the full duration of John Doe's GBM proceeding and directly interfered with John Doe's ability to participate in the proceeding, concentrate on his studies, and meaningfully engage with the PALS scholarship program. The racial harassment compounded the harm John Doe suffered from Columbia's biased conduct of the GBM proceeding by exploiting his race to pressure him into abandoning his defense.

1498. As a direct and proximate result of Columbia's deliberate indifference to the racial harassment John Doe suffered, John Doe has suffered substantial damages including impairment of his ability to participate in the GBM proceeding and mount a full defense, emotional distress, humiliation, loss of educational opportunities, and other direct and consequential damages.

1499. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

270

**Deleted:** <#>Under Title VI of the Civil Rights Act of 1964, it is unlawful for an educational institution to discriminate against any individual based on race, color, or national origin in programs or activities receiving federal financial assistance.¶
Plaintiff John Doe is a member of a protected class, specifically, he is a Black man.¶
Mack Roe, a fellow student made repeated statements to Plaintiff that were racially coercive and discriminatory. ¶
Specifically, Mack Roe repeatedly told Plaintiff that as a "black man" he "did not stand a chance" in proceedings at Columbia.¶
Such statements by Mack Roe were discriminatory and created a hostile educational environment for John Doe based on his race.¶
 Mack Roe's repeated racially discriminatory statements to John Doe adversely affected John Doe's enjoyment of educational opportunities at Columbia.¶
John Doe took subsequent action to protect himself from the racial discrimination from Mack Roe.¶
Plaintiff reported the racial coercion and harassment by Mack Roe to Columbia, seeking intervention and resolution under the institution's policies against racial discrimination and harassment.¶
Columbia ignored John Doe's complaints of racial discrimination.¶
Defendant Columbia had an obligation to provide an educational environment free of discrimination and harassment based on race.¶
Defendant Columbia had an obligation to protect John Doe from racial discrimination from Mack Roe and investigate John Doe's complaints of racial coercion and harassment by Mack Roe. ¶
Columbia exhibited  deliberate indifference to the racial discrimination and harassment reported by Plaintiff.¶
Columbia's failure to act on John Doe's complaints permitted the continuation of a racially hostile environment, further violating John Doe's rights under Title VI.¶
The actions and inactions of Columbia, were intentional, willful, and taken in disregard for the protected rights of Plaintiff John Doe.¶
As a direct and proximate result of the Defendants' actions, Plaintiff John Doe has suffered, and continues to suffer, significant emotional distress, humiliation, embarrassment, and other compensatory damages.¶

**Formatted:** Indent: Left:  0.5",  No bullets or numbering

**SIXTH CAUSE OF ACTION**
**(Violation of New York City Human Rights Law)**

Deleted: FIFTH

1500.  John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

1501. Columbia's actions were based upon impermissible discrimination based on John Doe's gender, disability, and race and therefore violated the New York City Human Rights Law (N.Y. City Administrative Code §§ 8-101, et seq.).

1502. Columbia's actions have severely impacted John Doe's major life activities, such as his ability to attend school and receive and education.

1503.  Based upon the foregoing, Columbia discriminated against John Doe in the terms, conditions, and privileges of his school attendance, and the rights and privileges contained therein, in violation of New York City's Human Rights Law by discriminating against John Doe on the basis of his gender, disability, and race.

1504.  As a direct and proximate result of this conduct, John Doe has suffered, and continues to suffer, physical and psychological harm, emotional distress, embarrassment, humiliation, damage to his reputation, and other damages in an amount to be proven at trial.

1505. Columbia's behavior constitutes willful and wanton negligence, recklessness, and a conscious disregard of John Doe's rights in furtherance of protecting their reputation with donors and the press, for which John Doe is entitled to an award of punitive damages in an amount of $50,000,000.

271

1506. John Doe is also entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

**Formatted:** No bullets or numbering

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands judgment against Columbia as follows:

(1)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Columbia awarding John Doe:

    (a)    an injunction vacating John Doe's disciplinary findings and decision, reinstating John Doe to Columbia as a student in good standing, and restoring John Doe to the status quo *ante*, and expunging John Doe's transcript of the disciplinary record, updating/correcting any records pertaining to the disciplinary findings against John Doe that may have been disclosed, reinstating John Doe's scholarship and enjoining any and all future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe and;

    (b)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(2)     on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Columbia awarding John Doe:

(a)     an injunction vacating John Doe's disciplinary findings and decision, reinstating John Doe to Columbia as a student in good standing, and restoring John Doe to the status quo *ante*, and expunging John Doe's transcript of the disciplinary record, updating/correcting any records pertaining to the disciplinary findings against John Doe that may have been disclosed, reinstating John Doe's scholarship, and enjoining any and all future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe and;

(b)     damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

**Formatted:** Normal, Line spacing:  single

(3)     on the third cause of action for violation of  Title IX of the Educational Amendments of 1972 a judgment against Columbia awarding John Doe:

(a)     an injunction vacating John Doe's disciplinary findings and decision, reinstating John Doe to Columbia as a student in good standing, and restoring John Doe to the status quo *ante*, and expunging John Doe's transcript of the disciplinary record, updating/correcting any records pertaining to the disciplinary findings against John Doe that may have been disclosed, reinstating John Doe's scholarship, and enjoining any and all future violations of Title IX in the process of investigating and

adjudicating the sexual misconduct complaint that is the subject of this action against John Doe and;

(b) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(4) on the fourth cause of action for violation of the Americans with Disabilities Act, a judgment against Columbia awarding John Doe:

(a) an injunction vacating John Doe's disciplinary findings and decision, reinstating John Doe to Columbia as a student in good standing, and restoring John Doe to the status quo *ante*, and expunging John Doe's transcript of the disciplinary record, updating/correcting any records pertaining to the disciplinary findings against John Doe that may have been disclosed, reinstating John Doe's scholarship, and enjoining any and all future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action against John Doe and;

(b) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(5) on the fifth cause of action for violation of Title VI of the Civil Rights Act of 1964 a judgment against Columbia awarding John Doe:

274

(a)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(6)    on the sixth cause of action for violation of New York City Human Right's Law a judgment against Columbia awarding John Doe:

(a)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, and punitive damages in an amount of $50,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**DEMAND FOR JURY**

Plaintiff John Doe hereby demands a trial by jury of all issues herein triable by jury.

**Dated: April 23, 2026,**
**New York, New York**

                    **Respectfully Submitted,**
                    **JOHN DOE**


                **By:** _____
                    **John Doe**
                    **PO Box #250050**
                    **New York, New York 10025**
                    **(917) 450-9050**
                    **johndoe.casemail@gmail.com**
                    **Plaintiff,** *Pro Se*

275

Deleted: fifth

Deleted: Right

Formatted: Normal, Line spacing: single

Formatted: Line spacing: single

Deleted: March

Deleted: 14, 2025

Deleted: /s/John Doe

Formatted: Font: Italic